# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA HARRIS, Derivatively on Behalf of ENERGY TRANSFER LP, | § § § § | Civil Action No: |
| Plaintiff, | § § | **VERIFIED UNITHOLDER** |
| | § | **DERIVATIVE COMPLAINT** |
| vs. | § § § | |
| KELCY L. WARREN, THOMAS E. LONG, JOHN W. MCREYNOLDS, MARSHALL S. MCCREA, III, MATTHEW S. RAMSEY, STEVEN R. ANDERSON, RICHARD D. BRANNON, RAY C. DAVIS, MICHAEL K. GRIMM, RAY W. WASHBURNE, and LE GP, LLC, | § § § § § § § § § § | **DEMAND FOR JURY TRIAL** |
| Defendants, | § § § | |
| and, | § § | |
| ENERGY TRANSFER LP, | § § | |
| Nominal Defendant. | § § § § § | |

Plaintiff Donna Harris ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Energy Transfer LP ("Energy Transfer" or the "Company"), submit this Verified Unitholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Energy Transfer with the U.S. Securities and

Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a unitholder derivative action brought in the right, and for the benefit, of Energy Transfer against its officers, directors and the General Partner (defined below) seeking to remedy Defendants' breach of fiduciary duties between February 25, 2017 through the present (the "Relevant Period") and have caused substantial harm to Energy Transfer.

2.      Energy Transfer was founded in 2002 and is based in Dallas, Texas. The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018.  Energy Transfer operates as a subsidiary of LE GP, LLC.

3.      Energy Transfer provides energy-related services in the U.S. and China. The Partnership owns and operates approximately 9,400 miles of natural gas transportation pipelines and three natural gas storage facilities in Texas and approximately 12,200 miles of interstate natural gas pipelines.

4.      Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania.  According to the Partnership's SEC filings, the Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. Additionally, the first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.  The second phase of the project, referred to as Mariner

East 2, began service in December 2018.

5.      On February 13, 2017, the Pennsylvania Department of Environmental Protection ("PADEP") approved water-crossing and sedimentation permits for the Mariner East 2 pipeline, which would transport natural-gas liquids across Pennsylvania to a terminal in Marcus Hook. According to news sources, the permits were believed to be the final regulatory hurdle to begin construction of the pipeline.

6.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Partnership's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Energy Transfer's permits to conduct the Mariner East pipeline project in Pennsylvania were secured via bribery and/or other improper conduct; (ii) the foregoing misconduct increased the risk that the Partnership and/or certain of its employees would be subject to government and/or regulatory action, thereby depreciating the Partnership's unit value; and (iii) as a result, the Partnership's public statements were materially false and misleading at all relevant times.

7.      On November 12, 2019, the Associated Press reported that Energy Transfer's Mariner East pipeline project was under investigation by the Federal Bureau of Investigation ("FBI"). Citing interviews with current and former state employees, the Associated Press reported that the FBI's investigation "involves the permitting of the pipeline, whether [Pennsylvania Governor Tom] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

8.      On this news, Energy Transfer's unit price fell $0.81 per unit, or 6.77%, over the following two trading sessions, closing at $11.16 per unit on November 13, 2019.

## JURSIDICTION AND VENUE

9.    Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) in that Defendants conduct business in this District at the Marcus Hook Complex on the Delaware River in Delaware County and the majority of Defendants' actions and misconduct occurred within this District.

11.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

### A.    Plaintiff

12.    Plaintiff Donna Harris is, and at all relevant times has been, a unitholder of Energy Transfer.  Plaintiff purchased units of Energy Transfer and continues to hold these units to the present.  Plaintiff is a citizen of Florida.

### B.    Nominal Defendant

13.    Nominal Defendant Energy Transfer is a Delaware limited partnership with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. Energy Transfer's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."  Nominal Defendant Energy Transfer is a citizen of Texas.

### Defendant LE GP

14.    LE GP is the general partner of Energy Transfer ("LE GP" or the "General Partner").

15.    Energy Transfer and LE GP are governed by the Company's Partnership

4

Agreement.  Per the Partnership Agreement, the General Partner conducts, directs and manages all activities of the Company.  All management powers over the business and affairs of the Company are exclusively vested in the General Partner.

C.    **Director Defendants**

16.    ***Defendant Kelcy L. Warren*** ("Warren") is a co-founder of the Company and has served as the General Partner's Chairman and Chief Executive Officer ("CEO") since 2007.  He is also the majority owner of the General Partner.  According to the 2018 Form 10-K, as of February 15, 2019, Defendant Warren beneficially owned 241,479,586 of the Company's common units, which represented 9.2% of the Company's outstanding units as of that date.  Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Warren owned approximately $3.63 billion worth of Energy Transfer units.  Upon information and belief, Defendant Warren is a citizen of Texas.

17.    ***Defendant Steven R. Anderson*** ("Anderson") has served as a director of the General Partner since June 2018. He also serves as a member of the General Partner's Audit Committee and Compensation Committee.  According to the 2018 Form 10-K, as of February 15, 2019, Defendant Anderson beneficially owned 1,544,588 of the Company's common units.  Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Anderson owned approximately $23.2 million worth of Energy Transfer units.  Upon information and belief, Defendant Anderson is a citizen of Texas.

18.    ***Defendant Richard D. Brannon*** ("Brannon") has served as a director of the General Partner since March 2016. He also serves as the Chairman of the General Partner's Audit Committee.  According to the 2018 10-K, as of February 15, 2019, Defendant Brannon beneficially owned 188,932 of the Company's common units.  Given that the price per unit of the Company's

common units at the close of trading on February 15, 2019 was $15.05, Defendant Brannon owned approximately $2.84 million worth of Energy Transfer units. Upon information and belief, Defendant Brannon is a citizen of Texas.

19.     **Defendant Ray C. Davis** ("Davis") is a co-founder of the Company and has served as a director of the General Partner since July 2018. He also served as a director of ETO from February 2013 until February 2018. According to the 2018 10-K, as of February 15, 2019, Defendant Davis beneficially owned 87,891,646 of the Company's common units, which represented 3.4% of the Company's outstanding units as of that date. Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Davis owned approximately $1.32 billion worth of Energy Transfer units. Upon information and belief, Defendant Davis is a citizen of Texas.

20.     **Defendant Michael K. Grimm** ("Grimm") has served as a director of the General Partner since October 2018 and serves as a member of the General Partner's Audit Committee and Compensation Committee. He has also served as a director of ETO since December 2005. According to the 2018 10-K, as of February 15, 2019, Defendant Grimm beneficially owned 96,313 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Grimm owned approximately $1.44 million worth of Energy Transfer units. Upon information and belief, Defendant Grimm is a citizen of Texas.

21.     **Defendant Ray W. Washburne** ("Washburne") has served as a director of the General Partner since April 2019. He also serves as a member of the General Partner's Compensation Committee. Upon information and belief, Defendant Washburne is a citizen of Texas.

22.     **Defendant Matthew S. Ramsey** ("Ramsey") has served as the Chief Operating Officer ("COO") of the General Partner since October 2018 and has served as a director of the General Partner since July 2012.  According to the 2018 10-K, as of February 15, 2019, Defendant Ramsey beneficially owned 148,051 of the Company's common units.  Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Ramsey owned approximately $2.22 million worth of Energy Transfer units.  Upon information and belief, Defendant Ramsey is a citizen of Texas.

**Defendant Officers**

23.     **Defendant Thomas E. Long** ("Long") has served as the General Partner's Chief Financial Officer ("CFO") since February 2016 and has served as a director of the General Partner since April 2019.   According to the 2018 10-K, as of February 15, 2019, Defendant Long beneficially owned 141,983 of the Company's common units.  Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant Long owned approximately $2.13 million worth of Energy Transfer units.  Upon information and belief, Defendant Long is a citizen of Texas.

24.     **Defendant John W. McReynolds** ("McReynolds") served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General Partner.  He has also served as a director of the General Partner since August 2005. According to the 2018 10-K, as of February 15, 2019, Defendant McReynolds beneficially owned 27,270,400 of the Company's common units, which represented 1% of the Company's outstanding units as of that date. Given that the price per unit of the Company's common units at the close of trading on February 15, 2019 was $15.05, Defendant McReynolds owned approximately $410.4 million worth of Energy Transfer units.  Upon information and belief, Defendant McReynolds is

a citizen of Texas.

25.     ***Defendant Marshall S. McCrea, III*** ("McCrea") has served as the President and

Chief Commercial Officer ("CCO") of the General Partner since October 2018 and has served as

a director of the General Partner since December 2009.   According to the 2018 10-K, as of

February 15, 2019, Defendant McCrea beneficially owned 1,922,870 of the Company's common

units. Given that the price per unit of the Company's common units at the close of trading on

February 15, 2019 was $15.05, Defendant McCrea owned approximately $28.9 million worth of

Energy Transfer units.  Upon information and belief, Defendant McCrea is a citizen of Texas.

## **AUDIT COMMITTEE CHARTER**

26.     The Audit Committee's charter states in relevant part:

LE GP, LLC (the "Company"), as the general partner of Energy Transfer LP (the
"Partnership"), is responsible for the management of the Partnership. In such
capacity, the Company is responsible for the preparation, integrity and objectivity
of the financial statements of the Partnership and for establishing and maintaining
a system of internal accounting and disclosure controls of the Partnership. It is the
responsibility of the independent auditors to express an opinion as to the
conformance of the Partnership's financial statements with generally accepted
accounting principles based upon their audit. The Audit Committee is a standing
committee of the Board of Directors of the Company (the "Board"). Its primary
purpose is to assist the Board in its oversight of (1) the integrity of the financial
statements of the Partnership, (2) the compliance by the Company and the
Partnership with legal and regulatory requirements, and the Partnership's Code of
Business Conduct and Ethics and Code of Ethics for Senior Financial Officers, (3)
the independent auditor's qualifications and independence and (4) the performance
of the Partnership's internal audit function and independent auditors.

\*   \*   \*

AUTHORITY AND RESPONSIBILITIES

The Audit Committee is empowered to investigate any matter brought to its
attention with full access to all books, records, facilities and personnel[] of the
Company and the Partnership. The

Audit Committee shall have the authority, to the extent it deems necessary or
appropriate to carry out its duties, to retain independent legal, accounting or other

advisors. The Company shall provide the Audit Committee with appropriate funding, as determined by the Audit Committee in its capacity as a committee of the Board, for payment of (1) compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company or the Partnership, (2) compensation to any independent counsel or other advisors engaged by the Audit Committee, and (3) ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties.

In fulfilling their responsibilities, it is recognized that members of the Committee are not fulltime employees of the Company. It is not the duty or responsibility of the Committee or its members to conduct "field work" or other types of auditing, legal, or accounting reviews or procedures. The Company's management is responsible for preparing the Company's financial statements for the Company and the Partnership and the independent auditors are responsible for auditing those financial statements.

Unless he or she believes to the contrary (in which case, he or she will advise the Committee of such belief), each member of the Committee shall be entitled to assume and rely on (1) the integrity of those persons and organizations within and outside the Company that it receives information from and (2) the accuracy of the financial, legal, safety, health and environment, and other information provided to the Committee by such persons or organizations.

The following shall be the usual recurring activities of the Audit Committee to assist the Board in fulfilling the oversight responsibilities described above. The Audit Committee may modify these activities (consistent with the requirements of the SEC and the NYSE) as particular circumstances warrant. Specifically, the Audit Committee shall from time to time as required and otherwise when the Audit Committee deems appropriate:

## **Communication and Reporting**

1. Provide a direct and independent line of communication between the Partnership's internal auditors, its independent auditors, and the Board.

2. Report regularly to the Board regarding any issues that arise with respect to the Partnership's financial statements or other financial information, compliance with applicable laws, rules, regulations, and the Company's Code of Business Conduct and Ethics and Code of Ethics for Senior Financial Officers; the independence and qualifications of the Partnership's independent auditors; and the performance of the Partnership's independent auditors.

*     *     *

**Internal Auditing Function**

11.  Review the appointment and replacement of the senior internal auditing executive.

12.  Review the significant reports to management prepared by the internal auditing function relating to internal controls and management's responses.

13.  Review the internal audit plan and significant changes in planned activities; review significant findings resulting from audits and managements' responsiveness to the findings.

14.  Review the internal auditors' assessment of the effectiveness of, or weaknesses in, internal control systems.

15.  Evaluate the performance and independence of the internal auditors.

16.  Review and discuss with the independent auditor the responsibilities, budget and staffing of the Company's internal audit function.

**Earnings Releases and Earnings Guidance**

17.  Discuss with management earnings press releases (including any use of "pro forma" or "adjusted" non-GAAP information) prior to their release, as well as financial information and earnings guidance provided to analysts and rating agencies.

**Financial Statements**

18.  Review with management and the Partnership's independent auditors:

(a)  The Partnership's annual audited and quarterly financial statements and related footnotes and the independent auditors' report thereon or review thereof, as applicable, including the effect of off-balance sheet structures on the Partnership's financial statements and the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Partnership's annual and quarterly reports to be filed with the SEC prior to the filing of same.

(b)  Recommend to the Board whether the Partnership's annual audited financial statements and accompanying notes should be included in the Partnership's Annual Report on Form 10-K.

(c)  Any significant difficulties or disputes with management encountered by the independent auditors during the course of the audit or interim reviews and any instances of second opinions sought by management.

(d)     Any significant financial reporting issues and judgments made in connection with the preparation of the Partnership's financial statements, including any significant changes in the Partnership's selection or application of accounting principles;

(e)     Any significant findings and recommendations made by the independent auditors with respect to the Partnership's financial policies, procedures and internal accounting controls, together with management's responses thereto and any special steps adopted in light of material control deficiencies;

(f)     The form of opinion the independent auditors propose to render to the Board and the Audit Committee.

(g)     The critical accounting policies and estimates used in preparing the financial statements of the Partnership.

(h)     The effect of regulatory and accounting initiatives.

(i)     Other material written communications between the Partnership's independent auditors and management, such as any management letter or schedule of unadjusted differences.

(j)     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Partnership's independent auditors.

(k)     Any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Partnership's financial statements or accounting policies.

(l)     Any disclosures made to the Audit Committee by the Company's Chief Executive Officer[] and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Partnership's internal accounting and disclosure controls.

(m)     The internal audit function responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.

(n)     Other matters required to be discussed by Statement on Auditing Standards (SAS) No. 61 and SAS No. 100, as the same may be amended in the future, relating to the conduct of the audit, including any difficulties encountered

in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

(o)    Other matters related to the Partnership's interim financial results to be included in the quarterly reports to be filed with the SEC and the matters to be communicated under SAS No. 100, as the same may be amended in the future.

## CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

27.    The Code of Ethics states in relevant part:

[…] Senior Financial Officers of the Company will, to the best of their knowledge and ability:

1.    Act with honesty and integrity, avoiding actual or apparent conflicts of interest with the Company and the Partnership in professional relationships that would likely be viewed as materially impairing the Senior Financial Officer's exercise of judgment on behalf of the Company or the Partnership. Avoid actual or apparent conflicts of interest in all cases unless a specific, case-by-case exception has been made after review and approval of specific circumstances by the Board of Directors. Prohibited conflicts of interests for Senior Financial Officers include significant work for an outside employer, or transactions between the Company or the Partnership and any other enterprise in which the Senior Financial Officer has an interest (other than owning a de minimis amount of publicly traded securities), including those in which a family member of a Senior Financial Officer has an interest.

2.    Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times.

3.    Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies. Although no single individual is expected to know the details of all laws, rules and regulations, it is important to take reasonable steps to ensure familiarity with all such laws, rules and regulations and to know enough to determine when to seek advice or guidance through the retention of qualified legal, financial and accounting experts, or other means.

4.    Respect the confidentiality of information acquired in the course of one's

work except when authorized or otherwise legally obligated to disclose such information.

5.  Not use confidential information acquired in the course of one's work for personal advantage.

6.  Proactively promote and be an example of ethical behavior among employees providing services to the Partnership.

7.  Promptly report to Chairman of the Audit Committee of the Board of Directors any conflict of interest or any conduct that the individual believes to be a violation of law or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such an actual or apparent conflict of interest with the Company or the Partnership.

8.  Carefully review a draft of each periodic report for accuracy and completeness before it is filed with the SEC, with particular focus on disclosures each Senior Financial Officer does not understand or agree with and on information known to the Senior Financial Officer not to be reflected in the report.

9.  Meet with members of senior management, division heads, accounting staff and others involved in the disclosure process to discuss their comments on the draft report.

10. Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared.

11. Consult with the Audit Committee of the Board of Directors to determine whether it has identified any weaknesses or concerns with respect to internal controls.

12. Confirm that neither the Partnership's internal auditors, if any, nor its outside accountants are aware of any material misstatements or omissions in the draft report or have any concerns about the management's discussion and analysis section of the report.

13. Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications, disagreements on accounting matters and violations of any part of this Code.

The Audit Committee of the Board of Directors will assess compliance with this Code, report violations of this Code to the Board of Directors, and, based upon the

relevant facts and circumstances, recommend to the Board of Directors appropriate action. The Audit Committee of the Board of Directors shall approve any waiver or amendment of this Code, and any such waiver or amendment shall be disclosed promptly, as required by law, rule or regulation. A violation of this Code may result in disciplinary action, including termination of employment.

## FALSE AND MISLEADING STATEMENTS

28.     On February 24, 2017, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Partnership's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K"). With respect to the Partnership's corporate governance, the 2016 10-K touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."

29.     The 2016 10-K also noted that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Company's] website." The Code of Business Conduct and Ethics (the "Code") found on Energy Transfer's website stated, in relevant part:

> ***It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.*** It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.  [Emphasis added].

30.     The Code defines a "Sensitive Payment" as the following:

"Sensitive Payments" means both receipt and disbursements whether or not illegal, and include:

a)      ***receipts from or payments to governmental officials or employees***;

b)      commercial bribes or kickbacks;

c)      amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

d)      corporate political contributions; and

e)      payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.   [Emphasis added].

31.     The 2016 10-K also assured investors that Energy Transfer had, presumably in a lawful manner, obtained all applicable permits and other authorizations for the Company's various properties used for conducting its business, and that such permits were valid, stating, in relevant part:

> We believe that we have satisfactory title to or valid rights to use all of our material properties. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business.

> Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business" are constructed on rights-of-way granted by the apparent record owners of the property . . . . Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee.  ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

32.    With respect to the Mariner East pipeline, the 2016 10-K stated, in relevant part:

*NGL Pipelines*

Sunoco Logistics owns approximately 900 miles of NGLs pipelines, primarily related to the Mariner systems in the northeast and southwest United States.

- The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017.

* * *

*NGLs Terminals*

* * *

- *Marcus Hook Industrial Complex*. In 2013, Sunoco Logistics acquired Sunoco, Inc.'s Marcus Hook Industrial Complex . . . . In addition to providing NGLs storage and terminalling services to both affiliates and third-party customers, the Marcus Hook Industrial Complex currently serves as an off-take outlet for the Mariner East 1 pipeline, and will provide similar off-take capabilities for the Mariner East 2 pipeline when it commences operations.

33.    Appended as exhibits to the 2016 10-K were signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), wherein McReynolds and Long certified that "[t]he [2016

10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange

Act of 1934" and that "[t]he information contained in the [2016 10-K] fairly presents, in all

material respects, the financial condition and results of operations of the Partnership."

34.    On February 23, 2018, Energy Transfer filed an Annual Report on Form 10-K with

the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K, as with the 2016 10-K, touted the existence of the Code and its purported applicability to the Company's directors, officers and employees. The 2017 10-K also contained representations substantively identical to those quoted in ¶ 27 above with respect to Energy Transfer's purportedly valid permits obtained for properties used in connection with its business.

35.     With respect to the Mariner East pipeline, Energy Transfer touted 300 miles of liquids pipeline and a pipeline throughput capacity of 70 MBbls/d. In further discussing the Mariner East pipeline and its history, the 2017 10-K touted, in relevant part:

> The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including ETP's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the second quarter of 2018.

36.     Appended as exhibits to the 2017 10-K were signed SOX certifications, wherein Defendants McReynolds and Long certified that "[t]he [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

37.     On May 3, 2018, Energy Transfer issued a press release, entitled "Mariner East 1 Released for Service by Pennsylvania Public Utility Commission," that generally touted the benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local

community, and the Company's resolution of recent regulatory hurdles that had stalled use of the

pipeline. Specifically, that press release stated in relevant part:

> Energy Transfer Partners, L.P. (NYSE: ETP) announced today that its subsidiary, Sunoco Pipeline L.P. (SPLP), received a unanimous vote from the Pennsylvania Public Utility Commission (PUC) to resume operations of its Mariner East 1 pipeline. SPLP has worked diligently with the PUC's I&E Division and their outside experts on the matter for several weeks and is pleased that all investigations concur regarding the safety and integrity of the pipeline. The procedures to resume public utility service on the pipeline will begin immediately.
>
> Mariner East 1 is a major transporter of propane in Pennsylvania, which is ultimately delivered to local communities, providing affordable fuel to heat homes and run businesses. When Mariner East 1 was shut-in as a precautionary measure, there were no issues with the pipeline, which has been safely operating for decades.
>
> Its continued safe operation has now been verified by all parties. Mariner East 1 is part of a larger public utility system including the Mariner East 2 and Mariner East 2X pipelines, which are currently under construction. Mariner East 2 mainline construction is 98% complete and 93% of the HDDs are either complete, in-progress or have been released for restart. Mariner East 2 is a critical energy infrastructure project, not only for Pennsylvania's economy, but for the thousands of people it puts to work every day. The total potential economic impact from all Mariner East construction in Pennsylvania is estimated to be more than $9 billion, supporting approximately 9,500 total jobs each year over six years of construction, with estimated wages of nearly $3 billion. These projects provide an economic boost in the 17 counties where they are located and across the entire Commonwealth.

38.    On December 29, 2018, Energy Transfer issued a press release entitled "Energy

Transfer Announces Mariner East 2 Pipeline Is in Service," which also generally touted the

benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local

community, and the pipeline's availability for interstate and intrastate service. Specifically, that

press release stated in relevant part:

> Energy Transfer LP (NYSE: ET) announced that effective today its Mariner East 2 natural gas liquids (NGLs) pipeline is in service, available for both interstate and intrastate service. The 350-mile NGL pipeline transports domestically produced ethane, propane and butane east from processing plants in Ohio across West Virginia and Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA, where the NGLs are stored for distribution to local,

domestic and waterborne markets.

Mariner East 2 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania. The Mariner East 2X pipeline, which parallels Mariner East 2, is expected to be in service in late 2019. The Mariner East system will provide both operational flexibility and enhanced security of NGL supply from producing areas to key markets in the region and beyond.

According to a 2015 economic impact study by EConsult Solutions, the total impact from the construction of the Mariner East pipelines is estimated to be more than $9.1 billion in Pennsylvania alone. When complete, the projects will have provided more than 9,500 construction jobs per year for six years, with associated earnings totaling more than $2.7 billion.

39.     On February 22, 2019, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K, as with the 2016 10-K and 2017 10-K, touted the existence of the Code and its purported applicability to the Company's directors, officers and employees. The 2018 10-K also contained representations substantively identical to those quoted above with respect to Energy Transfer's purportedly valid permits obtained for properties used in connection with its business, except that the 2018 10-K addressed the Company's properties generally, without reference to subsidiaries.

40.     With respect to the Mariner East pipeline, Energy Transfer touted 670 miles of liquids pipeline and a pipeline throughput capacity of 345 MBbls/d. In further discussing the Mariner East pipeline and its history, the 2018 10-K contained representations substantively identical to those quoted above, again removing references to its subsidiaries' ownership of relevant properties and adding that service for the Mariner East 2 began in December 2018.

41.     Appended as exhibits to the 2018 10-K were signed SOX certifications, wherein Warren and Long certified that "[t]he [2018 10-K] fully complies with the requirements of Section

13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

42.     Finally, on April 23, 2019, Energy Transfer issued a press release, entitled "Energy Transfer Announces Mariner East 1 Pipeline Is Back in Service," which, as with the other press releases discussed herein, generally touted the benefits provided by the Mariner East pipeline and the Company's resolution of recent regulatory hurdles that had stalled use of the pipeline. Specifically, that press release stated in relevant part:

> Energy Transfer LP (NYSE: ET) announced that effective today, Mariner East 1 pipeline has resumed operations. The 350-mile, 8-inch natural gas liquids (NGL) pipeline transports NGLs across Southern Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA. Energy Transfer worked closely with the Pennsylvania Public Utility Commission Bureau of Investigation and Enforcement (BI&E) throughout an extensive three month investigation, through which Energy Transfer confirmed the integrity of the pipeline in the area of West Whiteland Township, Chester County, PA. The investigation also confirmed that at no time was Mariner East 1 ever destabilized in this area.

> Mariner East 1 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania.

43.     The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Partnership's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Energy Transfer's permits to conduct the Mariner East pipeline project in Pennsylvania were secured via bribery and/or other improper conduct; (ii) the foregoing misconduct increased the risk that the Partnership and/or certain of its employees would be subject to government and/or regulatory

action, thereby depreciating the Partnership's unit value; and (iii) as a result, the Partnership's

public statements were materially false and misleading at all relevant times.

## THE TRUE FACTS BEGIN TO BE REVEALED

44.     On November 12, 2019, the *Associated Press* published an article entitled "FBI

eyes how Pennsylvania approved pipeline."  The *Associated Press* article reported in part:

> HARRISBURG, Pa. (AP) — The FBI has begun a corruption investigation into
> how Gov. Tom Wolf's administration came to issue permits for construction on a
> multibillion-dollar pipeline project to carry highly volatile natural gas liquids across
> Pennsylvania, The Associated Press has learned.
>
> FBI agents have interviewed current or former state employees in recent weeks
> about the Mariner East project and the construction permits, according to three
> people who have direct knowledge of the agents' line of questioning.
>
> All three spoke on condition of anonymity because they said they could not speak
> publicly about the investigation.
>
> The focus of the agents' questions involves the permitting of the pipeline, whether
> Wolf and his administration forced environmental protection staff to approve
> construction permits and whether Wolf or his administration received anything in
> return, those people say.

45.     On this news, Energy Transfer's unit price fell $0.81 per unit, or 6.77%, over the

following two trading sessions, closing at $11.16 per unit on November 13, 2019.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

46.     Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties, unjust enrichment and abuse of control by Defendants.

47.     Plaintiff will adequately and fairly represent the interests of the Company and its

unitholders in enforcing and prosecuting its rights and has retained counsel competent and

experienced in derivative litigation.

48.     Plaintiff is a current owner of Energy Transfer Units and has continuously been an

21

owner of the Units during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold the Units throughout the duration of this action and are prepared to do so.

49. During wrongful course of conduct at the Company, the Board consisted of Defendants. Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act as discussed below.

50. Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of his advisory, executive, managerial, and directorial positions with the Company, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

51. Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

52. Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

53. Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's unitholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are

therefore not disinterested parties.

54.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to unitholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

55.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

## DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Warren**

56.     Defendant Warren is not independent or disinterested.  Defendant Warren is a co-founder of the Company and has served as the General Partner's Chairman and CEO since 2007. He is also the majority owner of the General Partner.  As the Company admits, he is a non-independent director.  Defendant Warren was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed or authorized the signing of.  As the General Partner's highest officer and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Warren is a defendant in the securities class action pending in the United States District Court for the Northern District of

Texas (the "Securities Class Action").  For these reasons, Defendant Warren breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Long**

57.    Defendant Long is not independent or disinterested.  Defendant Long has served as the General Partner's CFO since February 2016 and has served as a director of the General Partner since April 2019.  Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant Long with his principal occupation, and he receives significant compensation, including $6,609,967 in 2018 for his services.  As such, Defendant Long is beholden to the General Partner.  As the General Partner's CFO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant Long signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K.  Moreover, Defendant Long is a defendant in the Securities Class Action.  For these reasons, Defendant Long breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Reynolds**

58.    Defendant McReynolds is not independent or disinterested.  Defendant McReynolds served as the President of the General Partner from March 2005 until October 2018 on which date he became Special Advisor to the General Partner.  He has also served as a director

24

of the General Partner since August 2005. As the Company admits, he is a non-independent director. The General Partner provides Defendant McReynolds with his principal occupation, and he receives significant compensation, including $1,422,273 in 2018 for his services. As such, Defendant McReynolds is beholden to the General Partner. As the General Partner's President and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant McReynolds signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant McReynolds is a defendant in the Securities Class Action. For these reasons, Defendant McReynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant McCrea**

59.    Defendant McCrea is not independent or disinterested. Defendant McCrea has served as the President and CCO of the General Partner since October 2018 and has served as a director of the General Partner since December 2009. As the Company admits, he is a non-independent director. The General Partner provides Defendant McCrea with his principal occupation, and he receives significant compensation, including $10,780,120 in 2018 for his services. As such, Defendant McCrea is beholden to the General Partner. As the General Partner's President and CCO, and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion,

bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant McCrea signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant McCrea breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Ramsey**

60.     Defendant Ramsey is not independent or disinterested. Defendant Ramsey has served as the COO of the General Partner since October 2018 and has served as a director of the General Partner since July 2012. As the Company admits, he is a non-independent director. The General Partner provides Defendant Ramsey with his principal occupation, and he receives significant compensation, including $4,400,195 in 2018 for his services. As such, Defendant Ramsey is beholden to the General Partner. As the General Partner's COO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Ramsey signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant Ramsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Anderson**

61.    Defendant Anderson is not independent or disinterested follow.    Defendant Anderson has served as a director of the General Partner since June 2018.  Defendant Anderson has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant Anderson signed, and thus personally made the false and misleading statements in the 2018 10-K.   For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Brannon**

62.    Defendant Brannon is not independent or disinterested.  Defendant Brannon has served as a director of the General Partner since March 2016.  Defendant Brannon has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant Brannon signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons,

27

Defendant Brannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Davis**

63.     Defendant Davis is not independent or disinterested.  Defendant Davis is a co-founder of the Company and has served as a director of the General Partner since July 2018. Defendant Davis has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Davis signed, and thus personally made the false and misleading statements in the 2018 10-K.  For these reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and thus would not cause the General Partner to consider a demand fairly.

**Defendant Grimm**

64.     Defendant Grimm is not independent or disinterested.  Defendant Grimm has served as a director of the General Partner since October 2018.  Defendant Grimm has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Grimm signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Grimm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**Defendant Washburne**

65.     Defendant Washburne is not independent or disinterested. Defendant Washburne has served as a director of the General Partner since April 2019. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Washburne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

**The General Partner**

66.     Defendant LE GP faces a substantial likelihood of liability as a result of its knowing engagement in the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to cause the Company to make false and misleading statements and omissions of material fact to the investors and the general public that falsely represented the Company's performance and value. As the direct beneficiary and the primary controller of the above-alleged scheme, the General Partner benefited at the expense of the Company. As the General Partner breached its fiduciary duties to the

Company, it faces a substantial likelihood of liability, and it is not independent or disinterested, and thus demand on the General Partner is futile.

67.     All the directors on the Board of the General Partner have fiduciary duties to the General Partner, and in controlling the General Partner, they would cause it not to consider a demand fairly because granting the demand would hurt it.

68.     The majority of the Board of the General Partner is not independent or disinterested, as each of them either knowingly or recklessly participated in the conduct alleged herein, in complete abdication of their fiduciary duties to the Company, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the General Partner.

## COUNT I

### Against Defendants for Breach of Fiduciary Duties

69.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

70.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

71.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

72.     In breach of their fiduciary duties owed to Energy Transfer, Defendants willfully or recklessly caused the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and make false and misleading statements and omissions of material fact that failed to disclose that: (i) the construction permits issued in

connection with the Mariner East Pipeline were obtained by the Company through the use of coercion, bribery, or other improper methods; (ii) the use of such improper methods increased the risk that the Company would be subjected to government or regulatory investigations and/or litigation; and (iii) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

73.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

74.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuit, severe damage to the unit price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### COUNT II

### Against Defendants for Unjust Enrichment

75.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

76.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Energy Transfer.

77.    The Defendants either benefitted financially from the improper conduct, including from the receipt of bonuses, unit options, or similar compensation from the General Partner that was tied to the performance or artificially inflated valuation of Energy Transfer, or received

compensation that was unjust in light of the Defendants' bad faith conduct.

78.     Plaintiff, as a unitholder and a representative of Energy Transfer, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

79.     Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## COUNT III

### Against Defendants for Abuse of Control

80.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

81.     Defendants' misconduct constituted an abuse of their ability to control and influence the Company.

82.     As a direct and proximate result of Defendants' abuse of control, the Company sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT IV

### Against Defendants for Waste of Corporate Assets

83.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

84.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public Unit holders, Defendants have caused Energy Transfer to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful

actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

85.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

86.     Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of his fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding Plaintiff judgment on each and every Count;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: January 17, 2020

> KAUFMAN, COREN & RESS, P.C
> By:
> _____
> Deborah R. Gross
> 2001 Market Street, Ste 3900
> Two Commerce Square
> Philadelphia PA  19103
> Email:  dgross@kcr-law.com
>
> **GAINEY McKENNA & EGLESTON**
> Thomas J. McKenna
> Gregory M. Egleston
> 501 Fifth Avenue, 19th Floor
> New York, NY  10017
> Telephone: (212) 983-1300
> Facsimile: (212) 983-0383
> Email: tjmckenna@gme-law.com
> Email: gegleston@gme-law.com
>
> *Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: January 21, 2020

KAUFMAN, COREN & RESS, P.C
By:

Deborah R. Gross
2001 Market Street, Ste 3900
Two Commerce Square
Philadelphia PA  19103
Email:  dgross@kcr-law.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## VERIFICATION

I, DONNA HARRIS, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___17___ day of January 2020.

_DONNA HARRIS_
DONNA HARRIS

JS 44 (Rev 02/19)                    CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| DONNA HARRIS, Derivatively on Behalf of ENERGY TRANSFER LP | KELCY L. WARREN; THOMAS E. LONG; JOHN W. McREYNOLDS MARSHALL S McCREA, III, et al. (SEE ATTACHED) |

**20      364**

(b)  County of Residence of First Listed Plaintiff  Collier County, FL
     *(EXCEPT IN U S  PLAINTIFF CASES)*
     Naples Florida

County of Residence of First Listed Defendant  Dallas County TX
     *(IN U S  PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
       THE TRACT OF LAND INVOLVED

(c)  Attorneys *(Firm Name, Address, and Telephone Number)*

Deborah R Gross, 2001 Market St., Ste  3900, Two Commerce Sq.,
Philadelphia, PA 19103; 215-735-8700

Attorneys *(If Known)*

| II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)* | | III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* |
|---|---|---|

*(For Diversity Cases Only)*

| | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|
| ❏ 1  U S Government Plaintiff | ❏ X Federal Question *(U S Government Not a Party)* | Citizen of This State  ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| ❏ 2  U S Government Defendant | ❏ X 4 Diversity *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State  ❏ X 2 | ❏ X 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| | | Citizen or Subject of a Foreign Country  ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for  Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ X 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & | ❏ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ X 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U S Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

| V.  ORIGIN *(Place an "X" in One Box Only)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| ❏ X 1 Original Proceeding | ❏ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from Another District *(specify)* | ❏ 6 Multidistrict Litigation - Transfer | ❏ 8 Multidistrict Litigation - Direct File |

**VI.  CAUSE OF ACTION**

Cite the U S  Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
28 USC §1332, alleging breach of fiduciary duties by directors

Brief description of cause
of nominal defendant Energy Transfer which does business in this district

| VII.  REQUESTED IN COMPLAINT: | ❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P | DEMAND $ in excess of $150,000 00 | CHECK YES only if demanded in complaint JURY DEMAND:  ❏ X Yes   ❏ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) IF ANY | *(See instructions)*  JUDGE  G A McHugh | DOCKET NUMBER  20-CV-00200 |
|---|---|---|

| DATE  1-21-2020 | SIGNATURE OF ATTORNEY OF RECORD  Israel V /s/ |
|---|---|

JAN 21 2020

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

**HARRIS v. WARRAN, ET AL.**

**ATTACHMENT TO CIVIL COVER SHEET**

**LIST OF DEFENDANTS CONTINUED**

MATTHEW S. RAMSEY
STEVEN R. ANDERSON
RICHARD D. BRANNON
RAY C. DAVIS
MICHAEL K. GRIMM
RAY W. WASHBURNE
LE GP, LLC,

Defendants,

and

ENERGY TRANSFER LP,

Nominal Defendant.

GAM

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

**20    364**

Address of Plaintiff: 772 Grand Rapids Blvd, Naples FL 34120

Address of Defendant: 8111 Westchester Drive, Ste 600 Dallas TX 75225

Place of Accident, Incident or Transaction: EDPA Marcus Hook

---

**RELATED CASE, IF ANY:**

Case Number 20-CV-00200     Judge: McHugh     Date Terminated:

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | Yes | No |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | | ☒ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | ☒ | |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | | |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | | ☒ |

I certify that, to my knowledge, the within case ☒ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE 1-21-20     _____     44542
                 *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify)* _____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☒ 9. All other Diversity Cases
  *(Please specify)* Shareholder derivative

---

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Deborah R Gross , counsel of record *or* pro se plaintiff, do hereby certify

- ☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.
- ☒ Relief other than monetary damages is sought.

DATE 1-21-2020     _____     44542
                   *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38

*Civ. 609 (5/2018)*

JAN 21 2020

*GAM*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

| | |
|---|---|
| DONNA HARRIS, Derivatively on Behalf of ENERGY TRANSFER LP KELCY L. WARREN, et al. | CIVIL ACTION |
| | **20   364** |
| | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)          (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )

| | | |
|---|---|---|
| 02/21/2020 | *Deborah R. Gross* | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-735-8700 | 215-735-5170 | DGross@kcr-law.com |
| | | |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN 21 2020