## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DONNA HARRIS, Derivatively on Behalf of ENERGY TRANSFER LP,<br><br>    Plaintiff,<br><br> vs.<br><br>KELCY L. WARREN, THOMAS E. LONG, JOHN W. MCREYNOLDS, MARSHALL S. MCCREA, III, MATTHEW S. RAMSEY, STEVEN R. ANDERSON, RICHARD D. BRANNON, RAY C. DAVIS, MICHAEL K. GRIMM, RAY W. WASHBURNE, and LE GP, LLC,<br><br>    Defendants,<br><br>  and,<br><br>ENERGY TRANSFER LP,<br><br>    Nominal Defendant. | Index No: 2:20-cv-00364-GAM<br><br>**VERIFIED AMENDED UNITHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Donna Harris ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Energy Transfer LP ("Energy Transfer", the "Partnership" or the "Company"), submits this Verified Amended Unitholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Energy Transfer with the U.S. Securities and Exchange Commission ("SEC"), regulatory filings made by Energy Transfer and Sunoco Logistics Partners LP ("Sunoco") (collectively with Energy Transfer, the "Energy

Transfer Companies"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, communications between the Energy Transfer and the Pennsylvania Department of Environmental Protection ("DEP") and the Pennsylvania Public Utility Commission ("PUC") and other public and non-public information regarding the Energy Transfer.

## I.      NATURE OF THE ACTION

1.      This is a unitholder derivative action brought in the right, and for the benefit, of Energy Transfer against its officers, directors and the General Partner (defined below) seeking to remedy Defendants' (defined below) breach of their duties of good faith that began on or about February 25, 2017 and continued thereafter (the "Relevant Period"), which has caused substantial harm to Energy Transfer.

## II.     JURISDICTION AND VENUE

2.      Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) in that Defendants conduct business in this District and the majority of Defendants' actions and misconduct occurred within this District.

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## III.    PARTIES

### A.      Plaintiff

5.      Plaintiff Donna Harris is, and at all relevant times has been, a unitholder of Energy Transfer.   Plaintiff purchased units of Energy Transfer and continues to hold these units to the

present.  Plaintiff is a citizen of Florida.

**B.**    **Nominal Defendant**

6.    Nominal Defendant Energy Transfer is a Delaware limited partnership with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. Energy Transfer's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."  Nominal Defendant Energy Transfer is a citizen of Texas.

7.    Non-party Sunoco Logistics Partners LP ("Sunoco") is a subsidiary of Nominal Defendant Energy Transfer, having been acquired on or about April 28, 2017.

**C.**    **Defendant LE GP**

8.    LE GP is the general partner of Energy Transfer ("LE GP" or the "General Partner").

9.    Energy Transfer and LE GP are governed by the company's Partnership Agreement.  Per the Partnership Agreement, the General Partner conducts, directs and manages all activities of the Partnership.   All management powers over the business and affairs of the Partnership are vested in the General Partner.

**D.**    **Director Defendants**

10.    ***Defendant Kelcy L. Warren*** ("Warren") is a co-founder of the Partnership and has served as the General Partner's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") since 2007.  He is also the majority owner of the General Partner. According to the 2018 Form 10-K, as of February 15, 2019, Defendant Warren beneficially owned 241,479,586 of the Partnership's common units, which represented 9.2% of the Partnership's outstanding units as of that date.  Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Warren owned approximately $3.63 billion worth of Energy Transfer units.  Upon information and belief, Defendant Warren is

a citizen of Texas.

11.     **Defendant Steven R. Anderson** ("Anderson") has served as a director of the General Partner since June 2018. He also serves as a member of the General Partner's Audit Committee and Compensation Committee.  According to the 2018 Form 10-K, as of February 15, 2019, Defendant Anderson beneficially owned 1,544,588 of the Partnership's common units. Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Anderson owned approximately $23.2 million worth of Energy Transfer units.  Upon information and belief, Defendant Anderson is a citizen of Texas.

12.     **Defendant Richard D. Brannon** ("Brannon") has served as a director of the General Partner since March 2016.  He also serves as the Chairman of the General Partner's Audit Committee.   According to the 2018 Form 10-K, as of February 15, 2019, Defendant Brannon beneficially owned 188,932 of the Partnership's common units.  Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Brannon owned approximately $2.84 million worth of Energy Transfer units.  Upon information and belief, Defendant Brannon is a citizen of Texas.

13.     **Defendant Ray C. Davis** ("Davis") is a co-founder of the Partnership and has served as a director of the General Partner since July 2018.  He also served as a director of Energy Transfer Operating, L.P. ("ETO"), formerly known as Energy Transfer Partners, L.P., from February 2013 until February 2018. According to the 2018 Form 10-K, as of February 15, 2019, Defendant Davis beneficially owned 87,891,646 of the Partnership's common units, which represented 3.4% of the Partnership's outstanding units as of that date.  Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Davis owned approximately $1.32 billion worth of Energy Transfer units.   Upon

information and belief, Defendant Davis is a citizen of Texas.

14.     **Defendant Michael K. Grimm** ("Grimm") has served as a director of the General Partner since October 2018 and serves as a member of the General Partner's Audit Committee and Compensation Committee.   He has also served as a director of ETO since December 2005. According to the 2018 Form 10-K, as of February 15, 2019, Defendant Grimm beneficially owned 96,313 of the Partnership's common units.   Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Grimm owned approximately $1.44 million worth of Energy Transfer units.   Upon information and belief, Defendant Grimm is a citizen of Texas.

15.     **Defendant Ray W. Washburne** ("Washburne") has served as a director of the General Partner since April 2019. He also serves as a member of the General Partner's Compensation Committee.   Upon information and belief, Defendant Washburne is a citizen of Texas.

16.     **Defendant Matthew S. Ramsey** ("Ramsey") has served as the Chief Operating Officer ("COO") of the General Partner since October 2018 and has served as a director of the General Partner since July 2012.   According to the 2018 Form 10-K, as of February 15, 2019, Defendant Ramsey beneficially owned 148,051 of the Partnership's common units.  Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Ramsey owned approximately $2.22 million worth of Energy Transfer units. Upon information and belief, Defendant Ramsey is a citizen of Texas.

17.     **Defendant Thomas E. Long** ("Long") has served as the General Partner's Chief Financial Officer ("CFO") since February 2016 and has served as a director of the General Partner since April 2019.  According to the 2018 Form 10-K, as of February 15, 2019, Defendant Long

beneficially owned 141,983 of the Partnership's common units.  Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant Long owned approximately $2.13 million worth of Energy Transfer units.  Upon information and belief, Defendant Long is a citizen of Texas.

18.     Defendants Warren, Anderson, Brannon, Davis, Grimm, Washburne, Ramsey and Long are collectively referred to herein as the "Director Defendants".

### E.     <u>Defendant Officers</u>

19.     ***Defendant John W. McReynolds*** ("McReynolds") served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General Partner.  He has also served as a director of the General Partner since August 2005. According to the 2018 Form 10-K, as of February 15, 2019, Defendant McReynolds beneficially owned 27,270,400 of the Partnership's common units, which represented 1% of the Partnership's outstanding units as of that date. Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant McReynolds owned approximately $410.4 million worth of Energy Transfer units.  Upon information and belief, Defendant McReynolds is a citizen of Texas.

20.     ***Defendant Marshall S. McCrea, III*** ("McCrea") has served as the President and Chief Commercial Officer ("CCO") of the General Partner since October 2018 and has served as a director of the General Partner since December 2009.  According to the 2018 Form 10-K, as of February 15, 2019, Defendant McCrea beneficially owned 1,922,870 of the Partnership's common units. Given that the price per unit of the Partnership's common units at the close of trading on February 15, 2019 was $15.05, Defendant McCrea owned approximately $28.9 million worth of Energy Transfer units.  Upon information and belief, Defendant McCrea is a citizen of Texas.

21.     The Director Defendants and Defendants McReynolds and McCrea are collectively

referred to herein as "Defendants".

## IV.   **SUMMARY OF FACTS**

22.     Energy Transfer is a natural gas and energy transportation and storage company, operating the largest oil and natural gas pipelines in the United States (*i.e.*, Dakota Access pipeline, the Rover pipeline, and the Mariner East pipeline system).

23.     This derivative case concerns the actions by Defendants to build some of the most hazardous pipelines in the United States; for example, the Revolution, Mariner East 2 ("ME2") and Mariner East 2X ("ME2X") pipelines (altogether, the "Pipeline Projects")—while violating essential rules and regulations created to allow the construction and operation of these pipelines to be safe and to guarantee that citizens' interests are promoted by public officials.  Defendants caused the Partnership to conceal from the market the serious risks posed by the Partnership's approach to building the Pipeline Projects, the Partnership's misconduct in obtaining pipeline permits and intimidating residents as the Partnership built them.  Defendants' actions involved the Partnership applying pressure to Pennsylvania government officials to grant the permits for the ME2 pipeline, with the full knowledge of the risk of drilling in Pennsylvania's mine-riddled and limestone-filled geology.  Defendants caused the Partnership to construct the Pipeline Projects in landslide-prone and sinkhole-prone areas. Defendants also caused the Partnership to hire Pennsylvania constables (in uniform) to intimidate residents who were concerned about the consequences of pipeline construction.  This conduct to complete the Energy Transfer pipelines destroyed communities, created a serious threat to life, and delayed the completion of the Pipeline Projects and resulted in reduced ME2 throughput.

24.     The risk to life created by Defendant's approach to building the Pipeline Projects materialized.  In September 2018, the Revolution pipeline exploded, displacing families and incinerating its surroundings.  During the Relevant Period, ME2's drilling destroyed several lakes,

causing numerous sinkholes that ruined neighborhoods, and hundreds of "frac-outs" (instances where drilling fluids leaked out and threatened private property and water resources). These problems led to regulatory scrutiny, multiple violations and Consent Orders against the Partnership, millions of dollars in fines and penalties, and added delay and costs.

25.     Throughout the Relevant Period, Defendants caused the Partnership to conceal its misconduct from the market by claiming that the Partnership and its subsidiaries had "only" the safety of the local Pennsylvania communities at heart, and that the Partnership abided by a strict Code of Business Conduct and Ethics (the "Code of Conduct").  The Code of Conduct prevented the Partnership's executives from "authorizing payment" for "Sensitive Payments" (which included "payments to government[] officials or employees" and "commercial bribes or kickbacks") "whether lawful or unlawful, designed to secure special treatment for the Partnership Group."

26.     But Defendants caused the Partnership to hide from the market that they had caused the Partnership to hold behind the scenes meetings with state regulators to secure the approval of ME2, and that the Partnership bribed uniformed Pennsylvania constables to intimidate concerned citizens.

27.     The false and misleading statements Defendants caused the Partnership to make on these topics were critical to the market/investors as the Pipeline Projects are a dangerous "triple threat" whose risks needed to be managed to timely and profitably bring the Pipeline Projects online.  The Pipeline Projects are not typical suburban pipelines, carrying gas to heat residential homes and local businesses.  When completed, they will carry highly-explosive natural-gas liquids ("NGLs")—compressed ethane, butane, and propane.

28.     NGLs are not only highly explosive, but also odorless and colorless. If a leak

occurs, a person could not naturally detect it before a minor spark caused a catastrophic explosion. ME2 and ME2X will carry large amounts of NGLs 350 miles, from the Marcellus shale gas fields in western Pennsylvania all the way to the Marcus Hook port approximately 20 miles southwest of Philadelphia.  From Marcus Hook, the chemicals will be transported to Scotland and Scandinavia and then made into pellets and made into plastic.

29.     Building a pipeline in the 21st century on time and with the planned throughput presented a host of serious challenges and risks.  These risks included the difficult geology of Pennsylvania, which contains mine voids.  A mine void is an area of excavation that remains after all rehabilitation of a mine is complete. The geology of Pennsylvania also contains other features besides mine voids making it susceptible to landslides and sinkholes.

30.     The Partnership's plan to use Horizontal Directional Drilling ("HDD") to drill under or through challenging geological or high-density residential areas required thorough consideration of numerous safety and environment-related factors, which included ground stability, drinking water aquifers, and residents' private wells.  Therefore, the plan to build an NGL pipeline required a careful strategy to reduce the life-threatening risks posed by the construction and use of NGL pipelines.

31.     When the Partnership and Sunoco first applied to the DEP for permits to build ME2, the application contained many errors and deficiencies that, by statute, should have led to the permits' immediate rejection.

32.     As recounted in the securities class action, entitled *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.*, Case 2:20-cv-00200-GAM (D. PA) (the "Securities Class Action"), upon information and belief, John Quigley, the former Secretary of the DEP stated that during his tenure from January 2016 through May 2016, Sunoco "wasn't even

close to submitting a complete application" despite constant communications between the DEP and Sunoco about how to do so.  At a March 2016 meeting between Quigley and Sunoco's President Mark Hennigan, the former Secretary read Mr. Hennigan the "riot act" and told Mr. Hennigan that Sunoco was going to have to start over because the application was "so woefully inadequate."  According to the Securities Class Action, and upon information and belief, in Mr. Quigley's words: "They weren't even close to a permit."

33.    For example, absent from the Partnership's permit applications was any recognition that the predicted fatal impacts of accidental releases from the ME2 pipeline could extend up to 2,135 feet from the location of an incident.

34.    In addition, constructing ME2 in Pennsylvania required the Partnership to investigate and understand the geology of the land where ME2 would run.  The Partnership did not conduct this work.  Instead, the Partnership recklessly pushed forward with ME2 as if it were being constructed like the Partnership's pipelines elsewhere.  This was an easily avoidable mistake since it is well-known that Pennsylvania's terrain and geology are full of varying rock and soil formations, including limestone that is prone to sinkholes and other structural disasters.  The result is that the Partnership caused landslides and sinkholes that resulted in serious delays of the Pipeline Projects and eliminated the Partnership's ability to bring the Pipeline Projects online with the claimed initial throughput.

35.    For a company planning to employ HDD through large parts of Pennsylvania's sub-surface rock formations, understanding Pennsylvania's geology was important to preventing catastrophes; for example, sinkholes, or contamination of Pennsylvania's water supplies.  In the Partnership's rush to push through the permit applications, it failed to conduct an adequate investigation, and, thus, encountered scores of geological obstacles that have, contrary to its public

claims, delayed the in-service dates of the pipelines and drastically reduced the ME2 pipeline's throughput.

36.     Following Mr. Quigley's March 2016 exchange with Sunoco, Quigley was terminated as DEP Secretary in May 2016.   According to the Securities Class Action, Mr. Quigley then heard that "despite continuing deficiencies, the governor's office ordered my successor to issue the permit, and he capitulated."   The Partnership obtained approval to construct ME2 on February 13, 2017, days before announcing the Partnership's annual financial results.  The permits were the final regulatory hurdle to begin construction of ME2.

37.     Throughout the Relevant Period, Defendants caused the Partnership to repeatedly falsely assure the market that the Partnership acted in accordance with its Code of Conduct and that it had lawfully obtained valid permits to begin construction on ME2.  However, unknown to the market, Defendants, acting either independently or in concert with Pennsylvania Governor Tom Wolf's administration, made use of coercion, bribery, and/or other illicit means of forcing the DEP to approve the construction permits that were critical to the development of ME2.  The Partnership then proceeded to disregard warnings about dangerous drilling locations and instead built the Pipeline Projects through locations prone to landslides and dangerous sinkholes, which caused significant and costly delays.  To manage the outcry from the public regarding pipeline explosions and sinkholes, the Partnership had an "unwritten policy" to hire government officials—*Pennsylvania constables*—to act as security around the Partnership pipeline construction sites. This constituted bribery under the Pennsylvania criminal statutes and has resulted in several criminal prosecutions, including against the Partnership's chief of security for the Pipeline Projects.

38.     Defendants caused the Partnership to falsely tell the market that the Partnership was

on track to finish the Revolution and ME2 pipelines by specific deadlines and that, when complete, ME2 would have a throughput of 275,000 to 450,000 barrels per day ("bls/d").  For instance:

- On May 4, 2017, Defendant Long reported that "[o]ur Revolution project is still on schedule to be in service in the fourth quarter of 2017";

- On February 22, 2018, Defendant Long reported that construction on Revolution was "mechanically complete" and that it will go into full service once Rover and Mariner East 2 are in service, and Defendant McCrea added that "sometime in the second quarter [of 2018], we'll have Mariner on and ready to take barrels from Revolution";

- On May 10, 2018, Defendant Ramsey stated that Mariner East 2 would enter service in "mid to late" third quarter 2018; and

- During investor presentations that Defendants caused the Partnership to make from May 31, 2017 up until August 14, 2018, the Partnership touted ME2's "initial capacity" as being 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.

39.     These claims were material, as the in-service dates and throughput of the pipelines would determine when the Partnership could reduce its billions of dollars in capital spending devoted to constructing the pipelines, when the Partnership could start transporting NGLs through the pipelines, and at what throughputs.  But, in reality, as a result of the Partnership's repeated regulatory violations and reckless construction mishaps, reaching those deadlines and claimed throughput levels was not a possibility at the time those claims were made.

40.     Defendants also caused the Partnership to falsely claim that the Partnership was building the Pipeline Projects safely.  For instance:

- On November 8, 2017, Defendant Long assured the market that the Partnership was "very focused on safely and responsibly bringing our projects into service, including . . . the Mariner East [projects]";

- On February 22, 2018, Defendant Long stated again that the Partnership "remain[s] committed to working closely with . . . PA DEP and other regulatory agencies and are focused on safely and responsibly bringing Phase 2 of . . . ME2 . . . into service"; and

- On January 26, 2018, *StateImpact* quoted Sunoco spokesperson Jeff Shields as saying that Sunoco goes "above and beyond" state and federal safety regulations, and is building the pipeline under "stringent" environmental regulations.

41.     The Partnership, however, suffered many safety violations, construction problems, and adverse events during its construction of the Pipeline Projects, including the explosion of the Revolution pipeline.  In addition, Defendants caused the Partnership to engage in a pattern of disregard for the safety of Pennsylvania residents impacted by its construction of the Pipeline Projects, including by illegally hiring Pennsylvania constables to intimidate them into silence.

42.     On August 10, 2018, Energy Transfer disclosed to the market that, because of the above-referenced construction setbacks, the Partnership would temporarily cobble together portions of a nearly 100-year-old, 12-inch pipeline with the brand-new 20-inch pipeline that formed the ME2 to complete the ME2 pipeline.

43.     After the disclosure of this so-called "Frankenpipe" structure, the public was told that the use of the Frankenpipe would significantly reduce ME2's throughput (from the claimed 275,000 to 450,000 bls/d to only approximately 100,000 bls/d on ME2's initial in-service date), and that full completion of the ME2 pipeline would be further delayed.

44.     Then, on September 10, 2018, a portion of Energy Transfer's Revolution pipeline dramatically exploded in Beaver County, Pennsylvania.  The explosion destroyed one home, burned three acres of land, and forced residents to flee.  The explosion cut power to over 1,500 people.  According to Energy Transfer's own investigation, the Revolution explosion was caused by a landslide in an area that Energy Transfer knew or should have known was prone to them.

45.     On October 29, 2018, the DEP ordered Energy Transfer to halt work on the Revolution pipeline until the damage caused by the explosion had been remedied.  As of June 1, 2020—nearly two years later—Revolution was still not operational.

46.     On December 19, 2018, the Chester County District Attorney Tom Hogan ("DA Hogan") announced that he had launched a criminal investigation into the construction of the Mariner East System and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle bullying of Chester County citizens."  The press release quoted DA Hogan as saying:

> We expected the state regulators and the governor to step in and assure the safety of Pennsylvanians.  They have not.  So now the Chester County District Attorney's Office will demand that every aspect of these pipelines be constructed safely, or we will bring into play all of the tools of the criminal justice system.

47.     The press release further explained that the construction of the Mariner East System had caused "significant sinkholes in . . . residents' back-yards" and "contamination of well water" in Chester County, and cited the Revolution explosion in Beaver County as "chang[ing] speculation into tangible danger and destruction."  The Chester County District Attorney further explained that the investigation would cover past and future conduct, and that "[p]otential charges [could] include causing or risking a catastrophe, criminal mischief, environmental crimes, and corrupt organizations."

48.     On August 8, 2019, DA Hogan announced that his office was charging Pennsylvania Constables hired by Energy Transfer to guard pipeline construction sites with bribery.  According to press reports, two constables were arrested "after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline."

49.     Chester County residents had reported that armed security guards identified themselves as state constables on their property.  At the time of the arrests, Chester County District Attorney Chief of Staff Charles Gaza said, "We cannot have elected law enforcement officials hiring themselves out and using their public positions for person[al] profit," because "[i]t

undermines the integrity and independence of law enforcement and our government."

50.     On November 12, 2019, an article by *The Associated Press* stated that the Federal Bureau of Investigation ("FBI") was undertaking a corruption investigation into how Pennsylvania Governor Wolf's administration came to issue the permits for the construction of the ME2 pipeline. As the *AP* reported, "FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits" and "[t]he focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

51.     On December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for ME2 and ME2X.  In the press release, DA Hogan stated:

> This is a pretty simple case.  State Constables sold their badges and official authority.  Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens.  And the defendants attempted to conceal their activity through a maze of companies and payments.

52.     The press release continued:

> Energy Transfer decided they needed security for the pipeline.  However, rather than simply hiring a private security firm, Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline.  Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act. Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.

## V.     AUDIT COMMITTEE CHARTER

53.     The Audit Committee's charter states in relevant part:

> LE GP, LLC (the "Company"), as the general partner of Energy Transfer LP (the "Partnership"), is responsible for the management of the Partnership. In such capacity, the Company is responsible for the preparation, integrity and objectivity

of the financial statements of the Partnership and for establishing and maintaining a system of internal accounting and disclosure controls of the Partnership. It is the responsibility of the independent auditors to express an opinion as to the conformance of the Partnership's financial statements with generally accepted accounting principles based upon their audit. The Audit Committee is a standing committee of the Board of Directors of the Company (the "Board"). Its primary purpose is to assist the Board in its oversight of (1) the integrity of the financial statements of the Partnership, (2) the compliance by the Company and the Partnership with legal and regulatory requirements, and the Partnership's Code of Business Conduct and Ethics and Code of Ethics for Senior Financial Officers, (3) the independent auditor's qualifications and independence and (4) the performance of the Partnership's internal audit function and independent auditors.

\*   \*   \*

AUTHORITY AND RESPONSIBILITIES

The Audit Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel[] of the Company and the Partnership. The

Audit Committee shall have the authority, to the extent it deems necessary or appropriate to carry out its duties, to retain independent legal, accounting or other advisors. The Company shall provide the Audit Committee with appropriate funding, as determined by the Audit Committee in its capacity as a committee of the Board, for payment of (1) compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company or the Partnership, (2) compensation to any independent counsel or other advisors engaged by the Audit Committee, and (3) ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties.

In fulfilling their responsibilities, it is recognized that members of the Committee are not fulltime employees of the Company. It is not the duty or responsibility of the Committee or its members to conduct "field work" or other types of auditing, legal, or accounting reviews or procedures. The Company's management is responsible for preparing the Company's financial statements for the Company and the Partnership and the independent auditors are responsible for auditing those financial statements.

Unless he or she believes to the contrary (in which case, he or she will advise the Committee of such belief), each member of the Committee shall be entitled to assume and rely on (1) the integrity of those persons and organizations within and outside the Company that it receives information from and (2) the accuracy of the financial, legal, safety, health and environment, and other information provided to the Committee by such persons or organizations.

- 16 -

The following shall be the usual recurring activities of the Audit Committee to assist the Board in fulfilling the oversight responsibilities described above. The Audit Committee may modify these activities (consistent with the requirements of the SEC and the NYSE) as particular circumstances warrant. Specifically, the Audit Committee shall from time to time as required and otherwise when the Audit Committee deems appropriate:

**Communication and Reporting**

    1.    Provide a direct and independent line of communication between the Partnership's internal auditors, its independent auditors, and the Board.

    2.    Report regularly to the Board regarding any issues that arise with respect to the Partnership's financial statements or other financial information, compliance with applicable laws, rules, regulations, and the Company's Code of Business Conduct and Ethics and Code of Ethics for Senior Financial Officers; the independence and qualifications of the Partnership's independent auditors; and the performance of the Partnership's independent auditors.

*     *     *

**Internal Auditing Function**

    11.    Review the appointment and replacement of the senior internal auditing executive.

    12.    Review the significant reports to management prepared by the internal auditing function relating to internal controls and management's responses.

    13.    Review the internal audit plan and significant changes in planned activities; review significant findings resulting from audits and managements' responsiveness to the findings.

    14.    Review the internal auditors' assessment of the effectiveness of, or weaknesses in, internal control systems.

    15.    Evaluate the performance and independence of the internal auditors.

    16.    Review and discuss with the independent auditor the responsibilities, budget and staffing of the Company's internal audit function.

**Earnings Releases and Earnings Guidance**

17.     Discuss with management earnings press releases (including any use of "pro forma" or "adjusted" non-GAAP information) prior to their release, as well as financial information and earnings guidance provided to analysts and rating agencies.

**<u>Financial Statements</u>**

18.     Review with management and the Partnership's independent auditors:

(a)     The Partnership's annual audited and quarterly financial statements and related footnotes and the independent auditors' report thereon or review thereof, as applicable, including the effect of off-balance sheet structures on the Partnership's financial statements and the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Partnership's annual and quarterly reports to be filed with the SEC prior to the filing of same.

(b)     Recommend to the Board whether the Partnership's annual audited financial statements and accompanying notes should be included in the Partnership's Annual Report on Form 10-K.

(c)     Any significant difficulties or disputes with management encountered by the independent auditors during the course of the audit or interim reviews and any instances of second opinions sought by management.

(d)     Any significant financial reporting issues and judgments made in connection with the preparation of the Partnership's financial statements, including any significant changes in the Partnership's selection or application of accounting principles;

(e)     Any significant findings and recommendations made by the independent auditors with respect to the Partnership's financial policies, procedures and internal accounting controls, together with management's responses thereto and any special steps adopted in light of material control deficiencies;

(f)     The form of opinion the independent auditors propose to render to the Board and the Audit Committee.

(g)     The critical accounting policies and estimates used in preparing the financial statements of the Partnership.

(h)     The effect of regulatory and accounting initiatives.

(i)     Other material written communications between the Partnership's independent auditors and management, such as any management letter or schedule of unadjusted differences.

(j)     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Partnership's independent auditors.

(k)     Any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Partnership's financial statements or accounting policies.

(l)     Any disclosures made to the Audit Committee by the Company's Chief Executive Officer[] and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Partnership's internal accounting and disclosure controls.

(m)     The internal audit function responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.

(n)     Other matters required to be discussed by Statement on Auditing Standards (SAS) No. 61 and SAS No. 100, as the same may be amended in the future, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

(o)     Other matters related to the Partnership's interim financial results to be included in the quarterly reports to be filed with the SEC and the matters to be communicated under SAS No. 100, as the same may be amended in the future.

## VI.    CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

54.     The Code of Ethics states in relevant part:

[…] Senior Financial Officers of the Company will, to the best of their knowledge and ability:

1.     Act with honesty and integrity, avoiding actual or apparent conflicts of interest with the Company and the Partnership in professional relationships that would likely be viewed as materially impairing the Senior Financial Officer's exercise of judgment on behalf of the Company or the Partnership. Avoid actual or apparent conflicts of interest in all cases unless a specific, case-by-case exception has been made after review and approval of specific circumstances by the Board of Directors. Prohibited conflicts of interests

for Senior Financial Officers include significant work for an outside employer, or transactions between the Company or the Partnership and any other enterprise in which the Senior Financial Officer has an interest (other than owning a de minimis amount of publicly traded securities), including those in which a family member of a Senior Financial Officer has an interest.

2.    Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times.

3.    Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies. Although no single individual is expected to know the details of all laws, rules and regulations, it is important to take reasonable steps to ensure familiarity with all such laws, rules and regulations and to know enough to determine when to seek advice or guidance through the retention of qualified legal, financial and accounting experts, or other means.

4.    Respect the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose such information.

5.    Not use confidential information acquired in the course of one's work for personal advantage.

6.    Proactively promote and be an example of ethical behavior among employees providing services to the Partnership.

7.    Promptly report to Chairman of the Audit Committee of the Board of Directors any conflict of interest or any conduct that the individual believes to be a violation of law or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such an actual or apparent conflict of interest with the Company or the Partnership.

8.    Carefully review a draft of each periodic report for accuracy and completeness before it is filed with the SEC, with particular focus on disclosures each Senior Financial Officer does not understand or agree with and on information known to the Senior Financial Officer not to be reflected in the report.

9.     Meet with members of senior management, division heads, accounting staff and others involved in the disclosure process to discuss their comments on the draft report.

10.    Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared.

11.    Consult with the Audit Committee of the Board of Directors to determine whether it has identified any weaknesses or concerns with respect to internal controls.

12.    Confirm that neither the Partnership's internal auditors, if any, nor its outside accountants are aware of any material misstatements or omissions in the draft report or have any concerns about the management's discussion and analysis section of the report.

13.    Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications, disagreements on accounting matters and violations of any part of this Code.

The Audit Committee of the Board of Directors will assess compliance with this Code, report violations of this Code to the Board of Directors, and, based upon the relevant facts and circumstances, recommend to the Board of Directors appropriate action. The Audit Committee of the Board of Directors shall approve any waiver or amendment of this Code, and any such waiver or amendment shall be disclosed promptly, as required by law rule or regulation. A violation of this Code may result in disciplinary action, including termination of employment.

## VII.   CODE OF CONDUCT

55.    During the Relevant Period, Defendants caused Energy Transfer to assure investors that it adhered to exacting ethical standards in its dealings with regulators and government officials, which the Partnership codified in its Code of Conduct. Energy Transfer touted the Code in its SEC filings, including the Form 10-K that the Partnership filed with the SEC on February 24, 2017 (the "2016 Form 10-K"), and referred investors to the Partnership's website, where Energy Transfer published the Code throughout the Relevant period.

56.    Indeed, Energy Transfer represented that the Code identified requirements, not aspirations. For example, the Code explained that "[i]n all instances, the policies of the Company

require that the business of the Partnership Group be conducted in a lawful and ethical manner. Every Employee" — which the Code defined as including "the officers and members of the Board of Directors of the Company" — "acting on behalf of the Partnership Group must adhere to these policies."

57.    The Code detailed the Partnership's supposedly stringent policies prohibiting attempts to bribe or influence government officials.  It set forth the Partnership's commitment that each of its employees was "required" to adhere to the Partnership's Anti-Corruption Policy, the U.S. Foreign Corrupt Practices Act, other anti-corruption laws, and "the highest ethical standards in fulfilling . . . responsibilities to, and on behalf of [Energy Transfer] and its investors."  The Code specifically drew attention to the heightened ethical ramifications of the Partnership's dealings with government officials and regulators, explaining that "[w]hat is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign)," and stating that its employees "should not provide . . . anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department." Energy Transfer's Code further explained: "Employees must respect and obey the laws of the cities, states and countries in which the Partnership Group operates."

58.    The Code also specifically set forth Energy Transfer's strict policies prohibiting payments or use of Partnership funds to "secure special treatment for the Partnership Group" or for anything other than a "legitimate business purpose."  These policies were broad in scope, applying regardless of whether conduct was technically "lawful or unlawful" or was conducted by the Partnership, individuals, or third parties employed by the Partnership.  The Partnership also

broadly defined payments that were to be treated as sensitive under the policy as including (among other things) "receipts from or payments to governmental officials or employees" and "corporate political contributions," and it prohibited attempts to "disguise" sensitive payments in "any . . . manner."

59. The Code also set forth detailed reporting requirements for Partnership officers and directors with respect to Code violations. Specifically, the Code stated:

> Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors. . . . All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports. . . . Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action[.]

60. In addition to the Code, Energy Transfer adopted specific policies applicable to its highest executives – its CEO and CFO, *i.e.* Defendants Warren and Long during the Relevant Period. Specifically, Energy Transfer maintained a Code of Ethics for Senior Financial Officers (the "Code of Ethics"), which required its CEO and CFO to:

- "Act with honesty and integrity";

- "Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the [SEC] and in other public communications, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times";

- "Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies";

- "Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared"; and

- "Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public

filings and communications, disagreements on accounting matters and violations of any part of this Code."

61.    In the 2016 Form 10-K and subsequent filings, Energy Transfer also represented that "we believe we have valid rights to use all of our material properties" and that Energy Transfer had "obtained or made all required material . . . filings with[] the various state and local government and regulatory authorities which relate to . . . the operations of our business."

62.    However, unbeknownst to market/investors, these representations were materially false and misleading when made.  Energy Transfer secured the necessary permits for construction of ME2 from the DEP through coercion and pressure on government officials.  As the *Associated Press* reported on November 12, 2019, the FBI launched an investigation into Energy Transfer and the Pennsylvania Governor's office over allegations that Governor Wolf and his staff had exerted improper control over the DEP's supposedly independent decision to approve the required ME2 permits.

63.    In addition, as discussed in further detail below, Energy Transfer bribed Pennsylvania constables to act as security and employ intimidating tactics around Energy Transfer pipeline sites, particularly those sites where significant construction-related problems had already occurred.  As DA Hogan alleged in the criminal complaints against the Constables and Energy Transfer's security chief Frank Recknagel, Pennsylvania constables are government officials and Energy Transfer's payments to them in connection with construction of the Mariner East pipelines constituted bribery in violation of Pennsylvania law.

**VIII.    FACTS**

64.    The Mariner East pipeline is a multibillion-dollar pipeline project designed to transport highly volatile NGLs from the Marcellus and Utica Shales in western Pennsylvania, West Virginia and eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus

Hook Industrial Complex on the Delaware River.  There, the NGLs are processed, stored and distributed to local, domestic and waterborne markets.  The Mariner East System crosses 17 counties of Pennsylvania.

65.     The first phase of the project, ME1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.  ME1 is currently in service for propane and ethane transportation, storage and terminalling.  ME1 has an approximate capacity of 70,000 bls/d.

66.     The second phase of the project, ME2, is an NGL pipeline that was slated to have a maximum capacity of 450,000 bls/d based on a 20-inch pipe diameter.  Upon the initial announcement of Energy Transfer's plans to construct ME2, Energy Transfer stated that ME2 would be in-service by the end of 2016.  To date, although (as discussed further below) Energy Transfer has brought into service an ad hoc combination of ME2's 20-inch diameter pipe and an older, 12-inch diameter pipeline, the true 20-inch "ME2" – as Energy Transfer had repeatedly presented it to investors – remains under construction.

67.     Energy Transfer also planned for an optional expansion to ME2, known as ME2X. Depending on the number of commitments Energy Transfer received during its open season process before it began constructing ME2, Energy Transfer had made plans to construct ME2X as an additional 16-inch pipeline alongside ME2 to provide the Mariner East System with an added capacity of 250,000 bls/d.

68.     Energy Transfer also planned to augment the Mariner East System by constructing the "Revolution Project," an expansion to the existing Revolution pipeline that would connect it to the Mariner East System, enabling Energy Transfer to transport additional NGL volumes out of the Marcellus Utica region.  Prior to the Revolution explosion in September 2018, this expansion

would have had the potential to substantially increase the product flows to Marcus Hook.  The existing Revolution pipeline consisted of 20 miles of 16" pipes.  The new project would add 110 miles of 20", 24" and 30" pipes.

69.     On March 2, 2015, Energy Transfer announced that it expected ME2 to commence operations in the fourth quarter of 2016. However, unlike ME1, which involved converting a 1930s-era gasoline pipeline for use in transporting NGLs, ME2 was more complex and time-consuming greenfield construction.   ME2 would span approximately 350 miles across 17 Pennsylvania counties, and cross 570 wetlands and more than 1,200 streams.  ME2 was also slated to cut through approximately 2,700 properties.

70.     Given the enormous scope of the project and the potential for significant environmental impact and safety risk from ME2's construction and operation, the Partnership was required to go through an extensive regulatory review process prior to beginning construction  The project required extensive reviews and subsequent permitting by the Pennsylvania DEP, focused on several key Pennsylvania environmental regulations.

71.     Key permit requirements included, among other things, those related to Pennsylvania Code Chapter 102 ("Chapter 102"), which focuses on "earth disturbances associated with oil and gas exploration, production, processing or treatment operations or transmission facilities when earth disturbance is five acres or greater," and those related to Pennsylvania Code Chapter 105 ("Chapter 105"), which concerns "activities located in, along, across or projecting into a watercourse, floodway or body of water, including wetlands."

72.     To gain permit approval, the Partnership was required to explain how it would avoid polluting water crossings along ME2's path.  Energy Transfer planned to conduct much of the pipeline construction using "Horizontal Directional Drilling," or "HDD."  HDD is a method

for laying underground pipelines by drilling an underground channel for the pipeline. HDD is used as an alternative to digging trenches on the ground's surface.

73. The HDD method involves three stages. First, a pilot bore drills a borehole along the planned route. Then, the drill bit is replaced by a "reamer," which enlarges the borehole diameter by excavating soil. Finally, the pipe is pulled back through the enlarged hole. "Drilling mud"—a mixture of water, clay, and chemicals—is used at each of these stages to keep drilling tools cool and lubricated, to remove drilled material, to support the drilling hole, and to lubricate the pipe as it is pulled through the drilled hole.

74. However, HDD creates certain unique risks. Among other things, the pressurized drilling fluids used in HDD can seep through the ground, rising to the surface or contaminating underground water supplies—a phenomenon known as an "inadvertent return" or a "frac-out." Accordingly, as part of the permitting process, the DEP asked Sunoco to evaluate the risks of HDD as part of its Chapter 105 permit proposal.

75. Energy Transfer submitted its initial Chapter 102 and Chapter 105 applications for ME2 in the summer of 2015.

76. Within the category of NGLs, there are many different varieties including propane, butane, and ethane. ME2 principally carries ethane. Ethane is a colorless odorless gas that is principally used to produce ethylene, which the petrochemical industry uses to manufacture a wide range of products, most of which are converted into plastics. Additional end-uses for ethylene include detergent and anti-freeze. At room temperature, ethane is an extremely flammable gas, which forms an explosive mixture when mixed with air.

77. Within the blast zone of a leak, ringing a doorbell, making a phone call, opening a garage door, turning lights on, or running an engine could ignite a fatal explosion. Given these

properties, in the event of a leak in an NGL pipeline, the Partnership instructs local residents to "leave the area by foot immediately and attempt to stay upwind," but there is no guidance for people to determine when and whether they are in a safe area.

78.    The ethane that ME2 carries across Pennsylvania is not used for domestic energy generation.  Rather, Energy Transfer brings it to Marcus Hook to export to Europe, mostly to Scotland, Norway and Sweden.  Sunoco's Marcus Hook terminal was the United States' first export facility for ethane to Europe, beginning in 2016.  Under a 15-year contract, new purpose-built tankers move the ethane from Marcus Hook to Scotland and Norway for use in INEOS Olefins & Polymers Europe petrochemical plants.  Ethane exports from Marcus Hook also travel to Borealis Group's petrochemical "cracker" at Stenungsund, Sweden.

79.    Before constructing the pipelines to carry ethane to Marcus Hook, and in order to ensure that it could bring the Pipeline Projects online and with the claimed throughput under Energy Transfer's claimed schedule, it was incumbent on Defendants to ensure that Energy Transfer had performed a proper assessment of the risk of its construction, including its risk to human life, but which it failed to perform.

80.    On behalf of the Energy Transfer Companies, Defendants were motivated to bring the Pipeline Projects online as quickly as possible because the commitments from third parties for the transport of NGLs were based on  the pipelines being in service by certain agreed upon dates. For example, during an August 9, 2017 Energy Transfer earnings call, Defendant Ramsey responded, "we do expect to have it in service sometime in the fourth quarter . . . .  But it's kind of hard to bring new customers on until you get a project that's been in the works for many years in service. So we are in great shape the day we bring it on, on initial revenues.  And we are highly confident that we will bring on significantly more commitments and more volumes after we bring

the pipeline in service." On Energy Transfer's November 8, 2017 investor call, Defendant McCrea said "Once we get them in service, we couldn't be more excited about the returns. . . . Mariner needs to come online."

81.     The Energy Transfer Companies obtained the permits for ME2 by exerting undue influence on the DEP, including by causing the ouster of former DEP Secretary John Quigley after he indicated to Sunoco that he would likely deny the initial applications.

82.     In March 2016, due to a large number of permit deficiencies, as former DEP Secretary Quigley later stated on Twitter, he "told Sunoco senior leadership that their continued inability to complete their permit application appeared to be willful and had to be immediately remedied or the application would be denied.  I was ushered out of DEP two months later."  In fact, Secretary Quigley "resigned" from his position on May 20, 2016, shortly after the meeting with Sunoco.

83.     According to Quigley, prior to his May 2016 departure from the DEP, he had engaged in an extensive back and forth with Sunoco – specifically Sunoco's President and CEO Michael Hennigan – about the pipeline permits.  From January through May 2016, Sunoco "wasn't even close to submitting a complete application" despite constant communications between the DEP and Sunoco about how to remedy the deficiencies.

84.     In March 2016, after learning of additional deficiencies and observing Sunoco's unwillingness to submit a complete and adequate application (including failing to identify all the wetlands and stream crossings for the pipeline), Mr. Quigley called for a meeting with Sunoco CEO Hennigan, Tetra Tech Inc. (Sunoco's engineer contractor), as well as their project manager. Mr. Quigley discussed the plethora of deficiencies in Sunoco's permit application and "read them the riot act."  Mr. Quigley told them that if they did not get their act together, he would send the

application back, and they would have to start all over again.

85.     Shortly thereafter, Quigley was pushed out as DEP Secretary.

86.     Later, everything that the DEP warned about during Mr. Quigley's tenure and set forth in numerous DEP deficiency letters, such as the potential for ground water pollution and frac-outs, came to pass.

87.     Upon information and belief, the DEP, post-Quigley, issued the ME2 permits just days before the Energy Transfer Companies were set to release their annual financial results to investors on February 24, 2017.

88.     After Mr. Quigley's termination, by June of 2016, the DEP deemed Energy Transfer's initial 20 proposals administratively complete.  The DEP accepted public comments concerning the Chapter 105 permit applications from June 25, 2016 through August 24, 2016 and concerning the Chapter 102 permit applications from August 6, 2016 through September 6, 2016.

89.     Many public comments focused on numerous deficiencies in the permit applications, including wetland and stream crossings that Sunoco had failed to count in its applications.

90.     Indeed, Sunoco had a starkly negative track record for safety and environmental violations.  As *Philadelphia* Magazine later reported on July 6, 2019:

> Between 2002 and the end of 2017, pipelines affiliated with the company across the country experienced a leak or an accident every 11 days on average, according to an analysis of federal pipeline data compiled by environmental advocacy organizations Greenpeace USA and Waterkeeper Alliance.  In an evaluation by NPR affiliate *StateImpact Pennsylvania*, the same federal data showed that Sunoco Pipeline is responsible for the industry's second-highest number of incidents reported to inspectors over the past 12 years.

91.     As Sunoco eventually became a subsidiary of Energy Transfer on or about April 28, 2017, Defendants were obligated to know its safety profile.

92.     On September 6, 2016, the DEP issued 20 detailed technical deficiency letters,

outlining hundreds of substantive problems with the Chapter 102 and Chapter 105 permit applications for ME2.

93.     As noted herein, because construction of the ME2 pipeline carried the risk of harming the water and soil resources of Pennsylvania, the DEP was required to conduct an extensive regulatory review before the DEP issued any permits and before any construction of the ME2 pipeline could commence.

94.     Upon information and belief, the DEP lacked discretion to issue permits for incomplete applications.  Chapter 102 states: "An application or NOI for a permit is not complete until the necessary information and requirements under The Clean Streams Law (35 P.S. § § 691.1—691.1001) and [Chapter 102] have been satisfied by the applicant."  25 PA Code § 102.6(c)(1).  Chapter 102 provides that, when the DEP determines that an application is incomplete, "it will notify the applicant in writing," and the "applicant shall have 60 days to provide the information necessary to complete the application . . . or the Department . . . will consider the application to be withdrawn by the applicant."  *Id.* §102.6(c)(2).

95.     Likewise, Chapter 105 provides a virtually identical mandatory process for handling the review and approval of applications dependent on the submission of all necessary information.

96.     Upon information and belief, the Partnership was required to submit a complete and accurate application demonstrating that the ME2 pipeline met applicable legal requirements before the DEP could properly approve Chapter 102 and 105 permits.

97.     Energy Transfer originally had until November 2016 to address the deficiencies listed in the 20 DEP technical deficiency letters sent in September 2016 but sought an extension of its response deadline to December 2016.  On December 5, 2016, Energy Transfer submitted

updated application materials for each of the 20 Chapter 102 and Chapter 105 permits it sought for ME2.  The DEP declined to seek additional public comment with respect to the Partnership's updated applications, despite requests from concerned citizens.

98.     As *StateImpact Pennsylvania* later reported on January 26, 2018, Governor Wolf's administration was deeply involved with the DEP's review of the ME2 permits.  Indeed, as the deadline by which the Energy Transfer Companies were set to release their fiscal year 2016 annual financial results quickly approached, the Governor's office became increasingly involved in pressuring the DEP to issue the ME2 permits.  In particular, it is public knowledge that Governor Wolf's special assistant, Yesenia Bane, the spouse of an oil and gas industry lobbyist, exchanged a series of text messages with DEP Secretary Patrick McDonnell (who replaced Mr. Quigley in May 2016) that, according to *StateImpact*, "raise[d] questions about the role the Governor's office played in the permitting process."

99.     One meeting with Ms. Bane, Mr. McDonnell, and representatives from Sunoco, Joseph McGinn ("McGinn") and Michael J. Hennigan ("Hennigan"), occurred just weeks before the DEP suddenly granted the ME2 permits and allowed the pipeline to move forward.

100.    McGinn served as Sunoco's Senior Manager for Public Affairs from April 2013 to April 2017, Energy Transfer's Senior Director of Public Affairs from April 2017 to October 2017, and Energy Transfer's Vice President of Public Affairs from May 2019 to the present.

101.    Hennigan served as Sunoco's President and CEO from 2012 to approximately April 2017, at which point he became Energy Transfer's President, Crude, Liquids and Refined Products. On May 30, 2017, Energy Transfer announced that Hennigan would depart the Partnership effective June 16, 2017.

102.    In response to the later public disclosure of numerous text messages between Ms.

Bane of the Governor's office and Mr. McDonnell, secretary of the DEP, as reported in a January 26, 2018 article in *StateImpact*, Joe Minott, executive director of the Clean Air Council, explained that the texts showed involvement of the Governor's office in the permitting process at a level going "way beyond" merely staying abreast of developments, explaining:  "You have the governor's staff meeting with Sunoco and DEP, you have the governor's staff telling DEP not to move forward in taking actions until Governor's Office is fully informed."

103.    An earlier December 10, 2016 *StateImpact* article investigated Ms. Bane and her potential conflicts of interest.  The article stated that Ms. Bane's husband had been a lobbyist with Buchanan Ingersoll & Rooney in Harrisburg, PA, working for several oil and gas companies, and then had joined EQT—a gas drilling company—as a senior government relations manager in November 2016.  The article further stated that Ms. Bane had been "heavily involved in Marcellus Shale issues," and had participated in "dozens of formal meetings on oil and gas issues, as well as informal dinners, lunches, and coffee meet-ups with industry representatives," including "meetings involv[ing] her husband's clients' projects."

104.    On January 27, January 30, and February 1, 2017, the DEP provided further technical deficiency letters to the Energy Transfer Companies.  In response, the Energy Transfer Companies provided revised, yet still deficient, application materials on February 6, 2017.  That same day, DEP Secretary McDonnell met with opponents of the ME2 project, including concerned citizens and civil society organization leaders, who again unsuccessfully sought to persuade the DEP to hold a further public comment period with respect to the pipeline.

105.    Just one week later, on February 13, 2017, the DEP approved Chapter 102 and Chapter 105 permits for ME2, despite the importance and number of open issues set forth in the January and February 2017 technical deficiency letters.

106.    *StateImpact Pennsylvania* reported that "[c]ritics of the pipeline project are skeptical that the hundreds of deficiencies detailed previously by the agency could have been corrected in such a short period of time," and stated that Pennsylvania lawmakers had called meetings with DEP personnel to understand "how, or whether, Sunoco had corrected hundreds of deficiencies in its application."

107.    Instead, the DEP granted the permits, but subjected them to a list of "special conditions" (the "Special Conditions").  The Special Conditions, listed in each of the Energy Transfer Companies' 17 Chapter 105 permits, contained substantial lists of terms and construction methods the Energy Transfer Companies agreed to abide by throughout their construction of ME2.

108.    On April 8, 2019, *The Guardian* reported on the ongoing investigation and concerns about the ME2 permitting process, explaining:

> Emails, text messages and regulatory records show that the secretary of Pennsylvania's department of environmental protection (DEP), Patrick McDonnell, directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application. The department also appeared to be under pressure from Wolf's office at the time.

109.    The article stated that, shortly Ms. Bane had texted Secretary McDonnell asking him not to send a deficiency letter to Sunoco without sending it to the Governor's office first. Thereafter, McDonnell wrote to DEP staff members who were involved in the pipeline review, stating: "Govs office needs a list of the outstanding issues ASAP."

110.    The article also stated:

> A DEP senior official who was involved in the Mariner East 2 project, John Stefanko, noted in a later legal deposition that McDonnell had directed staff "that we needed to make a decision by February 10th", although the review had been scheduled to persist for at least several additional months.

111.    The article also noted that Governor Wolf had "received substantial donations from companies with a financial stake in Mariner East 2, including $20,000 toward his 2018 re-election

campaign from the gas producer EQT Corporation"—John Bane's company, which had a shipping contract for ME2—and that, "[d]uring [Wolf's] 2014 campaign, he received $1.5m in campaign contributions from organizations, individuals and [PAC]s tied to the oil and gas industry." Bane continued to be extensively involved on behalf of the Governor's office in the time period prior to and up to the issuances of the permits for construction of the ME2 pipeline on February 13, 2017.

112.   Throughout the Relevant period, Energy Transfer repeatedly claimed that it was constructing its pipelines, including ME2, pursuant to the highest safety and regulatory standards. For example:

- During Energy Transfer's November 8, 2017 investor call, Defendant Long stated that Energy Transfer was "very focused on safely and responsibly bringing our projects into service, including . . . the Mariner East [projects]";

- During Energy Transfer's February 22, 2018 conference call, Defendant Long reiterated that Energy Transfer "remain[s] committed to working closely with . . . PA DEP and other regulatory agencies and are focused on safely and responsibly bringing Phase 2 of . . . ME2 . . . into service";

- In early 2018, Energy Transfer and Sunoco took out a full-page advertisement in a Harrisburg newspaper touting their efforts to ensure the safety of ME2. In particular, Energy Transfer and Sunoco claimed that they will "operate our pipeline with the highest level of safety at all times" and highlighted their commitment to "paying extra attention to safety"; and

- On July 6, 2019, *Philadelphia* Magazine quoted Energy Transfer spokesperson Lisa Dillinger as claiming that Energy Transfer goes "above and beyond what is required to ensure the safety of our lines."

113.   While supposedly adhering to the "highest level of safety at all times," Energy Transfer also promised investors that once it placed ME2 in-service, the pipeline would have an initial carrying capacity of 275,000 barrels of NGLs per day ("bls/d"). For example:

- In Energy Transfer's Annual Report, filed on Form 10-K with the SEC on February 24, 2017, Energy Transfer claimed that ME2 would be in service in the third quarter of 2017 and, at that time, would "expand the total takeaway capacity" of the Mariner East System from 70,000 bls/d to "345,000 []bls/d," an increase of 275,000 bls/d;

- On May 31, 2017, Energy Transfer presented at the 2017 MLPA Investor Conference held in Orlando, Florida. At the conference, Energy Transfer claimed that ME2 would be in service "by the end of Q3 2017," and would have an "initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day"; and

- During investor presentations Defendants held from May 31, 2017 up until August 14, 2018, 13 in total, Energy Transfer touted ME2's "initial capacity" as being 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.

114. These claims were materially false and misleading because Energy Transfer did not construct the Pipeline Projects safely or in compliance with the law. Furthermore, the Partnership's reckless disregard for known risks in the construction of the Pipeline Projects, which created harm to residents and the environment, regulatory scrutiny, and resulting delay, rendered Defendants' claims of throughput and the Pipeline Projects' completion dates materially false and misleading when made because those claims lacked any reasonable basis in fact.

115. Energy Transfer began construction on ME2 almost immediately following issuance of the permits, and within months, serious problems began to arise with the project. By May 3, 2017, the DEP received notice of a frac-out that released drilling fluid consisting of bentonite clay and water, as well as drilling cuttings of subsoils and groundwater ("Drilling Pollutants"), in Delaware County.

116. The DEP issued at least 36 notices of violation in connection with the Partnership's construction activities in 2017, and a further 55 notices throughout 2018.

117. Energy Transfer's disregard for constructing a safe and environmentally responsible pipeline ensured that Energy Transfer would not be able to meet its claimed ME2 and ME2X in-service dates or achieve the claimed throughout for the pipelines.

118. Defendants failed to disclose, among other things, that (i) from the start of the Pipeline Projects' construction, Energy Transfer experienced significant setbacks building the

Pipeline Projects; (ii) Energy Transfer needed to complete the Pipeline Projects by the end of 2018 to prevent customers from voiding their commitment contracts with Energy Transfer; (iii) Energy Transfer would be unable to complete the Pipeline Projects by the end of 2018—including with the stated initial carrying capacity and pipeline specifications—without constructing an unsafe and environmentally destructive pipeline; (iv) Defendants expected, or were reckless in not expecting, increased scrutiny and consequences from the DEP due to their increased "corner-cutting," including by violating Pennsylvania law and the Special Conditions to their construction permits; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

119.    On February 13, 2017, the DEP approved Sunoco's ME2 permit applications and granted Sunoco its Chapter 102 and 105 ME2 and ME2X permits

120.    On February 13, 2017, the Clean Air Council ("CAC"), the Delaware Riverkeeper Network ("DRN"), and the Mountain Watershed Association, Inc. ("MWA") (collectively, the "Environmental Advocates"), filed before the Environmental Hearing Board ("EHB") an appeal of the DEP's issuance of these permits.  The Environmental Advocates alleged that the DEP had issued the ME2 permits despite not having finished the required technical review of them, and despite the applications being incomplete, internally inconsistent, and in violation of the law.

121.    On February 14, 2017, the Environmental Advocates filed before the EHB a Petition for Supersedeas requesting that the EHB enjoin Sunoco from constructing ME2 and ME2X while the EHB reviewed the legality of the DEP's issuance of the permits.   The Environmental Advocates argued that the DEP approved Sunoco's permits despite the fact that Sunoco's applications contained hundreds of unresolved deficiencies documented in submissions that spanned over 500 pages.  The Environmental Advocates further alleged that the current plans

for the Mariner East System were not safe and did not adequately protect the environment.

122.    On June 10, 2017, Sunoco caused a frac-out allowing approximately 40 gallons of Drilling Pollutants to seep into the ground near the Mingo Presbyterian Church.  After Sunoco attempted to vacuum the spill, the next day, another 100-gallon frac-out occurred at the same work site.  In its initial report to the DEP, Sunoco claimed the spills were likely related to conditions below the surface caused by "historic deep underground coal mining in the area," a condition that Sunoco should have been aware of before conducting HDD operations.  Subsequently, Tetra Tech, the same contractor that had prepared its HDD Inadvertent Return Assessment, Preparedness, Prevention and Contingency Plan (the "HDD IR Plan"), was asked to reevaluate the design of drills in the area, and it determined the risk of further spills was inherent to drilling in that spot.

123.    On July 25, 2017, the EHB issued an order in favor of the Environmental Advocates, and temporarily enjoined Sunoco from conducting HDD operations at 55 different work sites across Pennsylvania.  Judge Labuskes determined that "the permits that are the subject of this appeal are hereby superseded effective immediately to the extent they authorize the Permittee to conduct horizontal directional drilling."

124.    On July 27, 2018, the DEP reached a settlement with the Environmental Advocates. Pursuant to the agreement, the DEP paid the Environmental Advocates $27,500 and agreed to implement new policies aimed at enhancing public participation around pipeline projects.  Among other things, the DEP pledged to post more information online, including non-privileged, non-confidential materials received from companies seeking pipeline permits, as well as technical deficiency letters issued to pipeline companies, and final decision documents.

125.    On August 10, 2017, the EHB entered a Stipulated Order (the "August 2017 Order"), which resulted from a negotiated agreement between the Environmental Advocates,

Sunoco and the DEP.  Under the August 2017 Order, Sunoco agreed to perform a "re-evaluation" of the safety of constructing HDD operations at 41 different work sites.  Sunoco also agreed to reevaluate 22 other HDD sites at which Sunoco had already caused a frac-out to occur during the installation of ME2 and ME2X (collectively, the 63 "HDD Re-evaluation Sites").  Furthermore, Sunoco agreed to add to the list of HDD Re-evaluation Sites any site where a frac-out occurs in the future during the installation of ME2 or ME2X.

126.    In re-evaluating the 63 HDD Re-evaluation Sites, Sunoco agreed to (i) re-examine the geology at each site; (ii) consider data that is specific to the needs of each HDD being reevaluated; (iii) conduct additional geotechnical evaluations at each site using additional field drilling and sampling, seismic surveys, ground penetrating radar; and electromagnetic surveys/electrical resistivity tomography; and (iv) provide the DEP with an explanation for why Sunoco elected not to use certain geotechnical evaluations, if applicable.

127.    Sunoco was ordered to submit a report for each of the HDD Re-evaluation Sites that detailed the findings and presented the results of its studies on each of these sites.  Each report was required to "specify all actions to be taken by Sunoco to eliminate, reduce, or control the release of [frac-outs] of HDD drilling fluids to the surface of the ground or impact to water supplies at that location during HDD operations."

128.    In addition, Sunoco agreed to revise its HDD IR Plan.  The HDD IR Plan was first filed by Sunoco in connection with the permit applications in December 2016.

129.    Also, according to the HDD IR Plan, the Energy Transfer Companies are required to notify the DEP immediately after each frac-out (*i.e.*, inadvertent return) occurs, and after each separate loss of circulation of drilling fluids occurs.

130.    After re-evaluating the 63 HDD Re-evaluation Sites, Sunoco submitted

reassessments for 27 of them, all of which were originally designated as "low risk" sites. Sunoco reached contrary conclusions to their original evaluations at many of these sites. Many of the 27 reassessed sites were identified as posing "a high risk" or "an increased risk," or as "susceptible to the inadvertent return of drilling fluids." Nearly all the reassessed waterway crossings required a redesign and new DEP approvals.

131.    Sunoco's new designs were still not effective at preventing frac-outs. Since November 2018, Sunoco had caused at least 10 frac-outs at the reassessed sites alone, including one site where a 30,000-gallon spill of Drilling Pollutants reached a wetland in Berks County.

132.    Among the 63 re-evaluated HDD sites was an HDD site located off Swedesford Road in West Whiteland Township (HDD Site #S3-0381, Permit ID #PA-CH-0219) (the "Swedesford Site"). The Swedesford Site is located approximately one-half of a mile from Energy Transfer's HDD site located near Lisa Drive, also in West Whiteland Township (HDD Site #S3-0400, Permit ID #PA-CH-0256) (the "Lisa Drive Site").

133.    On August 8, 2017, Energy Transfer submitted to the DEP a Void Mitigation Plan for Karst Terrain and Underground Mining (the "Void Mitigation Plan"). In this plan, Energy Transfer labeled the Swedesford Site as posing a "low risk" of encountering subsurface voids, while labeling the Lisa Drive Site as posing a "very low risk."

134.    Based on Energy Transfer's re-evaluation of the Swedesford Site, upon information and belief, Energy Transfer contracted with Groundwater & Environmental Services, Inc. ("GES") to conduct an HDD Hydrogeologic Re-Evaluation Report (the "West Whiteland Township Report"). In its report, GES warned that the alignment of HDD S3-0381 passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development. Carbonate rocks (Ledger and Conestoga Formations) are prone to sinkhole

development.

135.   Upon information and belief, Energy Transfer contractor Tetra Tech similarly alerted Energy Transfer to the severe risk of sinkholes in the same area.

136.   Despite these warnings, and despite assurances from Defendant Marshall McCrea on November 8, 2017, that Energy Transfer is "doing everything we can to work with PA DEP and to get all the HDDs completed and on time," Sunoco continued HDD construction in this area. On November 11, 2017, the Energy Transfer Companies' drilling of the ME2 pipeline in this area caused a 500-gallon frac-out and sinkholes to appear at the Lisa Drive Site.

137.   According to Lisa Drive residents, as stated in a putative class action filed on March 15, 2018, Energy Transfer's HDD operations caused "geysers of drilling fluids" to be released in the area, spewing "contaminants across the land of Plaintiffs and members of the Class."

138.   The DEP's investigation three days later reached the conclusion that Energy Transfer's pipeline construction had caused these frac-outs to occur.  Energy Transfer also had failed to promptly alert the DEP as was required under the Special Conditions in the ME2 Permits.

139.   On November 16, 2017, the DEP issued a Notice of Violation to Energy Transfer. The DEP specifically referenced Energy Transfer's "history of incidents" at this site, detailing the numerous frac-outs that Energy Transfer had caused, and reminded Energy Transfer that pursuant to the HDD IR Plan and the Special Conditions listed in each Energy Transfer's permits, the Partnership was required to "immediately" notify the DEP following any frac-out.

140.   The November 2017 Notice also required Energy Transfer to respond to multiple other requirements ordered in previous notices of violation, including providing the now late "incident reports" for frac-outs that occurred in August 2017, and confirming whether there were other unreported frac-outs at this site during the past months.  The request to provide a list of

additional frac-outs was particularly troublesome given that Energy Transfer was already legally required to report all frac-outs "immediately," and that each of the 28 Notices of Violations Energy Transfer had received thus far had instructed Energy Transfer to alert the DEP to any frac-out the Partnership caused.

141.    Shortly after the initial five sinkholes appeared, multiple additional sinkholes appeared which "caused and continue to cause damage to structures and other improvements" to the plaintiffs' properties, such as "cracking in the walls, chimneys and driveways of their homes."

142.    Public water utility company Aqua America ("Aqua") was forced because of the multiple sinkholes to make multiple emergency repairs on the pipeline path to prepare for a potential collapse of their water lines.  Aqua had previously warned Energy Transfer to avoid the use of horizontal direction drilling (HDD) near their wells in that same area and to use alternative pipe construction methods, but Energy Transfer had ignored the warnings.

143.    Four months later, on March 2, 2018, Energy Transfer began testing ME2 again to assess its structural integrity.  In a rush to suppress the resulting sinkholes, and "without the permission of the [DEP] or the [PUC]," Energy Transfer "pumped 8 or more cement trucks full of cement grout into several of the sinkholes" and "DEP and PUC immediately applied for a stop work order which was granted against [Energy Transfer]."

144.    The damage caused by Energy Transfer's latest sinkholes was severe.  According to the Lisa Drive Plaintiffs:

> Since the appearance of the sinkholes, Sunoco workers have inundated the area. The neighborhood is besieged by men in pickup trucks from Texas, New York, Arkansas, and other faraway places.  The neighborhood is being dug up by backhoes in an emergency effort to discover the full extent of the disaster wrought by Sunoco.  The underground has been so altered by Sunoco's [s]inkholes that DEP and PUC are concerned about imminent and catastrophic hazard to Plaintiffs and members of the Class arising from the damage to the existing natural gas pipeline[, *i.e.*, ME1].  Sunoco has installed multiple seismic monitors throughout the

neighborhood, including on the property of plaintiffs, because of regulators['] concerns that the pipeline will shift and explode.

145.    Then, on January 20, 2019, Energy Transfer caused yet another sinkhole to appear

on Lisa Drive.  According to a press release issued by the PUC on January 21, 2019:

> On January 20, 2019, at approximately 4:40 p.m., the PUC's Pipeline Safety Division was notified by Sunoco Pipeline LP, a/k/a Energy Transfer Partners (SPLP), that a new subsidence feature [*i.e.*, sinkhole] had formed near Lisa Drive, in Chester County, exposing the ME1 pipeline.  [The PUC's Independent Bureau of Investigation and Enforcement ("I&E")] immediately dispatched a safety engineer to the site.  I&E's geophysical consultant, ARM, was also asked to send a representative to the site.  To ensure public safety, at approximately 6:30 pm on January 20, 2019, I&E proposed to SPLP that this section of the ME1 pipeline be shut down pending further investigation.  At approximately 7:30 p.m. on January 20, 2019, SPLP initiated the stoppage of product transportation through this section of ME1.  The shutdown was completed at approximately 12:06 a.m. on January 21, 2019.  As a result of this shutdown, there is no product flowing through an approximately 7-mile long section of pipeline, between valves located at Boot and Exton, both in Chester County.

146.    As a result of the damage Energy Transfer pipeline construction caused, Energy

Transfer purchased two of the Lisa Drive homes for approximately $400,000 each.

147.    To control the site of the Lisa Drive sinkholes and other Energy Transfer

Companies' sites, Energy Transfer bribed Pennsylvania state constables to act as security at ME2

drilling locations, including at Lisa Drive.

148.    As noted above, Defendants caused Energy Transfer to falsely claim that the

Partnership adhered to all laws, that it was against the Partnerships' Code of Conduct to issue

"Sensitive Payments," such as bribes, to any government official to receive special treatment for

the Partnership's business, and that, despite DA Hogan's investigation, Energy Transfer had acted

lawfully.  For example:

- On February 24, 2017, Energy Transfer touted in the 2016 Form 10-K that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board," which forbade (i) "Sensitive Payments,"

such as "commercial bribes or kickbacks," and (ii) "provid[ing] gifts or anything of value to government officials . . . in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department";

- On February 23, 2018, Energy Transfer touted in its Annual Report filed on Form 10-K with the SEC (the "2017 Form 10-K"), the same assurances that the Partnership's executives are forbidden from (i) offering "Sensitive Payments," such as "commercial bribes or kickbacks" to governmental officials; and (ii) "provid[ing] gifts or anything of value to government officials . . . in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department";

- On December 19, 2018, in response to the opening of DA Hogan's criminal investigation, Energy Transfer released a public statement claiming that the Partnership "vehemently den[ies] any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release," and that the Partnership is "confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania";

- On January 4, 2019, Energy Transfer spokesperson Lisa Dillinger stated on behalf of the Partnership that "Energy Transfer has not engaged in any form of criminal activity";

- On January 22, 2019, Energy Transfer claimed, in response to accusations of bribery of Pennsylvania constables to intimidate homeowners, that the Partnership had "engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property";

- On March 20, 2019, in response to a criminal investigation into Energy Transfer's construction of the Pipeline Projects, Energy Transfer claimed that "[s]afety is our priority," that there was "no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines," and that the Partnership was "confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania"; and

- On July 6, 2019, *Philadelphia* Magazine reported that Energy Transfer claimed that the Partnership remains "confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania."

149.    The statements referenced above were materially false and misleading when made, and they failed to disclose material facts necessary to make them not misleading.  Specifically, as described in more detail below, Defendants willfully or recklessly made and/or caused the

Partnership to make false and misleading statements to the investing public that failed to disclose that (i) Energy Transfer had an "unwritten policy" to bribe Pennsylvania State Constables to act as private security for the Pipeline Projects; (ii) Energy Transfer bribed the Constables to display their badges and firearms at construction worksites and bully citizens so as to hide from citizens and investors the Partnership's unlawful construction practices; (iii) Energy Transfer created a series of shell corporations to hide its payments to the Constables; and (iv) as a result, Defendants' public statements were materially false and misleading when made.

150.    Frank Recknagel is the Energy Transfer security manager for the Mariner East project.  He coordinated with an entity known as TigerSwan to recruit law enforcement officers, rather than private security guards patrol the ME2 pipeline route.

151.    Recknagel told Bobbie Ripley, a TigerSwan employee, that it was Energy Transfer's "unwritten policy" to use "On Duty" law enforcement, sheriffs, or Constables to provide armed security.  Additionally, according to the criminal complaint that DA Hogan later filed, after residents of Lisa Drive expressed concerns about the presence of armed security personnel in close proximity to their homes and children, an executive-level Energy Transfer supervisor instructed Recknagel, on April 12, 2018, to make security personnel available to meet with local parents near Lisa Drive in West Whiteland Township.

152.    Before and after the Energy Transfer-directed meeting between the Constables and residents, the West Whiteland Township Police filed several police reports indicating contact with Constables.  For example, while responding to trespassing complaints on March 5 and 24, 2018, West Whiteland Township police spoke to Constable Kareem Johnson, who stated that he was hired by Sunoco.  Similarly, on May 7, 2018, West Whiteland Police responded to a disturbance on Lisa Drive and the filed report states that the police officers spoke to Constable Tyrai Anderson

from Dauphin County, who told the officers that he was "hired as a deterrent and to monitor the Lisa Drive location."

153.    The success of Energy Transfer's ME2 pipeline depended on the Partnership's ability to bring the pipeline online and carry the amount of NGLs that Energy Transfer told the market/investors it could carry.  During the Relevant Period, due to Energy Transfer's failure to timely disclose the frac-outs, water contaminations, regulatory violations, fines, and shutdowns; Energy Transfer's inability to conduct HDD in the area around Lisa drive and environs (as GSE warned Sunoco in November 2017); and the Lisa Drive sinkholes (which started in November 2017), Defendants caused Energy Transfer to mislead investors about the width of the pipe in the ME2 pipeline, when it would be brought online, and its throughput.

154.    During numerous investor presentations Defendants held from May 31, 2017 up until August 14, 2018, Energy Transfer touted ME2's "initial capacity" as being 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.

155.    In light of the problems at Lisa Drive, and other locations, as well as generalized issues with Energy Transfer's use of HDD, and unbeknownst to investors, Energy Transfer knew internally that it could not complete the planned ME2 on schedule with 20-inch pipe.  Instead, Energy Transfer realized that, in order to purportedly meet its 2018 in-service agreements, it needed to bring "ME2" online by cobbling together the new ME2 20-inch pipe with 12-inch pipe from another, much older pipeline.

156.    On July 3, 2018, the press reported that Energy Transfer and Sunoco were planning to pump NGLs through an existing 12-inch pipeline that was being used to flow petroleum products in some sections of Delaware and Chester counties, where the new Mariner East pipelines were still under construction.  The Partnership said it would use a portion of the older line from

Wallace Township to Middletown Township so that it could supply NGLs to its customers while construction proceeded. The article reported that Energy Transfer had already filed a request for this change with the PHMSA.[1]

157.    Previously, on June 19, 2018, a resident of Darby County reported that this same older line spilled over 33,500 gallons of gasoline into a Darby Creek.

158.    Prior to this July 3, 2018 announcement, Sunoco had already informed townships, including West Whiteland and East Goshen Townships, that it planned to repurpose the old pipeline because Sunoco was under pressure from its clients to deliver the promised NGLs, which were then at least 18 months behind the original schedule.

159.    West Goshen Township hired Accufacts, Inc. ("Accufacts") to evaluate Sunoco's proposal to repurpose the 12-inch pipeline.  Accufacts' analysis explained that the repurposed 12-inch pipeline would join the ME2 between Fairview Road in Wallace Township and Glen Riddle Junction in Middletown Township.  Plotting these addresses in mapping software shows that Lisa Drive in West Whiteland Township, Chester County—the site of the numerous frac-outs and sinkholes discussed above, and Sunoco's constable-hiring scheme, all of which came to a head in November 2017 through April 2018—is directly in-between them, suggesting that the purpose of using the old pipeline (instead of drilling ME2) was to bypass an area that Energy Transfer and Sunoco had already long known were plagued by geological risks and construction problems.

160.    As *StateImpact Pennsylvania* reported months later, on September 4, 2018, the 12-inch line Sunoco proposed to use was, in fact, the line that had leaked 33,000 gallons of gasoline into Darby Creek.

161.    On June 14, 2018, the PUC upheld part of a complaint by State Senator Dinniman,

---

[1]        Pipeline Hazardous Materials Safety Administration.

calling for a shutdown of Mariner East in West Whiteland on the grounds that the project was a threat to public safety.  The PUC said Sunoco had informed it of its plans for the 12-inch line but declined to provide further details.  "PUC was already notified by Sunoco because it is a public utility," said PUC spokesperson David Hixson.

162.    Defendants initially caused Energy Transfer to hide from investors the true impact of using the 12-inch pipe with ME2 until August 2018.  Only after being asked by analysts about such impact did Energy Transfer disclose, on August 10, 2018, that its *ad hoc* cobbling-together of old and new pipelines would result in a 65% reduction in ME2's initial throughput when brought online.

163.    Despite Energy Transfer's claims that it was doing everything in its power to ensure the timely and safe construction of the Pipeline Projects, Defendants' actions with respect to the Revolution pipeline further made clear that Defendants acted with severe recklessness when constructing the Revolution pipeline.

164.    Like Energy Transfer's reckless construction of ME2, Energy Transfer, through its subsidiary ETC Northeast Pipeline LLC, exhibited the same disregard for the law in its construction of the Revolution pipeline.  The Revolution Project consists of a pipeline that transports gas drilled by Energy Transfer customers to a cryogenic gas processing plant that would have processed and separated liquid natural gas into methane and various other NGLs (the "Revolution Plant").  The plan was to thereafter send compressed NGLs from the Revolution Plant through either ME2 or Energy Transfer's Rover pipeline.

165.    Construction on the Revolution pipeline began on March 14, 2017, and it was originally planned to be completed by mid-2017.

166.    The proposed construction route for revolution went through a geological area

prone to landslides. This fact was known to Defendants or should have been known to them based on the numerous geological studies of the area and proposed route to which they had access from Energy Transfer consultants and from public records.

167.   However, Energy Transfer's pipeline construction tactics forced the Partnership to significantly delay Revolution's in-service date. In fact, in early 2017, due to Energy Transfer's failure to fulfill its timing performance obligations, at least one Energy Transfer customer, EdgeMarc Energy Holdings, LLC ("EdgeMarc"), abandoned its commitment to transport natural gas through the Revolution.

168.   Defendants thereafter caused Energy Transfer to engage in a campaign of misrepresentations to its customers, promising concrete in-service dates, and offered clients contractual exits if the pipeline was not in service on the promised date.

169.   EdgeMarc, as well as Energy Transfer customer PennEnergy Resources, LLC ("PennEnergy"), both entered into contracts with Energy Transfer under the express condition that Energy Transfer would place a safe, legal, and structurally sound pipeline "in-service" by October 1, 2018 pursuant to PennEnergy's contract, and by January 1, 2019 pursuant to EdgeMarc's contract. Thus, this need to have the revolution pipeline in service on the promised dates was, upon information and belief, the motivation for Defendants to cause Energy Transfer to engage in dangerous construction tactics to speed the pipeline along.

170.   Upon information and belief, and according to testimony in litigations concerning Energy Transfer, Defendant McCrea was personally responsible for managing the construction of the Revolution pipeline, as well as managing Energy Transfer's contracts with EdgeMarc and PennEnergy.

171.   Throughout the Relevant Period, in addition to concealing its disregard for the risks

of constructing the Revolution pipeline in a landslide-prone area of Pennsylvania, Energy Transfer repeatedly made false representations to its investors that the Revolution and ME2 pipelines would be in-service sooner than was safely possible:

- On Energy Transfer's May 4, 2017 earnings call with investors, Defendant Long stated that "Our Revolution project is still on schedule to be in service in the fourth quarter of 2017";

- On Energy Transfer's August 9, 2017 earnings call, Defendant Long stated that "On our Revolution project, construction is scheduled to be completed in the fourth quarter of 2017" and Defendant McCrea stated that "it will be up and ready for service in the fourth quarter";

- On the Partnership's November 8, 2017 earnings call, Defendant Long pushed the date out slightly, stating at that time that "On our Revolution project[, c]onstruction is scheduled to be completed in the first quarter of 2018";

- On Energy Transfer's February 22, 2018 earnings call, Defendant Long claimed that "On our Revolution project, construction is mechanically complete, and we will go into full service once Rover and Mariner East 2 are in service" and Defendant McCrea added that "Revolution, as you know, that is built to feed Rover, and it's built to feed Mariner. . .  And we're very hopeful that we'll have Rover complete.  We're very close on that soon and that sometime in the second quarter, we'll have Mariner on and ready to take barrels from Revolution";

- On May 10, 2018, during Energy Transfer's first quarter 2018 investor call, Defendant Ramsey stated that Mariner East 2 would enter service in "mid to late" third quarter 2018; and

- On August 9, 2018, Defendant Long stated that "we continue to expect to place ME2 in service by the end of this quarter [third quarter 2018]."

172.    Energy Transfer, however, had been conducting daily inspections of the Revolution pipeline during the months leading up to its explosion in September 2018.  These inspections showed that the pipeline had repeated surface failures along its route, and areas where the ground around the pipeline was sinking.  These facts meant that Defendants were either aware, or were reckless in not knowing, that the projected completion dates for the Revolution could not be met.

173.    Defendants were also aware, or recklessly disregarded, that the amount of work remaining to be performed on ME2, including the use of the repurposed old pipeline and

undertaking HDD in unsuitable areas, would not allow for Energy Transfer to meet the claimed in-service dates for the full ME2 pipeline.

174.    Defendants were also aware that they had broken numerous environmental and safety laws and regulations in order to meet the claimed in-service dates and that fines and civil penalties would follow once the DEP discovered Energy Transfer's misconduct.

175.    On September 10, 2018, the Revolution pipeline exploded, demonstrating the real threat the Pipeline Projects posed to Pennsylvania citizens after Energy Transfer had failed to act in compliance with state environmental, safety and criminal laws, as well as with its own Code of Conduct.

176.    Defendants willfully or recklessly failed to disclose that (i) in January 2016, Energy Transfer hired an engineering consulting firm to evaluate the safety of the Revolution's planned pipeline path; (ii) the consulting firm warned Energy Transfer that the Revolution's path was highly dangerous and crossed terrain that was known to have landslides; (iii) Energy Transfer faced severe pressure to complete the Pipeline Projects by the end of 2018 to prevent customers from voiding their commitment contracts with Energy Transfer; (iv) Energy Transfer would be unable to complete the Pipeline Projects by the end of 2018 without constructing the Revolution along its originally planned path as securing additional easements to construct the Revolution along a safer path would be too time-consuming; (v) Energy Transfer would cut additional corners and construct an unsafe and environmentally destructive pipeline in order to meet the 2018 in-service date; and (vi) as a result, Defendants' public statements about the safety of Revolution and its completion date were materially false and misleading at all relevant times.

177.    Defendants' actions in connection with the Revolution project caused significant harm to the Partnership, including by (i) causing the DEP to issue an order on October 29, 2018

requiring Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline," (ii) causing the Chester County District Attorney to open a criminal investigation into Energy Transfer's apparent misconduct, and (iii) providing a basis for Energy Transfer's customers to void their contracts for taking product from the Revolution pipeline.

178.    Energy Transfer applied for and received numerous permits issued by multiple counties, regulatory bodies, and the DEP in order to construct the Revolution pipeline.  These include, Erosion and Sedimentation Control General Permit authorizations (the "ESCG Permits"). The ESCG Permits provide that each instance of non-compliance with these permits constitutes a violation of the Clean Streams Law and the 2012 Oil and Gas Act.

179.    Energy Transfer also applied for general permits pursuant to the Dam Safety Act ("Encroachment Permits") which provide for limited "encroachments" on specified waters.  The ESCG Permits also require that Energy Transfer operate and install Revolution using the best management practices ("BMP") so as to minimize soil erosion and sedimentation, and to manage stormwater, moving earth to install the pipeline, and to ensure the area around the pipeline was properly stabilized.

180.    In or about January 2016, Energy Transfer hired Terracon Consultants, Inc. ("Terracon"), a geological engineering consultant, to conduct a survey into the geologic route the Revolution pipeline was slated to take.  After its investigation, Terracon issued a Geohazard Evaluation Report (the "Hazard Report") which was intended to guide field personnel to safely construct the pipeline in conformity with the geological dangers to be found.

181.    Constructing an underground pipeline requires knowledge of anticipated geological and environmental hazards, observation, discussion, and mitigation to maintain safety during the

construction process, ensure the successful completion of the construction and to also ensure the long-term integrity of the proposed pipeline.

182.    Defendants knew that there were significant risks if Revolution was built along the path selected by Energy Transfer.  The geology of the proposed Revolution pipeline route would encounter shale bedrock, which is known to have a high potential for geological hazards. Defendants also knew that much of the route consisted of steep slopes and holes and shafts remaining from surface and underground mining activities.  Defendants also knew that the risks of landslides and sinkholes were high.

183.    Upon information and belief, Energy Transfer's consultant Terracon also conducted four scan line reviews.  This involves field reconnaissance of certain segments of the Revolution path, including one segment that was less than 500 feet from the ultimate site of the September 2018 explosion on the Revolution pipeline.  At this site, upon information and belief, Terracon observed and reported that this area of the route showed multiple signs of landslide susceptibility.

184.    Landslides can occur in areas where there are rotational slips and hummocky topography.  Rotational slips  occur when sections of land move down a slope, often caused by the added weight of absorbing heavy rainwater.  Hummocky topography is the highly irregular and wavy ground found near the bottom of a rotational slip and can occur as a result of a past landslide.

185.    Upon information and belief, Terracon advised that because of these steep slopes, removal of vegetation and/or restriction of natural drainage may result in increased landslide susceptibility because vegetation is important for absorbing rainfall.

186.    Defendants nevertheless caused Energy Transfer to build the Revolution pipeline along Energy Transfer's originally projected path along this steep terrain that was prone to

landslides, removed vegetation, and otherwise ignored the warnings and failed to take the necessary precautions to avoid danger from the improper construction of the pipeline.

187.     Energy Transfer not only disregarded its own expert's recommendations when constructing the Revolution pipeline, but Energy Transfer committed hundreds of violations of its construction permits.

188.     Energy Transfer's ESCG Permits required the implementation of Erosion and Sediment Control Plans ("E&S Plans") and Post-Construction Stormwater Management Plans ("PCSM Plans") "to minimize the potential for accelerated erosion and sedimentation from earth moving activities associated with the construction of the Revolution Pipeline."

189.     Energy Transfer's E&S Plans also required the use of various BMPs, including compost filter socks, waterbars, stabilized road entrances, erosion control blankets, and seeding. The ESCG Permits required Energy Transfer to conduct inspections of the BMPs "on a weekly basis and after each stormwater event . . . to ensure effective and efficient operation."

190.     Energy Transfer's E&S Plans also required that "[c]onstruction activities in areas susceptible to slope failures should be investigated and evaluated by a licensed Geotechnical Engineer in order to address any stability issues."

191.     In January 2017, the DEP, along with various other regulatory bodies, issued responses to Energy Transfer's E&S Plans, citing to dozens of technical deficiencies including improperly designed and/or constructed BMPs.

192.     Energy Transfer's E&S Plan failures affected construction of the Revolution pipeline.  During active construction of the pipeline, in May 2017, DEP inspections of the pipeline in Smith and Robinson townships identified violations of the Clean Streams Law because Energy Transfer had failed to properly implement multiple BMPs.

193.    From November 2017 to March 2018, the DEP inspected a single section of the pipeline at least ten times, resulting in over a dozen violations of the Clean Streams Law, and ultimately resulting in a Consent Order and Agreement, issued in June 2018 ("June 2018 Order").

194.    Pursuant to the June 2018 Order, Energy Transfer had violated Pennsylvania's Dam Safety and Encroachments Act, Clean Streams Law, dam safety and water management regulations, and erosion and sediment control regulations.

195.    The DEP also cited Energy Transfer for allowing spoiled material to slide downslope into a waterway known as Raccoon Creek, near where the pipeline later exploded. Energy Transfer had also failed to install BMPs to contain the spoiled material.  Energy Transfer's actions resulted in a "significant loss of the streambank" at Raccoon Creek, affecting approximately 290 feet.  Energy Transfer agreed to pay a $145,250 civil penalty and to implement certain restoration plans to resolve the violations.

196.    The June 2018 Order also required restoration and monitoring of the stream restoration for a period of five years.

197.    The Revolution pipeline experienced significant soil stability issues, including landslides, slope failures, and ground cracks in thirty-nine different sections.

198.    Energy Transfer was also cited for numerous violations of the Clean Streams Law at a different section of the pipeline in Independence Township.  From May 3, 2018 to May 29, 2018, Energy Transfer was inspected three times and cited for at least 15 violations of the Clean Streams Law at a section of the pipeline off of Newmann Road and Route 30 in Independence Township.

199.    The violations included a failure to implement and maintain effective BMPs, failure to provide temporary stabilization of the area in question, and failure to comply with its permit

conditions.

200.    The Revolution pipeline had issues with a lack of soil stability in areas other than where the explosion happened.  In February 2018, a landslide occurred in the pipeline right-of-way near Penny Hollow Road in Beaver County, Pennsylvania.

201.    The landslide occurred in an area known to have landslides.  Energy Transfer itself called the landslide "major" as it reportedly damaged trees and gouged out the land down to a nearby stream.

202.    In April 2018, another landslide occurred near Highway 151 in Independence Township.

203.    As with the Penny Hollow landslide, the Highway 151 landslide occurred in an area known to be prone to landslides.

204.    This landslide occurred approximately 30 feet from the landslide at the eventual explosion site.  Energy Transfer was in the process of attempting to stabilize the area by drying out saturated soil, moving that soil back uphill, and installing underdrains without a permit at locations in this saturated zone as determined by persons in the field.  The DEP later found that neither an engineer nor any other geotechnical expert was consulted by field staff when this work was performed.

205.    On or about June 1, 2018, Energy Transfer reported to the DEP that the Revolution pipeline was "mechanically complete and ready to be placed into commercial service."

206.    However, stability and soil movement issues at the eventual site of the explosion itself continued during the summer of 2018.

207.    In the days prior to the Revolution explosion,  Energy Transfer failed in its attempts to stabilize the site of the explosion by installing curtain drains and erosion matting, mixing

calcimite into the soil at the site of the explosion, and re-seeding the slope near the explosion site.

208.    The U.S. Army Corps of Engineers, and data published by the U.S. Geological Survey, a scientific agency of the U.S. government, designates the area in Western Pennsylvania where the Revolution pipeline explosion occurred as an area with a high incidence of landslides. Defendants either knew of this fact or were reckless in not knowing of it.

209.    Defendants, despite their actual or constructive knowledge of the dangers of the Revolution pipeline route, caused Energy Transfer to choose this dangerous route in order to speed along the construction and reduce costs by using existing right of ways, rather than obtaining safer easements in safer geologic areas.

210.    On September 9, 2018, Energy Transfer began the multi-day commissioning process to put the Revolution pipeline into service.  This required purging all the air from inside the pipeline and filling the pipeline with enough gas to raise pressure inside the pipeline to the desired level.  Energy Transfer never completed the commissioning process.

211.    At approximately 4:56 a.m. on September 10, 2018, Energy Transfer's reckless pipeline construction practices resulted in the rupturing of the Revolution pipeline and a massive explosion in connection with a landslide that occurred near Ivy Lane in Center Township, near Pittsburgh.

212.    Residents reported to the news media that the sound from the geyser of fire was so loud that they thought a plane was headed straight for their homes.  Callers dialing 911 reported potential plane crashes, meteorites, and power plant explosions.  Upon information and belief, neither the local fire department or government official at the township knew that the commissioning process with live gas had begun.

213.    The explosion almost killed a near-by family and knocked out power for over a

thousand electrical customers.  The explosion also burned several acres of land.

214.  In a letter Energy Transfer sent to residents of Ivy Lane the next day, Energy Transfer admitted that a landslide had occurred, but tried to blame the landslide on "unprecedented" rainfall, even though there was no such rainfall.

215.  ETC sent two letters to customers EdgeMarc and PennEnergy: the first claimed stated that the Revolution had been placed in-service one day earlier, on September 9, 2018, despite the fact that Energy Transfer had not finished the commissioning and packing process required before the Revolution could be placed into service; and the second claimed that "an event of Force Majeure occurred" on the Revolution pipeline, making Energy Transfer unable to accept gas from its customers.

216.  Defendants knew or were reckless in not knowing that the Revolution pipeline had not been placed into service before the explosion happened.

217.  Defendants also knew or were reckless in not knowing that Energy Transfer's contracts with EdgeMarc and PennEnergy prevented Energy Transfer from claiming an event of Force Majeure when the event was not "beyond the reasonable control" of Energy Transfer. However, neither the storm before the landslide nor the resulting explosion and fire was a Force Majeure.  Properly constructed pipeline systems are designed and engineered to account for the soil, slope and weather conditions where the pipeline is being laid.

218.  Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the site of the Revolution pipeline explosion "included a 'slip' landslide area" with "dangerous and unstable hillslope terrain."

219.  From November 2017 through February 2018, the Beaver County Conservation District, acting under delegated authority from the DEP, cited Energy Transfer at least six times

for failing to implement and maintain appropriate practices to minimize the risk of accelerated erosion and sedimentation along the Revolution.  The route selected for the Revolution pipeline exhibited these known risks, but Defendants nevertheless sought to place it there so that construction of the Revolution pipeline would not be further delayed.

220.    After the explosion of the Revolution pipeline and Energy Transfer's issuance of the inaccurate "in-service" and Force Majeure letters, both PennEnergy and EdgeMarc, contested Energy Transfer's claims, and noted that Energy Transfer had failed to put the Revolution into service by the end of 2018 as previously promised.

221.    After the Revolution explosion, post explosion investigations were conducted which confirmed that the slope of the ground was too steep and required mechanical stabilization.

222.    On October 29, 2018, the DEP issued an order requiring Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline" (the "October 2018 Order").  Energy Transfer was also ordered to submit a detailed plan of how Energy Transfer would repair the damage caused by the Revolution explosion.

223.    On October 30, 2018, the DEP issued a press release commenting on the October 2018 Order, which stated, in pertinent part, that the DEP's "inspections discovered violations including unreported landslides, impacts to aquatic resources, construction activities occurring in unpermitted areas, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."

224.    On November 26, 2018, after the DEP informed Energy Transfer that its erosion control plans were incomplete and inadequate, Energy Transfer appealed the DEP's order to the state Environmental Hearing Board.

225.    On December 3, 2018, Energy Transfer, pursuant to the October 2018 Order, issued its Stabilization Plan, Landslide Plan, and Updated ESC Plan ("Repair Plan").

226.    Between March 1, 2019 and December 9, 2019, Energy Transfer submitted six revisions to this Repair Plan, five of which were rejected and met with deficiency letters.

227.    Between the date of the explosion and the first week of January 2019, the DEP performed 46 inspections of the Revolution pipeline.  All of them noted continuing violations.

228.    On January 9, 2019, the DEP notified Energy Transfer that it had "failed to comply with the [October] 2018 Order" (the "January 2019 Notice").  Per the January 2019 Notice, Energy Transfer had, for four months after the explosion, "[f]ailed to install flagging, markers, or signs at the site," failed to "cease sediment laden discharges into Commonwealth waters" and failed to "temporarily stabilize disturbed areas."

229.    On February 8, 2019, the DEP issued a letter to Energy Transfer admonishing the Partnership for failing to remedy the damaged site of the explosion.  According to the letter, and a notice posted on the DEP's website that day titled "[DEP] Issues Hold on All Energy Transfer Clean Water Permit Approvals and Modifications Due to Non-Compliance," the DEP determined that Energy Transfer had "failed to comply with the Department's October [] 2018 [] Order, as well as [ESCG] Permit authorizations . . . issued for construction of the Revolution Pipeline."  The DEP stated that the permit hold will continue until Energy Transfer "demonstrates to the satisfaction of the [DEP] that its unlawful conduct has been corrected."

230.    The DEP stated in the January 2019 Notice that "[m]ultiple inspections by DEP staff, most recently in January 2019, found that [Energy Transfer] had not fulfilled the terms of the order and was not progressing toward compliance."  As a result, the DEP issued a permit hold suspending all reviews of clean water permit applications and amendments for Energy Transfer

- 60 -

and its affiliates, which would continue until Energy Transfer "demonstrates to the satisfaction of the Department that its unlawful conduct has been corrected."

231.    There was now growing evidence that the explosion of the Revolution pipeline was the direct result of Energy Transfer's failure to engineer and build a structurally safe pipeline.  As a result, Energy Transfer customers disputed their contractual commitments to Energy Transfer.

232.    On December 13, 2019, more than 15 months after the Revolution explosion, the DEP issued a letter that "conditionally" approved Energy Transfer's Repair Plan.

233.    Between the date of the Explosion and the DEP's approval of Energy Transfer's Repair Plan, the DEP found that "at least [19] distinct sections of the Revolution Pipeline were not temporarily or permanently stabilized, which resulted in numerous slides within and outside of the" permitted area, and that Energy Transfer had caused "at least 352 separate occurrences of accelerated erosion and sedimentation," and had discharged sediment laden water on "at least 540 different occasions" into various creeks, streams and other bodies of water.

234.    Furthermore, "at least 868 BMPs were not properly implemented or maintained," and "at least 1,359 BMPs were either not installed or installed improperly, contrary to the ESCGPs."  Moreover, "on at least 244 occasions, [Energy Transfer] did not submit corrective action reports after BMP failures."

235.    Upon information and belief, the conduct Defendants caused Energy Transfer to engage in caused the total elimination of at least 23 streams and 17 wetland areas, and the shortening or altering of 120 streams and 70 wetlands.

236.    On January 3, 2020, the DEP issued an Order that admonished Energy Transfer for willful and egregious violations of Pennsylvania law during its planning for and construction of the Revolution (the "January 2020 Order").

237.     This January 2020 Order was issued exactly two years after Judge Barnes issued the January 2018 Order admonishing Energy Transfer for its "willful and egregious" violations of Pennsylvania law during its construction of ME2.

238.     In the January 2020 Order, the DEP made multiple findings of conduct by Energy Transfer that violated its safety and environmental obligations and ordered Energy Transfer to pay a $30.6 million fine, the largest the DEP has ever issued.  According to Secretary McDonnell, "ETC's [a subsidiary of Energy Transfer] lack of oversight during construction of the Revolution Pipeline and their failure to comply with DEP's October 2018 compliance order demanded serious accountability. Their inaction led directly to this unprecedented civil penalty."

239.     The January 2020 Order held that Energy Transfer had "from the commencement of construction on March 14, 2017 to September 10, 2018, [] failed to inform the people that performed construction work on the Revolution Pipeline of the ESCGP Geohazard Requirements, the Construction Sequence, or any other part of the Narrative of the ESCGP."

240.     On April 27, 2020, the *Pittsburgh Post-Gazette* reported that Energy Transfer is "already negotiating a new settlement to address a slew of violations found since" the January 2020 Order.  Specifically, Energy Transfer had committed 596 new environmental violations since the January 2020 Order was issued, including causing "masses of rock and soil [to] slough[] downhill, spill[] over barriers, knock[] out trees and fill[] in streams."  In addition, Energy Transfer has still has not begun fixing the actual pipeline, since it cannot start that work until it first demonstrates to the DEP that it has erosion under control at the site where the Revolution pipeline exploded.

241.     According to the *Pittsburgh Post-Gazette*, while inspections of the Revolution pipeline have accounted for less than 1% of the 8,200 evaluations of well sites and pipelines the

DEP has conducted since January 1, 2020, the Revolution pipeline has accounted for 19% of the violations.  Between the day of the Revolution pipeline exploded and the January 2020 Order, Energy Transfer has accumulated approximately 8½ violations per inspection relating to the Revolution pipeline.  And, according to the article, Energy Transfer has increased this rate to nearly 10 violations per inspection since January 1, 2020.

242.    Energy Transfer is required to pay $20,000 for each day of non-compliance according to the January 2020 Order.  As of May 1, 2020, Energy Transfer owes the DEP nearly $2.5 million but the DEP has yet to receive any of these funds.

243.    The Revolution pipeline has remained out of service since the September 1, 2018 explosion and the PUC and the Pennsylvania Attorney General still have open investigations into the happening of the explosion.  The U.S. Department of Justice is also still investigating the cause of the explosion.

244.    On December 19, 2018, the Chester County District Attorney's office issued a press release announcing that it had opened a criminal investigation into the construction of the Mariner East pipelines and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle bullying of Chester County citizens."   The press release quoted District Attorney Tom Hogan as saying:

> We expected the state regulators and the governor to step in and assure the safety of Pennsylvanians.  They have not.  So now the Chester County District Attorney's Office will demand that every aspect of the pipelines be constructed safely, or we will bring into play all of the tools of the criminal justice system.

245.    The press release further stated that the construction of the Mariner East pipelines had caused "significant sinkholes in . . . residents' back-yards" and "contamination of well water" in Chester County, and cited the Revolution Explosion in Beaver County (discussed in detail below) as "chang[ing] speculation into tangible danger and destruction."   The Chester County

District Attorney further explained that the investigation would cover past and future conduct, and that "[p]otential charges [could] include causing or risking a catastrophe, criminal mischief, environmental crimes, and corrupt organizations."

246.   On January 4, 2019, the District Attorney announced that it had named Seth Weber, a former federal prosecutor, to the investigation.  Mr. Weber had "prosecuted many complex environmental cases as well as political corruption . . . cases during a 26-year career as an Assistant U.S. Attorney for the Eastern District of Pennsylvania."  District Attorney Hogan explained that Weber's appointment "certainly sends a message that we are taking it very seriously, and that somebody who has experience in this field is taking it very seriously."

247.   On March 5, 2019, Phil Heron of the website *Daily Times* reported that he had received a grand jury summons in Chester County, and that the jury selection process involved questions concerning the Mariner East project and Energy Transfer.

248.   On December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline, Frank Recknagel, in connection with his direction of a "buy-a-badge" scheme for security services along the ME2 pipeline project.  In the press release accompanying the announcement of charges, DA Hogan stated:

> This is a pretty simple case.  State Constables sold their badges and official authority.  Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens.  And the defendants attempted to conceal their activity through a maze of companies and payments.

249.   The press release continued:

> Energy Transfer decided they needed security for the pipeline.  However, rather than simply hiring a private security firm, Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline.  Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act.

Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.

250.    The charges accuse Energy Transfer of engaging in a "buy-a-badge" program to circumvent Pennsylvania state laws by hiring Pennsylvania State Constables to provide security for construction sites along ME2, while donning their badges, wearing their official uniforms, and bearing firearms.   The charges in the criminal complaint are against Recknagel, the Energy Transfer security chief, and four other individuals: Nikolas McKinnon of Stafford, Virginia, a senior security adviser for TigerSwan LLC ("TigerSwan"), an international security firm; Michael Boffo of Jacksonville, Florida, a site security manager for TigerSwan; James Murphy of Harrisburg, Pennsylvania, operator of Raven Knights LLC ("Raven Knights"), a Harrisburg-based security firm; and Richard Lester of Linglestown, Pennsylvania, registered owner of Raven Knights.  The charges in the criminal complaint include: (i) Bribery; (ii) Conspiracy; (iii) Dealing in proceeds of unlawful activity; (iv) violations of the Pennsylvania Constable Act; and (v) violations of the Pennsylvania Ethics Act.

251.    The Chester County District Attorney's Office's investigation revealed that Recknagel orchestrated the scheme to bribe the Constables.  As discussed below, Recknagel implemented Energy Transfer's "unwritten policy" to use government officials—State Constables—to secure the Energy Transfer construction sites and intimidate residents and potential protestors.

252.    As DA Hogan's press release and the criminal complaint highlighted, Pennsylvania Constables are elected public officials.  Constables are authorized under Pennsylvania law to serve arrest warrants and various forms of civil process, transporting criminal defendants for court, serving as courtroom security, preserving the peace at polling places during elections, and other duties.  For the foregoing, Constables are paid by the Pennsylvania courts as codified by statute.

Constables are prohibited from holding private detective licenses in Pennsylvania to avoid the appearance of misusing their public authority for private interests. In addition, Constables are prohibited from representing themselves as officers of the court when not performing judicial duties. In fact, the Pennsylvania Ethics Act prohibits Constables from using their office for their own private pecuniary benefit.

253.    According to the criminal complaint, rather than hire a private security firm for the Mariner East project, Energy Transfer decided to recruit and hire armed Pennsylvania State Constables, since Energy Transfer expected the Constables' badges and firearms would carry more influence than a private security guard's uniform.

254.    The criminal complaint states that at least one constable was working outside of his home jurisdiction while two others unwittingly approached Chester County Detective Ben Martin ("Detective Martin") to intimidate him at a site in West Whiteland Township, while Martin was on duty investigating Energy Transfer's illegal use of constables in January 2019.

255.    DA Hogan's team assigned Detective Martin to investigate concerns related to the construction and safety of ME2 on December 5, 2018. DA Hogan's office had received multiple reports from Chester County residents that Drilling Pollutants from ME2 were contaminating groundwater sources for private wells, that sinkholes had been opening along the path of the pipeline, and that many residents were concerned about a possible leak or explosion and the potential for catastrophic loss of life.

256.    According to the criminal complaint, on January 2, 2019, Detective Martin interviewed Thomas Allen ("Allen"), a resident of Lisa Drive in West Whiteland Township. Energy Transfer held an easement to construct and operate ME2 on Mr. Allen's property and had been engaged in construction activities there for many months prior to his interview with Detective

Martin.  Mr. Allen told Detective Martin that he had seen armed individuals on his property, one of whom Sunoco subcontractor Bob Reilly informed Mr. Allen was a Pennsylvania State Constable.

257.    Two days later, on January 4, 2019, Detective Martin interviewed State Senator Andy Dinniman who told him about several reports from his constituents that Energy Transfer had employed armed security guards on ME2 who displayed their badges and identified themselves as Pennsylvania state constables.  Senator Dinniman told Detective Martin that residents reported being intimidated by armed men showing their badges while restricting residents' movements on their own properties.

258.    On January 21, 2019, Detective Martin went to Lisa Drive in West Whiteland Township  As he was parked in a legal parking area on a public street at approximately 10:30 a.m., a security guard who identified himself as Pennsylvania state constable Mike Robel ("Robel") approached Detective Martin.  Robel was a Constable from Northumberland – not Chester – County, Pennsylvania.  Robel, wearing what the complaint describes as "a patrol style duty belt with a firearm" and a visible Pennsylvania State Constable badge, told Detective Martin that he could not remain in the spot and that he would have to move his vehicle.  According to Detective Martin, Robel told him that he was employed by Sunoco.  Detective Martin identified himself as a Chester County Detective and told Robel that he would move when he was finished with what he was doing.  Martin subsequently confirmed that Robel was a constable from Northumberland County after he ran a search on the Constable at the DA's office.

259.    Later that day, at around 2 p.m., Detective Martin spoke with Robel again on Lisa Drive.  Robel told the detective that he worked as a subcontractor for Sunoco for James Murphy (of Raven Knights) and that he was being paid by Sunoco, not the state courts, because "Sunoco

wanted certified Constables in uniform as private security for the project." Robel's statements to Detective Martin underscore that it was Energy Transfer's policy to have these armed constables present on Lisa Drive and at other sites along the pipeline, in violation of Pennsylvania law, and that Energy Transfer directly managed security for the project.

260.    According to the criminal complaint, McKinnon conveyed incident reports from the Constables to Recknagel and generally "kept him apprised of Constable activity."

261.    On March 13, 2019, Detective Martin interviewed Constable Tyrone Harley, Jr. Harley told Detective Martin that James Murphy of Raven Knights, a retired Pennsylvania State Trooper he knew through the Masonic Lodge, recruited him to work security for the Mariner East project.  Harley told Detective Martin that he reported to Mike Boffo of TigerSwan and used WhatsApp to communicate about his work on Mariner East.  Harley told Detective Martin he received $25 per hour for his work in paper checks.

262.    On April 8, 2019, Detective Martin interviewed Constable Paul Norris.  Norris told Detective Martin that he heard about the security detail work from Constable Kareem Johnson in April 2018.  Norris asked Johnson to pass his contact information along to the people "running the job."  Norris received a call to join the security team a few weeks later "from a security supervisor" and he faxed all of his credentials and qualifications to James Murphy of Raven Knights.

263.    Norris also said that Mike Boffo had established a suite of rooms at the Fairfield Inn in Lionville, PA to run the security operations. On June 1, 2018, Bobbie Ripley sent an email to Frank Recknagel informing him that the Constables would be attending body camera training. Harley said Boffo provided him with a body camera to use for his security detail on Lisa Drive.

264.    During a later interview of Constable Kareem Johnson by Detective Martin, Johnson said when he called the number fellow Constable Harley provided, he spoke to whom he

believes was Nikolas McKinnon from TigerSwan.  Shortly thereafter, Johnson went to the Fairfield Inn in Lionville and met with Mike Boffo and Bobbie Ripley from TigerSwan, to whom he provided his credentials and certifications.  During this meeting, Johnson was wearing his uniform and he was told to do so when he was working security on the Mariner East project.

265.    On August 8, 2019, Chester County law enforcement officials arrested Constables Mike Robel and Kareem Johnson and charged them with Bribery, Official Oppression, and Ethics Act violations.   In response to the arrest, Energy Transfer spokesperson Lisa Coleman misleadingly claimed in an email statement:

> Constables Johnson and Robel were not Sunoco or Energy Transfer employees. They were employed by Raven Knights, who provided security services and personnel.  We have a code of conduct for all of [our] contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that.

266.    Yet, upon information and belief, documents obtained by the Chester County DA's office show that the Constables were hired at the direction of Energy Transfer employees, such as Recknagel, and that payment to law enforcement for their authority is a company policy.

267.    Following further investigation throughout 2019, on December 3, 2019, DA Hogan's office issued a Chester County criminal complaint, which charged that Recknagel, the Energy Transfer security director, schemed to hide payments to state constables in order to allow Energy Transfer to have armed, uniformed government officials providing security at Energy Transfer locations while attempting to hide Energy Transfer's hiring of the Constables.  In a press release about the complaint, DA Hogan said:

> This is a pretty simple case.  State constables sold their badges and official authority. Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens.  And the defendants attempted to conceal their activity through a maze of companies and payments.  Meanwhile, new sinkholes are popping up along the Mariner East pipeline.  And still, the governor remains asleep at the wheel.

268.    The criminal complaint alleges that Energy Transfer and its wholly-owned subsidiary Sunoco illegally hired 19 constables to guard ME2.  According to the criminal complaint, Sunoco hired TigerSwan to oversee security on the Mariner East projects and the contracts governing TigerSwan's obligations indicate that subcontractors providing security services report to TigerSwan personnel for daily operations.

269.    Energy Transfer and TigerSwan have a long history of working closely together on high-profile Energy Transfer pipeline projects.  Energy Transfer had previously used TigerSwan to provide security for the controversial Dakota Access pipeline project in North Dakota and, at the time Sunoco entered into the Mariner East contract with the security firm, TigerSwan was litigating a case brought by the North Dakota Private Investigation and Security Board related to allegations of unlicensed security work in that state.  In North Dakota, TigerSwan faced scrutiny after *The Intercept* published leaked documents[2] detailing TigerSwan's invasive surveillance practices, which involved infiltrators, aerial monitoring, and a close collaboration with local law enforcement to thwart lawful protests near the Standing Rock reservation.[3]  The documents reveal that both of the TigerSwan contractors charged in Pennsylvania—McKinnon and Boffo— previously worked on Energy Transfer's Dakota Access pipeline.  Similarly, the Louisiana security board accused TigerSwan of registering a new security company in the state in an attempt to circumvent a previous license denial for security work related to Energy Transfer's Bayou Bridge

---

[2] Alleen Brown, Will Parrish, Alice Speri, THE INTERCEPT, *Leaked Documents Reveal Counterterrorism Tactics Used to "Defeat Pipeline Insurgencies,"* *available at* https://theintercept.com/2017/05/27/leaked-documents-reveal-security-firms-counterterrorism-tactics-at-standing-rock-to-defeat-pipeline-insurgencies/ (last visited at May 29, 2020).

[3] Alleen Brown, THE INTERCEPT, *Pipeline Giant Energy Transfer and Its Private Security Contractors Face Bribery Charges in Pennsylvania* (Dec. 8, 2019), *available at* https://theintercept.com/2019/12/08/energy-transfer-tigerswan-bribery-conspiracy-charges/ (last visited May 29, 2020).

oil pipeline.

270.    According to the criminal complaint, Raven Knights, controlled by former Pennsylvania state troopers Murphy and Lester and at the direction of Energy Transfer, hired the constables and paid them "in a fashion calculated to avoid legally-mandated reporting requirements."   The structure of the payments also served to obscure Energy Transfer's supervision of the constables.  According to the complaint, the Raven Knights bank account used to pay the constables was fed by deposits from TigerSwan and two Energy Transfer construction subcontractors.

271.    As alleged in the criminal complaint, Energy Transfer paid the constables a total of $804,590 between September 2017 and February 2019, "for the purposes of bribing Pennsylvania State Constables to use the authority of their office."  Recknagel arranged for these payments to be made in more than 23 separate transactions through subcontractors that had no operational control over the Constables.  DA Hogan's investigation revealed that TigerSwan and Raven Knights employees communicated extensively with Recknagel (i.e., Energy Transfer) regarding the payments to Constables, including an October 8, 2018 quarterly breakdown of spending for security at Lisa Drive in West Whiteland Township.  These communications also detailed the Constables' hiring, schedules, credentials, training and duties.   The emails specifically differentiated, according to the criminal complaint, between security and Constables assigned to the construction sites when addressing personnel and budgetary considerations.

272.    DA Hogan and his team found that every step of Energy Transfer's payments to the State Constables was "hidden and cloaked":

> Recknagel hid payments to the State Constables.  Recknagel, acting for Energy Transfer, arranged for uninvolved subcontractors to send payments to the security firms for eventual payment to the Constables.  In other words, Recknagel used a shell game to hide payments to the Constables.  For instance, Energy Transfer sent

payments to a subcontractor who was completely uninvolved in pipeline security. The subcontractor sent payments to Raven Knights. Raven Knights then paid the Constables, hiding the connection between Energy Transfer and the Constables. To make the transactions even more difficult to track, the Constables failed to report the payments on their Pennsylvania Ethics Statements, which is a legal requirement. Every step of the payments was hidden and cloaked.

Energy Transfer could have simply hired a reputable private security firm and paid the security guards directly. Instead, Recknagel and Energy Transfer wanted the power of the badge to enforce their corporate will and engaged in illegal activity to make it happen, then hid the payments in a byzantine process to avoid detection of their role.

273.  DA Hogan added in the press release, "These types of investigations are complex and time consuming. We are working our way up a chain of corruption, which has both corporate and political ramifications. Other law enforcement entities are also investigating. It will be interesting to see where the evidence leads."

274.  Energy Transfer's problems with pipeline construction were not limited to the ME2 problems at the Lisa Drive area or the explosion of the Revolution pipeline. Instead, Defendants caused Energy Transfer to engage in widespread misconduct which caused significant delay in the construction of the Pipeline Projects.

275.  Energy Transfer and Sunoco's reckless construction of ME2 polluted multiple public and private drinking water supplies.

276.  On July 24, 2017, Sunoco entered into a Consent Order and Agreement with the DEP. Pursuant to the Order, the DEP "determined that Sunoco's activities adversely impacted the well water of the 14 homeowners . . . by its drilling activities at the Shoen Road Drill Area, including causing cloudy water, turbid water, and discolored water" and that "Sunoco failed to immediately notify the Department of adverse impacts to private water supplies . . . as required" by Sunoco's permit.

277.  The DEP also found that Sunoco's pollution of these water supplies constituted a

violation of Pennsylvania's Clean Streams Law, the 2012 Oil and Gas Act, and the Dam Safety & Encroachments Act, and ordered Sunoco to halt HDD activities and implement a contingency plan to address any adverse impacts on private water supplies as a result of the pollution event.

278.   For a portion of its ME2 construction in Loyalhanna Township, Westmoreland County, Sunoco utilized HDD in order to install the pipeline under Loyalhanna Lake.  Prior to Sunoco's construction, the Pennsylvania Fish and Boat Commission conducted a fish survey of Loyalhanna Lake in 2014 and concluded that it had fair to very good populations of gamefish.

279.   On May 13, 2017, Sunoco caused a frac-out to occur under Loyalhanna Lake. Sunoco caused eight more frac-outs to occur over the next two months.

280.   On June 1, 2017, the Westmoreland County Conservation District ("WCCD") inspected the area around Loyalhanna Lake to evaluate Sunoco's compliance with its Chapter 102 Permits and The Clean Streams Law, Act of June 22, 1937.  Upon inspection, the WCCD determined that Sunoco had failed to implement effective Best Management Practices ("BMPs"), in violation of the Chapter 102 Permits and Pennsylvania law, and notified Sunoco.

281.   Less than a week later, on June 6, 2017, Sunoco caused two more frac-outs to occur at Loyalhanna Lake.  These were followed by two more frac-outs on July 16 and 17, 2017.

282.   The WCCD conducted a follow-up inspection of the Loyalhanna Lake site on July 27, 2017.  The WCCD determined that Sunoco had again failed to maintain effective BMPs, violating Pennsylvania law and Sunoco's Chapter 102 permits, and that Sunoco caused pollution to 'waters of the Commonwealth'" in violation of The Clean Streams Law.

283.   On September 7, 2017, the WCCD made another inspection of the Loyalhanna Lake site to determine whether Sunoco had corrected its construction practices so as to comply with its Permits and Pennsylvania law.  The WCCD found that Sunoco was in a continued state of

failing to maintain effective BMPs. Sunoco had also failed to clean the polluted water in Loyalhanna Lake.

284. On December 15, 2017, the DEP fined Energy Transfer $79,000 for Sunoco's repeated pollution of the waters at Loyalhanna Lake by its HDD activities which were violations (the "December 2017 Order"). In addition, Sunoco was ordered to conduct a clean-up program, including submitting regular progress reports to the DEP, conduct multiple studies to properly determine the size of the affected area, and fund a program to help repopulate the fish it killed.

285. On December 11, 2017, during construction at an HDD site near Raystown Lake, located in Huntingdon County (the "Raystown Lake HDD Site"), Sunoco reported a loss of circulation ("LOC") of approximately 2,000 gallons of Drilling Pollutants from its HDD drilling circulation. The 2,000 gallons of Drilling Pollutants discharged into Raystown Branch Juanita River.

286. On December 20, 2017, Sunoco reported that another frac-out had occurred to the ground surface at the HDD site at Raystown Lake.

287. Between the December 11 LOC and the December 20, 2017 frac-out, Sunoco experienced almost daily Drilling Pollutant LOCs. Upon information and belief, the amount was approximately a million gallons of Drilling Pollutants.

288. Sunoco was required to immediately report each instance of an LOC to the DEP when it occurred pursuant to its HDD IR Plan. Instead, Sunoco only timely reported the first 2,000 gallon LOC on December 11, 2017, and the December 20, 2017 frac-out; it did not report the other December 2017 LOCs until March 5, 2018. On December 6, 2018, Sunoco submitted a post event report to the DEP concluding that at least some of the one million gallons of Drilling Pollutants from the December 2017 LOCs had polluted the bottom of Raystown Lake.

289.    On February 18, 2019, Sunoco submitted a detailed follow-up report to the DEP which indicated that, during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprised a total of two million gallons of Drilling Pollutants lost.  Sunoco violated the HDD IR Plan in place by failing to immediately report the LOCs to the DEP as required.

290.    On July 16, 2019, Sunoco submitted another report to the DEP concerning environmental damage to Raystown Lake. The report stated that between April and December 2017, Sunoco had failed to report approximately 3 million gallons of Drilling Pollutants LOCs, which had polluted approximately 8 acres of the lake bottom of Raystown Lake.

291.    On January 3, 2020, the DEP issued a Consent Agreement and Order relating to Sunoco's pollution of Raystown Lake.  Pursuant to the Order, Sunoco was required to pay a $1.95 million fine, conduct a 110-acre cleanup of the bottom of Raystown Lake, and submit a Fish Habitat Improvement Plan to the DEP by February 1, 2020.

292.    On December 21, 2017, the DEP fined Sunoco $44,000 for multiple violations of Pennsylvania law and its ME2 permits stemming from the Energy Transfer Companies' failure to implement and maintain erosion and sedimentation control BMPs in Lebanon County.  The discovery of these violations occurred as a result of a site inspection by the Lebanon County Conservation District.

293.    According to the DEP's website, Energy Transfer's "construction activities resulted in accelerated erosion and sedimentation at three sites in Lebanon County in violation of its permits and the Clean Streams Law.  In each instance, Sunoco was required to install appropriate measures to effectively minimize the erosion and sedimentation issues at those sites," but failed to do so.

294.    Energy Transfer also violated permits obtained for sites located in many different

jurisdictions and locations throughout Pennsylvania.

295.    Given the delays to putting the ME2 pipeline into service, Energy Transfer executives were feeling the pressure to get ME2 online as quickly as possible.

296.    Energy Transfer continued to violate its permits in its rush to put the ME2 pipeline into service.  On or about November 10, 2017, there was a frac-out at Berks Site 1, which caused Drilling Pollutants to discharge into Hay Creek, a Class A wild trout water per the Fish and Boat Commission, and an Exceptional Value Water ("EV Water") under relevant Pennsylvania law.

297.    The Berks County Conservation District ("BCCD") concluded that Energy Transfer's HDD activities had caused the frac-out.  Energy Transfer's permits did not authorize the Partnership to use HDD activities at Berks Site 1.  Accordingly, the DEP issued a Notice of Violation for that location.

298.    Moreover, in violation of Special Condition 20.xx of Sunoco's Berks County permit, Sunoco was forbidden from performing any in-stream work at this site each year between October 1 and April 1 without prior written approval from the Pennsylvania Fish & Board Commission ("FBC").  A similar requirement is found in Energy Transfer's other Chapter 102 permits.  Defendants were aware of this restriction because this special condition was explicitly listed in Sunoco's Berks County permit, as well as on the site map of the authorized work area.

299.    The BCCD conducted an inspection of Berks Site 2. They found that, as at Berks Site 1, Sunoco had been conducting HDD operations at Berks Site 2 in direct violation of their permits, which permitted only trenching, and had been conducting in-stream work during the October 1 to April 1 restriction period.

300.    On November 21, 2017, the DEP issued a Notice of Violation to Sunoco. The Notice informed Sunoco that its HDD operations were not authorized at Berks Site 2.  The DEP

ordered Sunoco to provide the DEP with a list of worksites along ME2 in which Sunoco had unilaterally switched its waterway crossing method to HDD without receiving any authorization from the DEP.

301.    On December 5, 2017, the DEP responded to a third-party complaint that Sunoco had built a bridge at the Perry Bridge Area without a Chapter 105 permit to do so.

302.    On December 18, 2017, Sunoco notified the DEP that Sunoco had received two complaints from residents near the Cumberland Site that their water had become contaminated and cloudy.  Two days later, the Cumberland County Conservation District ("CCCD") concluded that (i) Sunoco's HDD operations had contaminated residents' water supplies; (ii) Sunoco was not permitted to conduct HDD activities at the Cumberland Site; and (iii) Sunoco had unilaterally elected to use HDD at this site without obtaining a permit modification or any other authorization from the DEP.

303.    On January 3, 2018, the DEP halted all of Sunoco's construction on ME2 and ME2X.  As DEP Secretary McDonnell stated in a press release that day: "Until Sunoco can demonstrate that the permit conditions can and will be followed, DEP has no alternative but to suspend the permits."

304.    In the DEP's January 3, 2018 order (the "January 2018 Order"), the DEP found:

> Sunoco's unlawful conduct . . . demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder.  Suspension of the permits . . . is necessary to correct the egregious and willful violations described herein. Other enforcement procedures, penalties and remedies available to the Department under the Clean Streams Law and the Dam Safety and Encroachments Act would not be adequate to effect prompt or effective correction of the conditions or violations demonstrated by Sunoco's lack of ability or intention to comply.

305.    Pursuant to the January 2018 Order, Sunoco was forced to "immediately suspend all work" on ME2 "unless expressly authorized by the [DEP] in writing."  The DEP again ordered

that Sunoco provide a detailed report "documenting any other unpermitted changes made to the method for installation of the pipeline."

306.   On February 8, 2018, Sunoco agreed to pay a $12.6 million fine to continue construction on ME2.  The civil penalty is one of the largest in DEP history and included continued monitoring of ME2 and ME2X.

307.   On April 27, 2018, the DEP fined Energy Transfer a further $355,000 for multiple violations of Pennsylvania law and the Special Conditions in the ME2 permits stemming from 69 separate frac-outs caused by Energy Transfer's HDD activities throughout the state.  According to the DEP's website:

> Sunoco's construction activities resulted in an unpermitted discharge of drilling fluids to wetlands, wild trout streams, and High-Quality Waters at a number of locations in Allegheny, Blair, Cambria, Cumberland, Dauphin, Huntingdon, Indiana, Lancaster, and Washington Counties in violation of its permits and the Clean Streams Law.  In each instance, [Energy Transfer] was required to halt operations, remediate the impacts, and submit proposed modifications to its construction methodologies to DEP for approval.  [Energy Transfer] was allowed to resume operations only after DEP reviewed and approved Sunoco's proposed modifications.  This penalty is in addition to the $12.6 million penalty levied against the company in February and covers separate violations.

308.   On March 7, 2018, the Chairman of the PUC, Gladys Brown, granted an emergency request filed by the PUC's Bureau of Investigation and Enforcement, ordering Energy Transfer to temporarily shut down ME1.  Citing concerns about the "integrity of the pipeline" in light of sinkholes that were developing in Chester County, some of which had exposed the ME1 pipe, Chairman Brown ordered Sunoco to inspect ME1 in the vicinity of the sinkholes, and also to study geologic conditions and submit findings to the PUC.

309.   *StateImpact* reported at the time, the order provided that "Sunoco [would] not be allowed to resume operation of the pipeline until it meets all safety requirements set down by PUC inspectors."  Energy Transfer completed corrective action in the last week of April 2018, and, on

May 3, 2018, the PUC permitted Energy Transfer to restart flows on ME1.

310.    On April 25, 2018, Pennsylvania State Senator Andrew Dinniman filed a written complaint against Sunoco before the PUC.  Senator Dinniman brought claims related to Sunoco's drilling operations in West Whiteland Township in Chester County for violations of the Pennsylvania Public Utility Code and PUC regulations, and sought an injunction prohibiting construction of ME2 and ME2X within 50 feet of any "private dwelling, industrial building or place of public assembly" in West Whiteland Township.

311.    Senator Dinniman's complaint detailed Sunoco's lengthy history of wrongful conduct and accidents in Chester County and around the state.  The complaint asserted that between April 25, 2017 and June 17, 2017, Sunoco's drilling had resulted in at least 61 frac-outs, and that Sunoco had repeatedly failed to timely advise the DEP about the frac-outs on ME2.

312.    The complaint also set forth that Sunoco's ME2 construction efforts had caused multiple sinkholes to develop in West Whiteland Township in late 2017 and early 2018. These sinkholes threatened nearby land and structures and risked the safety of ME1.  The complaint also documented how the PUC's Bureau of Investigation and Enforcement had sought and received an emergency order prohibiting operation of ME1 in March 2018, which the PUC promptly granted.

313.    Senator Dinniman also requested an emergency injunction seeking an order preventing Sunoco from constructing ME2 and ME2X or operating ME1, and requiring Sunoco to conduct geological tests and a public risk assessment, disclose risks to the public, and better train first responders.

314.    On May 21, 2018, Judge Barnes granted Senator Dinniman's emergency petition. In his "May 2018 Order", Judge Barnes found Sunoco to be responsible for multiple leaks, water contamination, frac-outs, and other issues.  Judge Barnes also found numerous risks and open

questions about Sunoco's construction operations.  The May 2018 Order stated that Sunoco's operation of ME1 raised serious concerns about its adherence to safety protocols, holding that "Sunoco failed to identify leaks on its pipeline and failed to report the leak or spill to proper authorities when they occurred," and explaining that those failures "appear[] to be on the surface a failure to follow proper protocol and safety procedure designed to protect the public."

315.     Judge Barnes also held that "Sunoco is putting West Whiteland Township's water supplies at risk by failing to adequately identify, document and avoid drilling through well or aquifer locations underground."  Judge Barnes found that "[a]t least fourteen wells [had] been adversely affected in West Whiteland Twp alone," even though Sunoco only identified 22 private wells in its water permit applications for the entire 350 mile length of the pipeline.

316.     Judge Barnes also held: "[C]redible testimony . . . shows Sunoco is operating in an unsafe manner, not . . . designed to protect the destruction of aquifers and private wells."

317.     Judge Barnes concluded: "Sunoco has made deliberate managerial decisions to proceed in what appears to be a rushed manner in an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety."

318.     On August 2, 2018, the DEP fined Energy Transfer another $147,000 for its multiple violations of Pennsylvania law and the Special Conditions appended to the ME2 permits arising from Sunoco's HDD construction methods.  These methods led to citizen complaints of polluted private water supplies in Chester County, and two complaints of contaminated water supplies in Berks and Lebanon counties.

319.     On August 20, 2019, the DEP fined Energy Transfer $240,000 for over 100 violations of Pennsylvania law and the Special Conditions to the ME2 permits stemming from approximately 40 separate frac-outs in Berks, Blair, Cambria, Cumberland, Delaware,

Huntingdon, Lebanon, Perry, Washington, and Westmoreland counties.

320.　On August 21, 2019, the DEP fined Energy Transfer an additional $78,000 for similar violations stemming from Sunoco's failure to implement and maintain erosion and sedimentation control BMPs in Cumberland County, as required by its permits.

321.　At the same time that DA Hogan's team was investigating Energy Transfer's illegal hiring of Pennsylvania State Constables, the FBI was investigating Governor Wolf's administration's rush to grant approval of the ME2 permits.  As reported by the *Associated Press* on November 12, 2019, "FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning" but wished to remain anonymous "because they could not speak publicly about the investigation."  The *Associated Press* report also stated, "The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say."

322.　Despite all of these voluminous construction accidents and delays, Energy Transfer repeatedly represented that its work on the ME2 pipeline was significantly complete.  For example:

- On Energy Transfer's August 9, 2018, earnings call, Defendant Long stated: "100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP"; and

- On the same August 9, 2018, earnings call, Defendant Ramsey stated: "99% of the mainline construction is complete, the 1% that remains on mainline construction is associated with the HDD's that we are completing right now.  So we have 16 HDD's to complete, all those have been approved by PA DEP and they're either drilling ahead or they're in the stage where we're going back to PA DEP with – when we have an inadvertent return.  But they've all been approved so we don't have to have any changes approved by PA DEP going forward like that.  All the road bores are finished. And as Tom said in the early remarks, 80% of the line has been hydro tested.  So we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year."

323.    Each of these claims was materially false and misleading when made given that Energy Transfer had not yet even submitted reevaluations for many of the HDD sites.

324.    In fact, in March 2020, Energy Transfer admitted to a large amount of work remaining on the construction of ME2 as part of a request for a waiver from Governor Wolf's March 19, 2020 Order suspending non-essential work in Pennsylvania due to the COVID-19 outbreak.

325.    Energy Transfer's March 2020 waiver requests lists numerous drilling and construction projects that the Energy Transfer Companies still needed to complete on the ME2/2X pipeline.  The existence of this large number of still incomplete projects demonstrates that Defendants' prior representations about the dates of completion of these pipelines were false.  The still-remaining projects included:

- 46 horizontal directional drill ("HDD") locations Pennsylvania;

- 3 HDDs not yet completed on property owned by the U.S. Army Corps of Engineers, specifically Loyalhanna Lake in Loyalhanna Township, Westmoreland County;

- Construction activity at a road bore underway at Pottstown Pike;

- Construction activity with an open cut of a portion of Appalachian Drive, located in Middlesex Township, Cumberland County; and

- 4 work locations on the ME2/2X pipeline project where open excavation trenches/pits still existed.

## IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

326.    During the Relevant Period, Defendants caused Energy Transfer to make a series of materially false and misleading statements and omissions.

### A.    ME2 Completion Dates and Throughput

327.    On February 24, 2017, Defendants caused the Company to file its 2016 Form 10-K. The 2016 Form 10-K was signed by Defendants McReynolds, Long, Warren, McCrea and Ramsey.

With respect to the Mariner East pipeline, Energy Transfer falsely claimed that ME2 would be in service in the third quarter of 2017 and, at that time, ME2 would have a "total takeaway capacity" of ***345,000 barrels per day***.  The 2016 Form 10-K stated: "Mariner East 2 will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017."

328.    This statement was materially false and misleading because Defendants knew, or recklessly disregarded, that constructing an entirely new ME2 pipeline that would be in service to carry 345,000 barrels of NGLs per day across the Commonwealth of Pennsylvania by the third quarter of 2017 was impossible.  This is because the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput.

329.    On a May 4, 2017 earnings call with investors, Defendant Long stated: "Our Revolution project is still on schedule to be ***in service in the fourth quarter of 2017***."  The May 4, 2017 call was also attended by Defendants Warren, McCrea, and Hennigan.

330.    This claim was materially false and misleading because Defendants knew, or recklessly disregarded, that completing the Revolution project, and bringing it in service (which depended on bringing the ME2 pipeline in service) by the fourth quarter of 2017 was impossible. This is because (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of ***two million gallons***

of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (iv) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (v) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

331.    On August 9, 2017, Energy Transfer announced its financial results for the second quarter of 2017.  During an earnings conference call held that same day (i) Defendant Ramsey falsely claimed that ME2 would be online "sometime in the fourth quarter" of 2017, (ii) Defendant Long stated "On our Revolution project, construction is scheduled to be completed in ***the fourth quarter of 2017***"; and (iii) in response to a question from an analyst about the status of the Revolution pipeline, Defendant McCrea stated that Revolution "***will be up and ready for service in the fourth quarter***." The August 9, 2017 call was also attended by Defendant Warren.

332.    These claims were materially false and misleading because Defendants knew, or recklessly disregarded, that bringing ME2 and Revolution in service (or "ready for service") in the fourth quarter of 2017 was impossible.  This is because (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of ***two million gallons*** of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, informed Energy Transfer ME2 personnel of the damage HDD operations could cause to public water wells

- 84 -

but Energy Transfer internally decided to continue using HDD; (iv) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (v) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; (vi) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay; and (vii) as discussed below, just three months later, Energy Transfer was forced to admit that construction on the Revolution project would not be completed before the first quarter of 2018.

333.    On February 22, 2018, Energy Transfer released its financial results for the fourth quarter and full year 2017.  During a conference call held that day, Defendant Long stated: "Now moving on to Mariner East 2 and 2X. *We continue to make progress on the construction of this project*, with 94% of mainline construction complete and 83% of HDDs completed or underway. At this time, we continue to target placing ME2 into *service by the end of the second quarter of 2018*."

334.    On February 23, 2018, Energy Transfer filed the 2017 Form 10-K.  Energy Transfer claimed that ME2 would be in service in the second quarter of 2018 and, at that time, ME2 would have a "total takeaway capacity" of *345,000 barrels per day*.  The 2017 Form 10-K stated that ME2 "will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the second quarter of 2018."

335.    These claims were materially false and misleading because Defendants knew, or recklessly disregarded, that bringing ME2 in service in the second quarter of 2018, and at the claimed throughput, was impossible.  This is because (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning

and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of *two million gallons* of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, informed Energy Transfer ME2 personnel of the damage HDD operations could cause to public water wells but Energy Transfer internally decided to continue using HDD; (iv) Energy Transfer knew the the alignment of HDD S3-0381 passes through Ledger Formation and Conestoga Formation limestones and dolomites and knew that carbonate rocks (Ledger and Conestoga Formations) are *prone to sinkhole development and solution openings, and should be thoroughly investigated before construction* but Energy Transfer failed to thoroughly investigate those conditions; (v) Energy Transfer caused catastrophic sinkholes at the Lisa Drive site that were related to issues so serious that they would delay completion of ME2 and required Energy Transfer to pivot to re-purposing an older pipeline in the area in and surrounding Exton PA, where Lisa Drive was located, and result in decreased throughput for the claimed "ME2" line; (vi) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (vii) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

336.    On March 22, 2018, Energy Transfer spokesperson Jeff Shields responded to allegations that Energy Transfer was putting Lisa Drive residents at risk with its HDD operations by denying that the karst rock formations at the Lisa Drive Site caused the frac-outs and sinkholes. He falsely claimed that "professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception," and that "construction through this area is

safe.  There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."  Mr. Shields' assertion was materially false and misleading because Energy Transfer was aware that, ***at the very least***, the first third of the HDD path at the Lisa Drive Site traversed known limestone formations, which dangerously increased the risk of causing sinkholes and frac-outs.

337.    On May 10, 2018, Energy Transfer held a conference call to discuss its financial results for the first quarter of 2018.  During this call, Defendant Ramsey claimed that ME2 would enter service in "mid to late" third quarter 2018.  Defendants Warren, Long, and McCrea also attended the conference call.

338.    On the August 9, 2018 earnings call, Defendant Long also stated that "[t]he Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteland Township.  ***To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service***.  This plan does not require any new permits and we have made all applicable regulatory notification."  He further stated:

> As a result, ***we continue to expect to place ME2 in service by the end of this quarter.  This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments***.

339.    When asked by an analyst to clarify how Energy Transfer could logistically jury-rig an existing section of a 12-inch pipeline and the current 20-inch ME2 pipeline together, Energy Transfer executives provided little clarification.  For example, Defendant McCrea explained that "***the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted***," but conspicuously refused to comment on the total capacity of ME2 with this 12-inch workaround.

### B.  False Claims of Protecting the Environment and Safe Construction

340.     During Energy Transfer's November 8, 2017 earnings call to discuss the Partnership's third quarter 2017 financial results, Defendant Long assured investors that Energy Transfer was "*very focused on safely and responsibly bringing our projects into service*, including . . . the Mariner East [projects]."

341.     In a statement published January 3, 2018 in numerous media outlets, including *The Philadelphia Inquirer*, in response to news that the DEP had halted construction of the ME2 pipeline on grounds that it was necessary "to correct . . . egregious and willful violations" including unauthorized HDD activities and failures to notify the DEP of frac-outs, Sunoco spokesperson Jeff Shields stated: "*We . . . reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work*."

342.     On February 8, 2018, news outlets including *Reuters* and *StateImpact Pennsylvania* reported that the DEP had allowed Sunoco to resume work on ME2 after Sunoco agreed to pay a $12.6 million fine for violations.  Articles quoted Sunoco spokesperson Shields as stating that Sunoco was "*committed to fully complying with the DEP order, which includes following all permit requirements*," and that: "*Safety is paramount for any energy infrastructure project that we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment*."

343.     Contrary to their claims, the Energy Transfer Companies had no intention of altering their conduct to better protect the environment and the safety of Commonwealth residents as their frac-outs continued at the same general pace.

344.     During Energy Transfer's February 22, 2018 conference call, Long reiterated that Energy Transfer "remain[s] committed to working closely with . . . PA DEP and other regulatory

agencies and are focused on *safely and responsibly* bringing Phase 2 of . . . ME2 . . . into service."
Defendants Warren, McCrea, and Ramsey also attended the February 22, 2018 conference call.

345.   On March 22, 2018, spokesperson Jeff Shields denied that the karst rock formations
at the Lisa Drive Site caused the frac-outs and sinkholes and falsely claimed that "professional
geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X
are no exception," and that "construction through this area is safe.  There is some karst [a rock
structure that contains limestone] north of this area, but it does not impact this area."

346.   In early 2018, Energy Transfer and Sunoco took out a full-page advertisement in a
Harrisburg newspaper falsely touting their efforts to ensure the safety of ME2.  Energy Transfer
and Sunoco claimed that they "will operate our pipeline with the highest level of safety at all times"
and highlighted: "We're paying extra attention to safety."  The full text of the advertisement is
reprinted below:

**<u>Mariner East Going Above and Beyond</u>**

Energy Transfer and Sunoco Pipeline are Committed to the Long-Term Integrity
and Safe Operation of the Mariner East 2 Pipeline.

At Energy Transfer and Sunoco Pipeline, we pledge to the communities we cross
and the customers we serve that we will operate our pipeline with highest level of
safety at all times.

Safety is what we do – providing the same and reliable transportation of energy
resources.

Mariner East 2 exceeds federal safety regulations in many areas:

−  It starts in the pipe mill, where our inspectors oversee the manufacture of the
   pipe to our strict standards, then inspect the pipe when it arrives in the
   construction site.
−  Before and after the pipeline is buried, and again once it is in operation, we
   put our pipelines through rigorous testing above and beyond what is required
   by federal safety regulations. Then we monitor them 24/7, 365 days a year.

- We employ heavier pipe wall thickness than required by the U.S. Department of Transportation. The higher quality of pipe reduces the risk of damage from sources such as excavating equipment or ground movement.
- We bury the pipeline deeper underground than required in most cases – at least 4 feet and up to 200 feet.[4]
- We inspect 100% of pipeline welds by X-ray; rather than the 10% required.
- We patrol our Mariner East pipelines more frequently than required by ground and air.

In addition:

- We team with local emergency responders along the route to provide information and training on emergency pipeline response. We have trained more than 2,000 emergency responders and public officials.
- State and federal regulators spent more than 100 inspection days during 2017 on the Mariner East project, more inspection days than on any other pipeline in Pennsylvania.

We're paying extra attention to safety, because that's what you deserve – safe, clean, reliable energy and a stronger economy for Pennsylvania.

347. On July 27, 2018, *StateImpact Pennsylvania* reported that the DEP had reached a settlement with Clean Air Council, Delaware Riverkeeper Network, and Mountain Watershed Association concerning the permits DEP had issued to Energy Transfer in connection with the construction of ME2. The article quoted Energy Transfer spokesperson Lisa Dillinger as saying: "***From the outset, Sunoco has maintained that the permits were . . . fully protective of the environment***."

348. On September 10, 2018, in the wake of the Revolution pipeline explosion, the *Pittsburgh Post-Gazette* reported on a September 9, 2018 Energy Transfer news conference:

---

[4] Sunoco did not in fact bury its pipe at the purported depths it told third parties. For example, on May 21, 2018, the ME2 pipeline was struck by an Aqua crew installing a water main outside homes in Middletown, Delaware County, along Lenni Road, a suburban street that is crossed by the pipeline route. The contactor hit the pipeline at 6.2 feet below the surface but had been informed by Sunoco that the pipe was buried 9 feet deep, according to a report filed with Pennsylvania One Call System Inc., a nonprofit that notifies utilities about existing underground infrastructure before they excavate.

Energy Transfer spokeswoman Vicki Granado said the company would join the PUC in the investigation beginning Tuesday. "***Our obligation to homeowners is 100 percent — that people continue to be safe and secure***," Ms. Granado said at a news conference at the Center municipal building Monday night. Ms. Granado said she couldn't recall a similar incident involving Energy Transfer, which has 83,000 miles of pipeline throughout the United States.

She said ***there were no environmental health risks to residents in the aftermath of the explosion***. The Revolution pipeline had been in the commissioning phase — a kind of dress rehearsal — since Sept. 3, according to Ms. Granado. It wasn't yet operating commercially, but gas was running through the pipe during the trial period, just as it would during normal operations, she said.

Ms. Granado didn't know how much pressure was in the line before it burst; it is designed to operate at a maximum pressure of 1,440 pounds per square inch.

Recent rain has ETC and its regulators focused on erosion control, Ms. Granado said, when asked about past landslides. "***It's something definitely that is being actively managed***."

349.    In a letter Energy Transfer sent to residents of Ivy Lane on September 10, 2018, Energy Transfer claimed that "[o]ur first priority continues to be the safety of those who live in this community." Despite this stated goal, Energy Transfer admitted in the letter that Energy Transfer's "initial site assessment" revealed that a landslide occurred, and Energy Transfer explained that the Partnership was well aware that "this type of land movement has been occurring throughout the state due to the unprecedented amount of rainfall."

350.    On September 25, 2018, *StateImpact Pennsylvania* published an article regarding incidents, fines and shutdowns at the ME2 pipeline. It quoted Energy Transfer spokesperson Lisa Dillinger as making the following materially misleading claims:

Lisa Dillinger, a spokeswoman for Sunoco's parent, Energy Transfer Partners, said . . . that since Sunoco Pipeline's integration with ETP on May 1, 2017, accidents have been "***drastically reduced***," and that the company spent $429 million on assets in 2017.

"***It is our priority to maintain and operate our assets to the highest safety standards***, not just because it makes good business sense, but because it is the right thing to do," she said.

351.     On October 21, 2018, the *Pittsburgh Post-Gazette* reported that, in April 2018, after the ME2 pipeline construction had been stopped and restarted, and Energy Transfer fined $12.6 million for "willful and egregious violations," DEP Secretary McDonnell said in an interview with the *Post-Gazette* that this project "had some of the toughest conditions of any permit" and that "The reality is that [Energy Transfer was] not meeting those permit obligations."  The *Post-Gazette* added that, as of the prior week, the ME2 project had more than 70 permit violations, according to the DEP.  When asked about such noncompliance, Ms. Dillinger noted only one instance, when Sunoco initiated a horizontal underground drilling operation on a site that was permitted for trenching.  "That was rectified about eight months ago," she misleadingly said.  She added the materially false and misleading claim that "***We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work***."

352.     On November 1, 2018, after the DEP ordered a halt to construction on the Revolution pipeline, Energy Transfer spokesperson Alexis Daniel wrote in an email quoted by the *Observer-Reporter* that "***We have been and will continue to comply with their orders,*** *" adding that the safety of the surrounding area is "our first priority*."

353.     On November 21, 2018, Energy Transfer issued a false and misleading statement through spokesperson Lisa Dillinger in an email responding to a November 19, 2019 petition filed by seven residents of Delaware and Chester Counties requesting that the Pennsylvania Public Utility Commission halt construction of the Mariner East pipeline, which passed close to their residences.  The residents were concerned that Energy Transfer was not prepared to respond to any leaks or other accidents, saying in their petition, "The [highly volatile liquids] Sunoco proposes to transport, with limited exceptions, are intended for use by the petrochemical industry,

not the public, and a route that favors high-consequence areas represents an unnecessary and unacceptable risk to public safety." In response to the residents' petition and concerns regarding the safety of the Mariner East pipeline and the Partnership's commitment to ensure such safety, according to *S&P Global Market Intelligence*, Dillinger misleadingly wrote on behalf of Energy Transfer, "We do not believe the claim is valid . . . The integrity of our Mariner East 1 and Mariner East 2 pipelines has been verified in the last few months by the PUC and PHMSA [the federal Pipeline and Hazardous Materials Safety Administration] through numerous tests and data collection along the routes."

354.   On December 19, 2018, after it was announced that Chester County District Attorney Tom Hogan ("DA Hogan") had opened a criminal investigation into Energy Transfer's construction of its pipelines in Pennsylvania, Energy Transfer released a statement that included the following materially false and misleading claim of safety:

> The safety of all those who live and work along our pipeline is our first priority and this project was planned and implemented based on that fact.

355.   The statements referenced above were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose that (i) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate protective measures, despite repeated warnings to the contrary; (ii) Energy Transfer had constructed its pipelines by causing hundreds of inadvertent returns of hundreds of thousands of gallons of Drilling Pollutants without timely informing regulators of those problems or LOCs; (iii) Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; (iv) Energy Transfer Companies knowingly sought to short-circuit important safety-related regulatory

oversight, and engaged in other additional misconduct that violated applicable laws and rules and would lead to serious environmental risks; and (v) the foregoing undisclosed facts meant that statements concerning the Energy Transfer Companies' focus on and commitment to safe and responsible planning and construction of the Pipeline Projects and compliance with applicable laws, rules, and regulations concerning environmental safety were materially false and misleading when made.

- *Between April 9, 2017 and October 30, 2017*, during the construction of ME2 at the Raystown Lake HDD Site Sunoco had caused LOCs to occur on 39 separate days, comprising a total of *two million gallons* of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone), and Energy Transfer significantly delayed disclosure of these events to the DEP;

- Energy Transfer knew that the alignment of HDD S3-0381 passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development, and knew that carbonate rocks (Ledger and Conestoga Formations) are *prone to sinkhole development and solution opening*s, and should be thoroughly investigated before construction, yet Energy Transfer failed to do so;

- As the press reported only months later, on September 4, 2018, the 12-inch line Sunoco proposed to use in the so-called "Frankenpipe" was, in fact, the line that had leaked 33,000 gallons of gasoline into Darby Creek on June 19, 2018; and

- Energy Transfer had conducted daily inspections of the Revolution pipeline during *the months leading up to its September 2018 explosion*, which demonstrated that Revolution had exhibited repeated surface failures along the pipeline route, and areas where the ground around the pipeline was sinking.

**C.    False Statements As To Violations Of Code Of Business
Conduct And Ethics And Statutes**

356.    On February 24, 2017, Energy Transfer filed the 2016 Form 10-K with the SEC, which was signed by Defendants Warren, Long, McReynolds, McCrea and Ramsey.  With respect to the Partnership's corporate governance, the 2016 Form 10-K touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."  The 2016 Form

10-K added that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . .

are available on [the Partnership's] website."

357.   The Code of Conduct found on Energy Transfer's website stated:

*It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.  It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner.* Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or *any bribe, kickback or other payment the propriety of which is questionable*, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

358.   The Code defines a "Sensitive Payment" as "both receipt and disbursements whether

or not illegal," and includes:

a)   *receipts from or payments to governmental officials or employees*;
b)   *commercial bribes or kickbacks*;
c)   amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;
d)   corporate political contributions; and
e)   *payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback*.

359.   In a section of the Code titled, "Payments and Gifts to Government Officials," the

Code emphasizes that gifts or other items of value must not be provided to government officials in

connection with Partnership business without written approval, stating:

*Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required*.  What is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign).  There are strict laws that govern providing gifts, including meals, entertainment, transportation and lodging, to

certain government (U.S. or foreign) officials, employees and consultants.  Because of the sensitive nature of these relationships, *you should not provide gifts or anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department*.

360.    In a section of the Code titled "Ethical Behavior" the Code states:

> Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors. Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties.

361.    Energy Transfer represented that the Code identified requirements, not aspirations. For example, the Code explained that "[i]n all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner.  Every Employee"—which the Code defined as including "the officers and members of the Board of Directors of the Company"—"acting on behalf of the Partnership Group must adhere to these policies."

362.    In addition to requiring that Partnership officers and directors not violate the Code, Code also set forth detailed reporting requirements for Partnership officers and directors with respect to Code violations.  The Code stated:

> Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors. . . . All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports. . . . Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action[.]

363.    The 2016 Form 10-K also assured investors that Energy Transfer had obtained all

applicable permits and other authorizations for the Partnership's various properties used for conducting its business, and that such permits were valid. The 2016 Form 10-K stated "[w]e believe that we have satisfactory title to or valid rights to use all of our material properties" and that "*we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business*."

364.     On February 23, 2018, Energy Transfer filed its 2017 Form 10-K, which was signed by Defendants Warren, Long, McCrea, McReynolds and Ramsey. The 2017 Form 10-K, as with the 2016 Form 10-K, touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board." The 2017 Form 10-K added that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."

365.     On July 27, 2018, *StateImpact Pennsylvania* reported that the DEP had reached a settlement with Clean Air Council, Delaware Riverkeeper Network, and Mountain Watershed Association concerning the permits DEP had issued to Energy Transfer in connection with the construction of ME2. The article quoted Energy Transfer spokesperson Lisa Dillinger as saying: "*From the outset, Sunoco has maintained that the permits were properly and lawfully issued by [the DEP].*"

366.     On December 19, 2018, after reports of sinkholes appearing within feet of residential homes, DA Hogan announced that his office would "bring into play all of the tools of

the criminal justice system" against Energy Transfer for its part in causing these problems.  DA Hogan explained that, over the past two years, his office has seen "these pipelines rip through the heart of Chester County" and has heard reports of "***not-so-subtle bullying*** of Chester County citizens by big corporate interests."  DA Hogan continued "We expected state regulators and [] Governor [Wolf] to step in and assure the safety of Pennsylvanians.  They have not."  After DA Hogan's announcement, Energy Transfer released the following materially false and misleading statement that included the following claim of its purported compliance with the law:

> We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines.  We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release.  We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites.  ***We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania*** and we are committed to aggressively defending ourselves against these ***baseless allegations.***  We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

367.  On January 4, 2019, after DA Hogan announced that it had named to the investigation former federal prosecutor Seth Weber, DA Hogan explained that Weber's appointment "certainly sends a message that we are taking it very seriously, and that somebody who has experience in this field is taking it very seriously."  That same day, *StateImpact* reported on Energy Transfer's statement that the investigation was "meritless," and quoted Energy Transfer spokesperson Lisa Dillinger as saying that DA Hogan would "not be able to avoid the inescapable conclusion that ***Energy Transfer has not engaged in any form of criminal activity***, and the issues referenced have already each been thoroughly investigated, reviewed, and ultimately resolved by the appropriate government agencies."

368.  On January 22, 2019, after DA Hogan accused Sunoco of hiring armed constables to protect the scene of a sinkhole along one of its controversial pipelines in Chester County, west

of Philadelphia, *NBC Philadelphia* reported the following materially false and misleading response from Energy Transfer:

> "**We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property** as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property," company spokeswoman Lisa Dillinger said in a statement.   "I will decline to discuss any further details of **our security efforts**, beyond that we do use security on our projects as needed to ensure the safety of our employees, our assets and those who live in the area."

369.    This statement was materially false and misleading for the reasons set forth below, as well as for asserting that it was the residents of Lisa Drive who requested Energy Transfer illegally bribe state constables to patrol their backyards.  As *Philadelphia* Magazine reported, one resident of Lisa Drive, "[T.J.] Allen says his once quaint property has been turned upside down and plagued by sinkholes, intrusive workers, and **mysterious security guards from out of state**. He's terrified for his life and ready to flee disaster at a moment's notice — and he's not alone."

370.    On March 20, 2019, after Delaware County District Attorney Katayoun Copeland and the Pennsylvania state Attorney General's office joined to launch a probe into allegations of criminal misconduct by Energy Transfer, Sunoco Logistics Partners, and related corporate entities, involving pipeline construction and related activities for the Mariner East 1, 2, and 2X pipelines, the *Chester Spirit* reported the following materially false and misleading response from Energy Transfer:

> "Safety is our priority.  **There's no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines**," Energy Transfer spokeswoman Lisa Dillinger told The SPIRIT.  "We have worked closely with commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information that is readily available on the PUC and DEP websites and we **are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania** and are committed to aggressively defending ourselves," Dillinger said. "We look forward to opening dialogue with the attorney general's and district attorney's offices in the hopes that we can bring this matter to an appropriate resolution," Dillinger said.

371.    On July 6, 2019, *Philadelphia* Magazine reported that Energy Transfer's Dillinger claimed that Energy Transfer remains "***confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania*** and are committed to aggressively defending ourselves."

372.    On August 8, 2019, after DA Hogan announced criminal charges against the elected state constables who were hired to provide security near sinkholes along the Mariner East pipelines, news outlets, including *Phillymag.com*, reported Energy Transfer's materially false and misleading denial of any wrongdoing or connection to the constables:

> In its own statement, Energy Transfer stressed that ***constables Johnson and Robel "were not Sunoco or Energy Transfer employees*.**"   "They were employed by Raven Knights, who provided security services and personnel," the Energy Transfer statement continued. "***We have a code of conduct for all of contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that***."

373.    The statements above were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading.  Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose that (i) the construction permits issued in connection with the Mariner East pipeline were obtained by the Partnership through the use of coercion, bribery, or other improper methods; (ii) Energy Transfer had an unwritten policy to bribe government officials – Pennsylvania constables – to act as security at pipeline sites in Pennsylvania and intimidate residents and the press and potential protesters, and used shell corporations to hide the payments from Energy Transfer to the constables; (iii) the use of such improper methods increased the risk that the Partnership would be subjected to government or regulatory investigations and/or litigation, thereby depreciating the Partnership's unit value; and (iv) the foregoing undisclosed facts meant that Defendants' statements concerning its compliance with

anti-bribery policies and principles, its receipt of properly-issued and legitimate permits, and its denials concerning its improper and illegal hiring of constables to perform security services in connection with ME2 construction were materially false and misleading when made.

## X.     <u>THE TRUTH COMES OUT</u>

374.    Defendants' materially false and misleading statements, and failure to disclose material facts necessary to prevent their statements from being misleading, caused damage to the Partnership.

375.    During a conference call with investors held on August 9, 2018, Defendant Long announced that Energy Transfer would only be able to meet its prior projections of having "ME2" in-service by the end of the third quarter by routing it through much older, 12-inch-diameter pipeline in certain areas where the PUC had halted construction.  In other words, Energy Transfer could only bring ME2 into service on time by jury-rigging ME2 pipeline using a pre-existing, smaller-diameter pipe—*i.e.*, not by actually completing ME2 after all.  Defendant Long stated:

> We continue to make progress on the construction of ME2 with 99% of mainline construction complete and 80% of hydro testing complete.  In addition, 100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP.  The Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteman Township.  ***To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service.***  This plan does not require any new permits and we have made all applicable regulatory notification.

> As a result, we continue to expect to place ME2 in service by the end of this quarter. ***This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments***.  Construction of ME-2X also continues and we expect the pipe to be online in mid-2019.

376.    At the August 9, 2018 earnings call, after acknowledging that Energy Transfer would be using 12-inch pipe to allow the Partnership to put the ME2 pipeline in service, Defendant Ramsey represented that the "1%" of the pipeline still to be constructed related solely to 16 HDD's

still to be completed, and that "*we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year*."

377.   Although disclosing that the ME2 pipeline would not consist entirely of 20" diameter pipe, and therefore the pipeline's throughput would be reduced, Defendants continued to mislead the market by (i) as alleged previously, continuing to state that the pipeline would be in-service by the end of the third quarter, (ii) as alleged previously, misrepresenting the actual state of affairs concerning the HDD-related work that Energy Transfer was required to complete, and (iii) failing to disclose that creating such a cobbled-together "Frankenpipe" would significantly reduce the throughput of the ME2 pipeline since the rate at which NGLs could flow through ME2 would necessarily be limited to the flow rate at its smallest width.

378.   Due to Defendants' misleading explanation of its work on the ME2 pipeline, analysts asked Energy Transfer for more information.

379.   On Friday, August 10, 2018, an analyst from Wolfe Research, LLC released a report that provided further clarification of the disclosure.  In this report, Wolfe criticized Energy Transfer for its "confusing" discussion of ME2 on the second quarter 2018 earnings call and called Energy Transfer's "transparency and disclosure on this project" "very low."  Wolfe wrote that:

> *Mariner East is messier than expected but consistent with our conservative modeling*.  Discussion of ME 2 on the call was confusing.  We talked to the company afterward.  The "interim solution" with re-purposing of pipes is large enough to satisfy contracts plus some walk-up volumes.  We estimate this could provide $150M - $250M of EBITDA starting in Q4.  However, *ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q19 (one year delay). Due to construction / regulatory issues, the company is using a hodgepodge of different sized pipes that will then be re-worked / upsized over time.  A final connection involving a small amount of ME 2 / ME 2x capacity won't be completed until 4Q20*.

380.   That same day, an analyst from Wells Fargo Securities, LLC, reported on Defendants' statements about the jury-rigged pipeline "confuse[d] the market," and explained that,

according to its analysis and calculations, ***ME2 would only have an initial capacity of 100 million barrels per day***, a nearly 65% reduction in the capacity represented just two months earlier during Energy Transfer's 2018 J.P. Morgan Energy Conference.  Wells Fargo also then estimated the total cost of the ME2 project to be $6 billion (as compared to the $3 billion figure that Energy Transfer earlier represented as the cost).   The report stated that Wells Fargo shared its analysis of the timing of the Mariner East projects with Energy Transfer, and Energy Transfer apparently did not challenge or object to these figures during that non-public call, because Wells Fargo published them.

381.    News of the makeshift pipe solution and the delayed completion of the actual ME2 pipeline caused Energy Transfer's unit price to plummet, falling from a closing price of $18.45 per unit on August 8, 2018, to a closing price of $17.41 per unit on August 13, 2018, a 5.6% price decline.

382.    On October 27, 2018, the *Associated Press* re-published and disseminated an exposé, initially written by the *Pittsburgh Post-Gazette*, which revealed how Defendants had caused Energy Transfer to  misstate, and fail to disclose, the risks that Pennsylvania's geology, and long history of sub-surface mining, posed to Energy Transfer's pipeline construction.  The article, "Pipeline ruptures bring new scrutiny to Pennsylvania geology," reported on how Energy Transfer's misstatements, and rush to construct its pipelines, resulted in numerous tragedies and setbacks for Pennsylvania residents negatively impacted by the pipeline.  As the article reported:

> . . . In this part of Pennsylvania [Washington County], subsidence is commonly associated with coal mining:  When coal is removed from the earth, it leaves voids in its wake.  Some collapse right away, sinking the surface above.  Some take time to yield the space to other rocks.   The movement underground can crack foundations on the surface, damage roads and, yes, break pipelines.
>
> Landslides are another category of subsidence that can wreak the same havoc.

With a soaking spring and summer, western Pennsylvania has had its share of them in recent months, including the Sept. 10 slip that ruptured a newly activated natural gas pipeline in Beaver County.  The pipeline was built by Energy Transfer Partners.

The resulting explosion burned down a home and brought a new level of alarm to residents near the yet-unfinished Mariner East 2 pipeline - a path that stretches 303 miles across picturesque hills underlain by hundreds of miles of old mines.

***Before construction began, Sunoco, which merged with Texas-based Energy Transfer Partners last year, told Pennsylvania regulators that the chances of its drills running into voids was either "low" or "very low*."**

The schematic for the horizontal drilling planned to go under [a local family's (the Seamans')] home shows the entire area sits on top of the old Pittsburgh Coal Co.'s Cincinnati Mine.

Opened in 1835, the mine was notorious for one of the worst explosions in the history of the industry, which killed 96 miners and one rescuer in 1913.

Sunoco's drilling work near the couple's Washington County home began May 27, 2017.  The first signs of trouble showed up within the first week.

Drilling mud came out of the ground in three unexpected places:  two near a travel-trailer sales parking lot and one just outside the Seamans' home, flowing into a culvert that emptied into the high-quality stream known as Froman Run.

Sunoco stopped drilling, placed filter socks and straw bales around the spills then carried on.

On June 10, about 40 gallons of drilling mud oozed out of the ground outside Mingo Presbyterian Church, a 187-year-old building with a bright red roof next to the Seamans' place.  A pumper truck was called in to vacuum the spill.

The next day, some 100 gallons of muddy water showed up in an old pump house behind the Seamans' home.

Sunoco dispatched vacuum trucks and stationed someone from the company to sit outside the couple's kitchen window 24 hours a day for weeks, monitoring the old water well to ensure a quick response to subsequent mud spills.

**Deep underground coal mining**

In its initial report to the state Department of Environmental Protection, Sunoco said the spills were likely related to conditions below the surface caused by "historic deep underground coal mining in the area."

When Tetra Tech, the same contractor that had prepared the original spill response plan, was asked to reevaluate the design of drills in the area, *it determined the risk of further spills was inherent to drilling in that spot.  It was bound to happen*.

"In response to a better understanding of the subsurface geology and degree of fracturing," Sunoco said, it decided to abandon attempts to install the pipeline through horizontal directional drilling - a method of tunneling under obstacles - and to instead use a combination of trenches and shallower, shorter bores.

That's when Sunoco cut down the trees on the steep slope in the Seamans' backyard and dug a trench that has remained empty since this summer, save for a large hole filled with muddy water.

The homeowners, meanwhile, wondered: If a pipeline is ever laid there, will it be vulnerable to landslides?

**Rethinking pipeline failures**

So far, spills and mishaps at Sunoco's horizontal drilling sites for the Mariner East 2 pipeline have been examined by regulators from an environmental perspective – Did the spill pollute a creek?  Did it foul drinking water or cause erosion?

Those things draw fines and require the company to rethink its processes.

But the earth's reaction to the pipeline can also be considered from the lens of safety: If the underground rock and soil shifted easily when prodded, will they do so again when a pipeline is installed, pressurized and filled with a highly volatile liquid?

These concerns have been articulated most forcefully by residents in a Philadelphia suburb in Chester County, where attempts to bore underground opened up sinkholes in people's backyards.

What if the ground moves again, they asked Sunoco when its officials were put on the stand at an administrative hearing earlier this year.

State Sen. Andy Dinniman, a Democrat from Chester County who has been the leading political voice against Sunoco, suggested that laying pipelines in karst geology - which exists where limestone has eroded underground and left voids behind - could be unsafe.

John Zurcher, a pipeline safety expert hired by Sunoco to testify at the May 10 hearing, disagreed.

Of all the thousands of miles of transmission lines in Pennsylvania, he said, "I know of no incidents that any one of those pipeline companies have had with subsidence or anything else due to these formations."

Zurcher said he consulted a database of pipeline incidents maintained by the Pipeline & Hazardous Materials Safety Administration before making his claim.

*"There's never been a failure of a pipeline in one of these areas caused by geology or a sinkhole or even mining subsidence that we have here in Pennsylvania."*

**Checking the records**

*The PHMSA records, which date back several decades, show more than a dozen such incidents across the country, including in Pennsylvania. . . .*

In the same testimony in which he said that subsidence has never broken a pipeline in this region, Zurcher, who worked as a safety manager at Columbia Gas Transmission from 1997 until 2003, noted seven protective measures that Sunoco had included in its permit to mitigate the risk of earth movement on Mariner East 2.

For example, for areas where there is a risk of subsidence from karst or mining activity, Sunoco's experts suggested keeping the pipe somewhat loose in the bore - not cementing it tightly against the hole.

**Mines for miles**

*Mine-related subsidence has foiled Sunoco's Mariner East 2 drilling plans in several other sites in western Pennsylvania. . . .*

383.    On October 29, 2018, the Pennsylvania DEP issued an Order and letter requiring

ETC Northeast Pipeline to immediately cease construction of Energy Transfer's Revolution

pipeline because of unreported landslides and soil erosion into waterways along the route. The

shutdown resulted from Energy Transfer's "failure to implement or maintain effective erosion or

sediment control best management practices (E&S BMP), as required by 15 PA Code Chapter 102,

that minimize the potential for accelerated erosion and sedimentation" and the "failure to provide

temporary stabilization, as required by 25 PA Code Chapter 102, upon temporary cessation of

earth disturbance activities."  Energy Transfer was given until November 9, 2018 "to provide a

detailed plan for controlling erosion along [the Revolution pipeline's] route."

384.    In response, Energy Transfer's unit price fell by 4%, from a closing price of $15.46 on October 26, 2018 to a closing price of $14.84 on October 29, 2018.

385.    On December 19, 2018, following numerous reports of sinkholes in residential areas Chester County DA Hogan, announced his office would "bring into play all of the tools of the criminal justice system" against Energy Transfer for its part in causing the sinkholes.  DA Hogan explained that his office had seen "these pipelines rip through the heart of Chester County" and heard reports of "***not-so-subtle bullying*** of Chester County citizens by big corporate interests." DA Hogan continued: "We expected state regulators and [] Governor [Wolf] to step in and assure the safety of Pennsylvanians.  They have not."

386.    DA Hogan also cited the September 2018 explosion and fire in Beaver County in the western part of the state on the Revolution Pipeline that feeds into the Rover pipeline, both of which are owned by Energy Transfer.  *KYW News Radio* reported on December 19, 2018:

> "We have seen some things that have happened here in Chester County that have drawn our specific attention for law enforcement," Chester County DA Tom Hogan said Wednesday [December 19].
>
> Hogan says over Thanksgiving he visited homes in West Whiteland affected by construction of the pipelines.
>
> "And I could see the terrible damage that had been done to their property, and I ***could see the fear on their faces about what was going on***, and at that point I realized we needed to step in and do something," he said.
>
> He says they've asked Sunoco and its parent company Energy Transfer LP to preserve all documents relating to sink holes and well water contamination in the county and also to an explosion along a natural gas pipeline in Beaver County.
>
> "We have seen these incidents happen and, quite frankly, we were waiting for the governor or the (Public Utilities Commission) to step in and ensure the safety of this pipeline and they chose not to do so," Hogan said.

The construction projects have been slapped with fines, and the PUC has suspended permits over prior violations.  And Hogan says he realizes his jurisdiction only goes so far, but he says his office can make sure they comply with all criminal laws.

"We also hope by letting the company know that we are overseeing this, that we are investigating, that we do have eyes on what is going on, that they will behave appropriately," he said.

The Mariner East pipeline ships natural gas from Western Pennsylvania to Marcus Hook in Delaware County and bisects Chester County.

*"We've gone from hypothetical risk to actual harms*," Hogan said.  "We want to make sure that anything that happens here in Chester County, people understand they could be liable."

387.     *Reuters* also reported the story of DA Hogan's investigation of Energy Transfer, and further disseminated on December 20, 2018 in an article entitled "Pennsylvania Prosecutor Opens Criminal Investigation of Mariner East Pipe."

388.     The news of DA Hogan's investigation caused the price of Energy Transfer units to fall by $0.70 per unit, or approximately 5.4%, from a closing price of $12.94 per unit on December 18, 2018, to a closing price of $12.24 per unit on December 21, 2018.  The unit price decline on December 21, 2018, after the late-evening *Reuters* report, of 4.67%.

389.     In response to news of DA Hogan's investigation, Defendants continued to cause Energy Transfer to mislead the market by causing Energy Transfer to release this statement:

We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines.  *We vehemently deny any such wrongdoing* and we take issue with the many factual inaccuracies contained in the District Attorney's press release.  We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites.  *We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania* and we are committed to aggressively defending ourselves against these baseless allegations.  We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

390.     On August 8, 2019, after a long investigation, DA Hogan arrested and charged two

Pennsylvania Constables – Kareem Johnson and Mike Robel – in connection with their work as private security guards in connection with the construction of the Mariner East pipeline project on Lisa Drive in West Whiteland Township, Pennsylvania.  The news of the arrests came out on August 8, 2019, on the local evening news, including on *3 CBS Philly*.  As *3 CBS Philly* reported:

> Two Pennsylvania constables have been arrested after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline.  The Chester County District Attorney's Office announced the arrests of 47-year-old Kareem Johnson, a constable in Coatesville, and 58-year-old Michael Robel, a constable in Northumberland County, on Thursday.

> Prosecutors say Johnson and Robel were hired by a Harrisburg-based company called Raven Knights as private security guards along the construction area of the Mariner East Pipeline in Chester.

> The Chester County District Attorney's Office opened a criminal investigation in connection to the Mariner East Pipeline project in December 2018.  Investigators say Chester County residents reported that armed security guards identified themselves as state constables on their property. . . .

> "***We cannot have elected law enforcement officials hiring themselves out and using their public positions for person[al] profit***," Chester County District Attorney Chief of Staff Charles Gaza said.  "It undermines the integrity and independence of law enforcement and our government."

> Johnson and Robel have been charged with official oppression, Ethics Act violations and other related offenses. . . .

> "There is a troubling aspect to this investigation that bears note," Chester County District Attorney Tom Hogan said.  "The Pennsylvania Department of Environmental Protection is charged with protecting Pennsylvania residents.  However[,] ***DEP . . . has retained criminal defense lawyers to represent them in this investigation and have insisted that all communications go through those lawyers***.

> "Imagine if the West Chester Police Department was investigating a burglary with the DAO [District Attorney's Office] but retained criminal defense lawyers to represent the police department and would only communicate with the DAO through the defense lawyers.  In almost 30 years working in the criminal justice system, I have never seen a state or federal agency retain criminal defense lawyers to communicate with the prosecutors that the agencies were supposed to be helping."

391.    According to a report in *State Impact Pennsylvania* and *WHYY* published before the start of trading on August 9, 2019, Johnson and Robel received $36,785 and $27,995, respectively, from Energy Transfer for their illegal work providing private security at the Mariner East pipeline project between 2018 and 2019.  Neither man reported their Energy Transfer-funded illegal income for tax purposes.  The charges brought against Johnson and Robel carried a maximum sentence of 24 years in prison.

392.    With respect to the specific charges against Johnson and Robel, *StateImpact* and *WHYY* further reported:

> DA Thomas Hogan said Michael Robel, 58, of Shamokin in Northumberland County and Kareem Johnson, 47, of Coatesville in Chester County also ***violated laws on bribery*** when they worked for Raven Knights, a Harrisburg company that was hired by Sunoco to provide security for pipeline construction.
>
> As state constables, the defendants are elected officials who are authorized for tasks including transporting criminal defendants, serving arrest warrants, and in limited circumstances making arrests, Hogan said in a news release.
>
> But he said they are not allowed to hire themselves out as security guards while working as constables, and must declare any income of $1,300 or more. . . .
>
> According to the complaint, Johnson's activities included instructing a freelance journalist not to step into the street at Lisa Drive, where sinkholes opened up during pipeline construction starting in late 2017.
>
> The complaint against Robel said he told a plain-clothes detective not to park on a part of Lisa Drive near where Sunoco was working.  Robel was wearing a firearm and displayed a state constable badge, the complaint said. . . .
>
> ***The charges include "official oppression," meaning that the defendants were using their status as constables to keep people away from public property where they had a right to be present***, [Hogan's chief of staff, Charles] Gaza said. . . .
>
> "Right now, we're not charging anyone above the constables with being complicit in this," Gaza said in an interview.

393.    On August 9, 2019, in response to the news of the arrests, the price of Energy Transfer units fell $0.13, or approximately 1%, to close at $13.90 after closing at $14.03 on August

8, 2019.  On Monday, August 12, 2019, the price of Energy Transfer units continued to drop, falling by over 3.7%, to close at $13.38 per unit.  As *News Bites* reported on August 12, 2019, the price of Energy Transfer units had "***sunk [] 4.6% over the past two days***" on higher than average trading volume.

394.    Following the Robel and Johnson arrests, Defendants caused Energy Transfer to release a statement falsely denying any association with the constables.   Energy Transfer spokesperson Lisa Coleman misleadingly claimed that the two men "***were not Sunoco or Energy Transfer employees***.  They were employed by Raven Knights, who provided security services and personnel."  Coleman then claimed, "We have a code of conduct for all of our contractors and third-party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that."   However, contrary to the statements of this spokesperson for Energy Transfer, there was an "unwritten policy" by Defendants at Energy Transfer to hire government officials such as constables to provide security for pipeline projects, in direct violation of Energy Transfer's code of conduct, and Energy Transfer undertook extensive measures in an attempt to conceal that the Defendants were causing Energy Transfer to ensure the constables were paid for their work for Energy Transfer.

395.    On November 12, 2019, the *Associated Press* published an article entitled "FBI eyes how Pennsylvania approved pipeline."  The article reported:

> The FBI has begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania, *The Associated Press* has learned.
>
> FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.

All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.

The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.

396.    The same day, the *Philadelphia Enquirer* further reported on the FBI investigation, adding that:

The FBI is investigating how Gov. Tom Wolf's administration issued construction permits for the $5.1 billion Mariner East project, the latest official inquiry into the contentious cross-state pipeline project that carries highly volatile gas liquids to a Delaware River export terminal.

***The federal probe has been running for at least six months*** and started in response to similar inquiries launched in the last year by the district attorneys of Delaware and Chester Counties as well as state Attorney General Josh Shapiro, according to three sources who spoke on the condition of anonymity because they were not authorized to publicly discuss the case.

The FBI's investigation, first reported by *The Associated Press*, has focused on ***whether Wolf administration officials forced staff of the Pennsylvania Department of Environmental Protection to ignore shortcomings and approve the pipeline's construction permits, according to the sources, who include current and former Wolf administration officials***.    A fourth source described the investigation as being in its preliminary stages. . . .

Chester County District Attorney Thomas P. Hogan, who launched the first criminal probe of the pipeline's construction last year, said Tuesday ***he has three prosecutors forging ahead***.    He welcomed news of the FBI's involvement.    "It doesn't impact our investigation, which has been going full steam ahead," he said.    "However, it's always good to see federal authorities bringing their resources to the table in an investigation of this complexity and magnitude."

397.    The price of Energy Transfer's units fell on unusually high trading volume in response to disclosures of the FBI's investigation, including the fact of the investigation and its length and severity.    On November 12, 2019, Energy Transfer's unit price fell by 2.6% to close at $11.66.    Then, on November 13, 2019, the price fell a further 4.3%, to close at $11.16.

398.    As SNL Energy's *Daily Gas Report* reported on November 14, 2019:

Energy Transfer LP shares saw their ***highest volume of trading since April 2016 as investors reacted to reports that the FBI is investigating Pennsylvania's permitting of subsidiary Sunoco Pipeline LP's Mariner East family of NGL pipelines***.

More than 55.6 million Energy Transfer units traded hands Nov. 13, with the stock price down nearly 4.3% to $11.16 per share.

FBI agents interviewed current or former state employees about the construction permits granted to Sunoco and whether Gov. Tom Wolf or members of his administration pressured environmental regulators to move the permits along, *The Associated Press* reported Nov. 12.  The agents are also trying to find out whether Wolf or his administration gained anything in return for approving the permits, the report said.

The Mariner East 2 pipeline project, which has had a string of problems with construction, is operating at a reduced capacity, moving NGLs to a shipping terminal in Marcus Hook, Pa., for export for producers.  The line takes NGLs from Ohio, West Virginia and western Pennsylvania to Marcus Hook, on the Delaware River near Philadelphia.

Mariner East 1 was shut down for three months earlier in the year after a sinkhole was found in a community in Chester County.

399.    On December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline.  In the press release accompanying the announcement of charges, DA Hogan stated:

> ***This is a pretty simple case.  State Constables sold their badges and official authority.  Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens***.  And the defendants attempted to conceal their activity through a maze of companies and payments.

400.    The press release continued:

Energy Transfer decided they needed security for the pipeline.  However, rather than simply hiring a private security firm, ***Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline.  Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act.  Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.***

401.    As discussed above, the charges accused Energy Transfer of engaging in a "buy-a-

badge" program to circumvent Pennsylvania state laws to hire Pennsylvania Constables to provide security for construction sites along the ME2 pipeline's route, while donning their badges, wearing their official uniforms, and bearing firearms.  The charges in the criminal complaint are against Energy Transfer security chief Frank Recknagel and four other individuals:  Nikolas McKinnon of Stafford, Virginia, a senior security adviser for TigerSwan LLC ("TigerSwan"), an international security firm; Michael Boffo of Jacksonville, Florida, a site security manager for TigerSwan; James Murphy of Harrisburg, Pennsylvania, operator of Raven Knights LLC ("Raven Knights"), a Harrisburg-based security firm; and Richard Lester of Linglestown, Pennsylvania, registered owner of Raven Knights.  The charges in the criminal complaint include: (i) Bribery; (ii) Conspiracy; (iii) Dealing in proceeds of unlawful activity; (iv) violations of the Pennsylvania Constable Act; and (v) violations of the Pennsylvania Ethics Act.

402.    The District Attorney's Office's investigation revealed that Recknagel, an Energy Transfer security supervisor, orchestrated the scheme to bribe the constables.  As discussed above, Recknagel implemented the "unwritten policy" Defendants had caused Energy Transfer to use of hiring constables for security.  While Defendants tried to blunt the impact of the news by denying the merit of the charges, the Defendants' explanation was itself revealed to be transparently misleading.  As the *Philadelphia Inquirer* reported on December 3, 2019:

> Vicki A. Granado, a spokesperson for Energy Transfer Partners, said . . . local law enforcement officials did not object to ***the company's plan to hire constables*** when it was discussed with them.  Later Tuesday, West Whiteland Township police said they were unaware that the company had hired constables for security.  ***Energy Transfer, they said, told them the company had hired a private security firm***.

403.    In response to the news of the charges against Recknagel, the price of Energy Transfer units fell by 2.0%, from a closing price of $11.63 on December 2, 2019 to a closing price of $11.40 on December 3, 2019.

## XI.    FURTHER FACTS AS TO DEFENDANTS' KNOWLEDGE

404.    At all relevant times, each of the Defendants knew or recklessly disregarded that their statements and omissions concerning their efforts to safely and legally construct the Pipeline Projects, and their intention to have Energy Transfer cooperate with the DEP to ensure an on-time in-service date for the Pipeline Projects at the claimed throughput, were or would be misleading at the time they were made.  In addition to the facts discussed above, the following facts further support a strong inference of the Defendants' knowledge.

405.    Energy Transfer executives Joseph McGinn and Michael J. Hennigan were directly involved in applying pressure to Pennsylvania government officials to approve Energy Transfer's Chapter 102 and 105 permit applications for ME2.  Internal documents and records obtained via right-to-know requests issued to government officials show that, between the DEP's issuance of numerous detailed technical deficiency letters concerning the Partnership's permit applications in September 2016 and the DEP's surprisingly quick issuance of permits in February 2017, Messrs. McGinn and Hennigan repeatedly contacted and pressured senior officials from Governor Wolf's office and the DEP, including Yesenia Bane, Governor Wolf's special assistant, and Patrick McDonnell, the head of the DEP. These contacts included numerous in-person meetings and phone calls between December 2016 and February 2017.

406.    Evidence shows that Messrs. McGinn and Hennigan applied pressure on the Governor's office and the DEP to secure approval of the permits.  Upon information and belief, Sunoco's pressure was so effective it resulted in the termination of former DEP Secretary Quigley who had challenged the sufficiency of the Energy Transfer Companies' permit applications, and after pressure was placed upon him by the Governor's office.

407.    On November 30, 2017, when a representative from Energy Transfer's security

vendor suggested to Energy Transfer that it might be easier to use *off-duty* police officers to provide security for the Mariner East project, Recknagel communicated that it was Energy Transfer's "*unwritten policy*" to use "on duty" law enforcement, sheriffs, or constables to provide armed security.  In addition, according to the criminal complaint filed against Recknagel, on April 12, 2018, after residents expressed concern about the presence of armed security personnel in close proximity to their homes and children, a still-unidentified *executive-level Energy Transfer supervisor* instructed Recknagel – an Energy Transfer employee – to make security personnel available to meet with local parents near Lisa Drive in West Whiteland Township.

408.    On August 8, 2019, two of the constables that provided security for Energy Transfer on Lisa Drive in West Whiteland Township were arrested by the Chester County District Attorney's office and criminally charged.  Defendants had caused Energy Transfer to create a layer financial transactions to cloak its employment of these constables on the Mariner East pipeline project.  Defendants knew or were reckless in not knowing that it was illegal to hire these constables to provide security, hired them anyway, and then tried to cover-up what happened by obscuring the source of the payments and not reporting any taxes on the wages paid to the constables.

409.    In this regard, and further demonstrating Defendants' knowledge of this bribery, Defendants went to extreme measures to manufacture a complex chain of shell entities to shuffle and hide the payments to the constables that Defendants caused Energy Transfer (through its subsidiary Sunoco) to hire and supervise.  Following months of investigation into Defendants' constable bribing, DA Hogan's office issued a Chester County criminal complaint which revealed that "*the defendants attempted to conceal their activity through a maze of companies and payments.*"  Indeed, according to DA Hogan, Energy Transfer "used a shell game to hide payments

to the Constables. . . . Every step of the payments was hidden and cloaked.  Energy Transfer could have simply hired a reputable private security firm and paid the security guards directly.  Instead, Recknagel and Energy Transfer wanted the power of the badge to enforce their corporate will and engaged in illegal activity to make it happen, then hid the payments in a byzantine process to avoid detection of their role."

410.     Defendants caused Energy Transfer to intentionally, knowingly and falsely attempt to distance their relation from these constables through its statement that "***Constables Johnson and Robel were not Sunoco or Energy Transfer employees***.  They were employed by Raven Knights, who provided security services and personnel.  We have a code of conduct for all contractors and third-party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that."  Contrary to these misleading assertions, ***documents obtained by the Chester County DA's office show that the Constables were hired at the direction of Energy Transfer employees, such as Recknagel, and that payment to law enforcement for their authority is a company policy***.

411.     Energy Transfer's Code of Ethics stated that its employees "should not provide . . . anything of value to government officials, employees and consultants, or members of their families, in connection with Partnership business ***without written approval from the Company's Chief Compliance Officer or the Company's Legal Department***."  The constables were either paid with the express authorization of Energy Transfer's Chief Compliance Officer or the Company's Legal Department, or such payments were in direct violation of this specific provision of the Company's own Code of Ethics and this statement was materially and knowingly false when made given the Partnership's "unwritten policy."

412.     The success of ME2 depended on Energy Transfer and Sunoco bringing the

pipeline online in an expeditious manner and carrying the amount of NGLs that Energy Transfer and Sunoco promised investors and customers it would carry. As revealed through documents produced in lawsuits that stemmed from the Revolution Explosion, multiple customer contracts had "drop-dead" dates such that Energy Transfer needed to place ME2 and the Revolution pipeline in service by the end of 2018 to prevent its customers from terminating their contracts without penalty. Knowing this, Defendants caused Energy Transfer to race to get the Pipeline Projects into service as fast as possible, which led Defendants to cause Energy Transfer to cut corners to save time. Defendants first sought to accomplish this goal by seeking to have John Quigley removed from his position as the head of the DEP in May 2016, and thereafter by using the influence of Governor Wolf's administration to pressure the DEP into granting permits by early February 2017 for the construction of ME2 notwithstanding hundreds of deficiencies that would otherwise have caused the permit applications to be denied. In addition, once the permits were issued by the DEP in February 2017, Defendants caused Energy Transfer and its subsidiary Sunoco to consistently cut corners in its planning and construction of the ME2 and Revolution pipelines, with dozens of notices of violations for frac-outs, sinkholes, inadvertent returns, and well and water contaminations following thereafter.

413. With full knowledge of the DEP's monitoring of the Energy Transfer Companies' compliance with Pennsylvania law and their permits, and that Energy Transfer's misconduct had also drawn the close scrutiny of the Environmental Advocates, abutting landowners, and State Senator Dinniman, Defendants knew that Energy Transfer would not be able to meet its 2018 deadlines without having to cut more corners.

414. Accordingly, in January 2018, Defendants should have either delayed ME2's in-service date until after 2018, and, in turn, notified Energy Transfer investors of the significant

potential customer backlash, or disclosed that Energy Transfer would be forced to jury-rig a 1930s-era pipeline to create a makeshift ME2, a purportedly new pipeline, which would have a significantly reduced maximum throughput.   Instead of pursuing either course of action, Defendants hid the truth from investors.

415.    Upon information and belief, it was not possible for Defendants to instantly create these plans for the jury-rigging of the pipelines.  Defendants knew by June 2018 that it would pursue the makeshift pipeline as Pennsylvania government officials at the township level had been informed by representatives of Energy Transfer by early July 2018 that Energy Transfer and Sunoco would be cobbling together ME2 with the existing 12-inch line.

416.    The fact that the Energy Transfer Companies knew that they needed to re-purpose the 12-inch pipeline well before mid-June 2018 is also demonstrated by the discussion of the timing of Sunoco's notification of that change to PHMSA.  As the West Whiteland Township's website discusses, by mid to late June 2018, Sunoco had already "advised Pipeline and Hazardous Materials Safety Administration (PHSMA) that they intend to use the existing 12" line to transport Natural Gas Liquids (NGLs).  This line is currently used to transport other petroleum products." The website continued: "They need to give PHSMA a 60-day notice so they intend start transporting NGLs in mid to late August" – *i.e.*, Sunoco made the notification to PHMSA in mid to late June 2018.  According to the website, "[t]his will reduce the pressure to complete the Mariner East 2 and Mariner East 2X pipelines."  Sunoco's notification to PHMSA necessarily involved internal discussion of the work and approvals necessary to make the change, as well as the preparation of any such submission to PHMSA, which would necessarily take a significant amount of time before Sunoco actually notified PHMSA.

417.    Further evidencing Defendants' knowledge, Defendants caused Energy Transfer to

conceal the true financial impact that the makeshift pipeline would have to it.  On November 8,

2018, during the third quarter 2018 earnings conference call, Defendant Long avoided a question

by an analyst from Bank of America Merrill Lynch in the below exchange:

> Question:  And then just on ME2, you said the line is 100% complete.  So you won't be using the workaround that you've talked about?

> Answer:  Yes. Well, what we said is that ME2 will be in service this quarter, and we're pushing hard as everybody knows.  *As far as go-arounds, I'm not sure what you're referring to other than -- what?*  Yes, so the bottom line is what we've said is we're in service with Mariner East 2 soon, we're in service with 2X (inaudible) by the third quarter of next year, and we couldn't be more excited to bring it on soon and also to grow our business as soon as we can.

418.    Defendants were highly attuned to the importance of the throughput of Energy

Transfer's Pipeline Projects as the Partnership touted the pipelines' throughputs in every investor

presentation from the start of the Relevant Period through the date that Energy Transfer disclosed

the makeshift pipeline to the market.  The attendees at those investor presentations included, but

were not limited to, Warren, Long, McCrea, Ramsey, and non-party Mike Hennigan (Sunoco's

President and CEO).

419.    Also supporting a strong inference of Defendants' knowledge is the critical nature

of the Pipeline Projects to Energy Transfer – including their size, safety risks, and functionality.

Thus the Defendants can be presumed to know the truth about the reckless and risky construction

of the Pipeline Projects.

420.    The Pipeline Projects were enormous investments for Energy Transfer and

represented a historic construction project in Pennsylvania.  As stated on Energy Transfer's

website www.marinerpipelinefacts.com, "Mariner East 1 & 2 represented the largest investment

of private money in Pennsylvania history."  Energy Transfer listed the Pipeline Projects as "growth

projects" for Energy Transfer in all 22 investor presentations held during the Relevant Period,

discussed ME2 and ME2X during their opening remarks on every earnings conference call during the Relevant period, and analysts asked for timing and status updates of the Pipeline Projects on every call.

421.    Defendants knew that Energy Transfer's financial success and growth relied on the successful construction of the Pipeline Projects.  ME2 and ME2X alone constituted "most" of Energy Transfer's $1 billion in capital expenditure ("CapEx") in the third quarter of 2018 and was the largest component of Energy Transfer's $5 billion CapEx spending in fiscal year 2018.

422.    In addition to the core significance of the Pipeline Projects to Energy Transfer's financial condition and operations, Defendant McCrea admitted the critical nature of the Pipeline Projects to Energy Transfer.  On November 8, 2017, Defendant McCrea stated that the Marcus Hook facility, located at the endpoint of the Pipeline Projects, "will be the best export and the largest in the country over the next 2 to 3 years with growth.  We think it will be the premium market around the world, both in Europe and Asia, for propane, ethane and butane and also meet needs along the Eastern Gulf Coast."

423.    Also supporting a strong inference of Defendants' knowledge is the intense regulatory scrutiny Energy Transfer faced, as well as the multiple criminal investigations opened during the Relevant Period.  Defendants' misconduct relating to the Pipeline Projects became the subject of the following investigations during the Relevant Period:

- **December 2018:**  Chester County DA Hogan opened an investigation into Energy Transfer's misconduct, including "subtle and not-so-subtle bullying" of Chester County residents.  News of this investigation reached national media outlets such as *Reuters* and *The Associated Press*.  This investigation, as well as a related set of criminal charges brought by DA Hogan, are still ongoing.

- **March 2019:**  Pennsylvania Attorney General Josh Shapiro and the Delaware County District Attorney's office announced a joint investigation into Energy Transfer and Sunoco for potential criminal misconduct relating to the construction of the Pipeline Projects.  This joint investigation is still ongoing.

- **November 2019:**  Energy Transfer disclosed in a November 9, 2019 Form 10-Q that the U.S. Attorney for the Western District of Pennsylvania issued a federal grand jury subpoena for documents related to the Revolution explosion, and that the Pennsylvania Office of Attorney General has commenced an investigation into the explosion.  These investigations are still ongoing.

- **November 2019:**  *The Associated Press* disclosed that the FBI has been investigating the Pennsylvania Governor's office for potential bribery allegations relating to the issuance of the ME2 permits.  News of this investigation was reported through national media outlets.  This investigation is still ongoing.

424.   Given the serious ramifications of these investigations, it is implausible to suggest that Defendants were not aware of the existence of, or were not intimately familiar with, the allegations pertaining to the above listed investigations.

425.   A strong inference of Defendants' knowledge is further supported by the DEP's and the PUC's multiple regulatory actions taken against Energy Transfer, Sunoco and ETC.  Since the start of the Relevant Period, Defendants have received over 100 Notices of Violations stemming from hundreds of frac-outs and instances of operating at worksites without adhering to the required BMPs.  In total, Defendants' misconduct (i) caused over 3.5 million gallons of Drilling Pollutants to contaminate Pennsylvania land and waterways; (ii) damaged as much as 90 acres of Pennsylvania lakes; (iii) created numerous sinkholes that damaged residents' properties; and (iv) contaminated scores of Pennsylvanian residents' water supplies.  As a result, Defendants were subjected to at least 20 orders and forced to pay over $45 million in fines—including the largest fine ever issued by the DEP.

426.   Defendants thus were highly aware of the damage they caused to the citizens and environment of Pennsylvania, and as such, Defendants knew, or were reckless in not knowing, that the statements they caused Energy Transfer to make to its investors about the Pipelines' in-service dates, throughput, safety profiles, and compliance with DEP regulations and the Company's own

Code of Conduct were materially false and misleading.

427.   In fact, further supporting a strong inference of Defendants' knowledge is the Defendants' denial of Judge Barnes' findings as to the misconduct which occurred in the construction of ME2.  After Judge Barnes issued the January 2018 Order condemning Energy Transfer and Sunoco for their "egregious and willful violations" of, and their "lack of ability or intention to comply" with, Pennsylvania law, Defendants caused Sunoco spokesperson Jeff Shields to claim that Energy Transfer and Sunoco "strongly disagree with the [DEP's] legal conclusions that our conduct was willful or egregious," and that "safety is paramount for any energy infrastructure project we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment."

428.   The January 2018 Order described multiple instances of misconduct on Energy Transfer's and Sunoco's part, including conducting HDD operations in areas in which Energy Transfer and Sunoco did not have permits to operate, constructing a bridge to cross a stream without first obtaining a permit and approval from Pennsylvania regulators to ensure the bridge's safety, and unilaterally "field changing" its construction methods from open bore trenching to HDD without seeking prior approval from the DEP – an action Defendants were not authorized to perform.

429.   Defendant McCrea was the Chief Commercial Officer and Director of Energy Transfer.  According to two of Defendant McCrea's direct reports at ETC – Alan Vaina (Senior VP of Business Development) and Adam Arthur (Senior Director of Business Development) – Defendant McCrea was personally responsible for managing the Revolution pipeline, as well as managing Energy Transfer's contracts with its two main customers EdgeMarc and PennEnergy. In depositions of Vaina and Arthur in a litigation between EdgeMarc and ETC, Vaina and Arthur

testified that they had worked very closely with McCrea, that McCrea described Arthur as his "right hand guy," and that Defendant McCrea was heavily involved in the oversight of the Revolution. According to Alan Vaina, ETC Senior VP of Business Development, Defendant McCrea was the decision-maker for ETC and the individual who had "final sign off" of the events relating to the Revolution.

430.    A strong inference of Defendants' wrongful conduct is further supported by their repeated attempts to minimize and downplay their misconduct related to the Revolution explosion and the Lisa Drive sinkholes. When Energy Transfer and Sunoco's misconduct caused sinkholes to appear near Lisa Drive in Chester County on multiple occasions, Defendants' reaction was to further conceal Energy Transfer's operations from the world, and to hire armed constables to prevent the media and Pennsylvania residents from discovering Defendants' misconduct.

431.    Despite Defendants' efforts, however, the press duly reported on the sinkholes, and Pennsylvania State Senator Andy Dinniman filed a Formal Complaint and Petition for Interim Emergency Relief against Sunoco before the PUC. The Lisa Drive sinkholes garnered significant media attention and spurred multiple lawsuits from Lisa Drive residents. In fact, the damage at Lisa Drive had become so severe that Defendants caused Energy Transfer and Sunoco to purchase two of the damaged properties for $400,000 each in April 2019.

432.    Similarly, Energy Transfer and ETC's destructive and improper construction of the Revolution sparked national attention when the Revolution exploded, causing Center Township residents to flee their homes in the early morning and destroying one family's home. Like the Lisa Drive sinkholes, the Revolution Explosion spurred significant litigation, including litigation between ETC and its customers EdgeMarc and PennEnergy, and resulted in ETC purchasing damaged homes.

433.     As uncovered in a litigation related to the Revolution Explosion, Mr. Vaina drafted two letters that falsely claimed the Revolution Explosion was caused by an event of Force Majeure. Adam Arthur was ETC Senior Director of Business Development.  Both Messrs. Arthur and Vaina have since admitted that Defendant McCrea had the final sign off on all ETC matters relating to the Revolution, including its relationship with EdgeMarc.  Therefore, the inference, upon information and belief, is that Defendant McCrea was involved in the drafting of the letters to EdgeMarc and the simultaneous cover-up of ETC's role in the explosion of the Revolution pipeline.  Based on the Revolution pipeline's importance to the Energy Transfer and to the overall success of the Pipeline Projects, as well as the seriousness of the Revolution pipeline explosion and the multiple inquiries about it by regulators and the press, each of the other Defendants would also have known or were reckless in not knowing about the falsity of the statements Defendants caused Energy Transfer to make concerning the planning, route and construction of the revolution pipeline, as well as the reasons for the explosion of the pipeline.

434.     A strong inference of Defendants' knowledge is further supported by the fact that Defendant Warren spoke in detail about delays to the Pipeline Projects' in-service dates and regulatory disputes and other litigations concerning the Pipeline Projects.  During Energy Transfer's third quarter 2017 earnings conference call held on November 8, 2017, early in ME2's construction, Defendant Warren discussed an issue Energy Transfer and Sunoco were having with respect to the placement of a valve station in West Goshen Township.  Defendant Warren stated that Energy Transfer was considering whether to relocate the valve outside the city entirely. Defendant Warren claimed that the West Goshen Township:

> went and got an administrative law judge to give an adjunctive [sic] relief and then the PUC upheld that.  But I think that there are number of different ways to resolve this issue, involving some land up there, and we feel very, very confident that we will have this issue resolved in a fairly short order, short time period.

435.    In addition, Defendant Warren explained to the market how the legal dispute concerning the pump station in West Goshen would not affect the timing of ME2's in-service date. Defendant Warren stated that once Energy Transfer "ha[s] this issue resolved in a fairly short order," that it will "move on to meet that in-service date that we put in front you this morning," *i.e.*, by the end of the second quarter in 2018, as Defendants "fight through a lot of these issues and rarely does a township [] win and get an adjunction [sic]."  These and other statements by Defendant Warren support that fact that Warren made himself personally knowledgeable about the true state of affairs relating to the ME2 pipeline, and nevertheless furthered the Defendants' false narrative that ME2 was on track to be in-service by the end of the second quarter in 2018, when that was not even a possibility given the number of HDDs and other pipeline construction projects that needed to be completed at that time.  In fact, Energy Transfer delayed ME2's in-service date by two quarters, and then only brought it into service by piecing together the 1930's era 12-inch pipe to bypass the 20-mile stretch in Chester and Delaware counties where ME2's 20-inch pipeline could not be placed by the end of the year 2018.

436.    On a February 21, 2019 earnings call with investors, Defendant Warren discussed regulatory and other matters concerning the delay of the Pipeline Projects in response to a question by a UBS Investment Bank analyst about "delays."  On that call, Defendant Warren admitted that Energy Transfer's conduct in constructing the Pipeline Projects in Pennsylvania had been problematic, stating: "***We made some mistakes*** . . . and we're going to take our medicine and fix those mistakes and complete good projects from this point forward, not insinuate that everything we've done has been bad, it's just ***we've made some mistake[s] that we're not proud of***."

437.    On multiple conference calls throughout the Relevant Period, Defendant Long assured investors that the Partnership was "very focused" on safety and/or on safely and

responsibly bringing its projects, including Mariner East, into service.

438.    Similarly, on the February 21, 2019 earnings call, in response to a UBS analyst's question about delays, Long stated: "[W]e've learned all kinds of lessons, and *we've made mistakes* and we are correcting those mistakes, and we'll not make those mistakes again.  So yes, we've learned a lot.  *Every place is not Texas* and, so we're making adjustments . . . ."

439.    By admitting to Energy Transfer's mistakes in Pennsylvania and speaking about safety on the earnings calls, including safety of the Mariner East project and associated delays in construction of the Pipeline Projects, Long presented himself as having sufficient knowledge to make these statements.

440.    Defendants knew that Pennsylvania's varied geologic profile presented challenges that required nuanced approaches that were different from building pipelines in more homogenous terrain and would likely require the pipeline to follow a less direct route at certain locations. Nonetheless, in spite of these known geologic issues, which often caused subsidence events, Defendants rushed through the Pipeline Projects and went into areas prior pipelines had avoided. Two examples suffice for this point.  *First*, with full knowledge of the geohazards in the area where Energy Transfer planned to construct the Revolution pipeline, the Partnership pushed forward to obtain permits for and build the pipeline, leading to the Revolution Explosion that occurred during the commissioning phase, before the pipeline even became operational.  *Second*, on Lisa Drive in West Whiteland Township, where the ME2 pipeline construction caused a subsidence event as discussed above, the builders of the Mariner East 1 line in the 1930s deliberately avoided the same area, which was known to have a risk of sinkholes.  When Energy Transfer proceeded to build ME2 on the same ground Mariner East 1 had avoided, it caused a series of subsidence events and sinkholes.

441.    Throughout the Relevant Period, Defendants repeatedly held themselves out as knowledgeable about and familiar with the subjects of the false and misleading statements.  For example, during Energy Transfer's earnings call on November 8, 2017, Defendant Long discussed in detail the Pennsylvania PUC's order concerning valve installation in West Goshen Township, as well as Energy Transfer's work with the DEP to secure approvals for HDD activities for ME2, and ME2 and Revolution Project schedules.  Similarly, on March 22, 2018, in discussing events at Lisa Drive, Energy Transfer spokesperson Jeff Shields purported to describe in detail the geography of the area, stating that there was "some karst [a rock structure that contains limestone] north of [Lisa Drive], but it does not impact this area."  And as set forth above, numerous Defendants made specific statements concerning the Pipeline Projects' physical infrastructure, throughput, and expected completion dates.

## XII.    EVIDENCE OF DEFENDANTS LACK OF GOOD FAITH

442.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of good faith, unjust enrichment, waste of corporate assets, abuse of control and for indemnification and contribution by Defendants.

443.    Plaintiff will adequately and fairly represent the interests of the Company and its unitholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

444.    Plaintiff is a current owner of Energy Transfer Units and has continuously been an owner of the Units during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold the Units throughout the duration of this action and is prepared to do so.

445.    Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had knowledge of material non-public information regarding the Company.

446.    Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

447.    Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's unitholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

448.    Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to unitholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

449.    Because of their participation in the gross dereliction of good faith duties, and the breach of good faith, Defendants are unable to comply with their good faith duties and prosecute this action.

## XIII.   DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### A.    Defendant Warren

450.    Defendant Warren is not independent or disinterested.  Defendant Warren is a co-founder of the Company and has served as the General Partner's Chairman and CEO since 2007. He is also the majority owner of the General Partner.  As the Company admits, he is a non-

independent director.  Defendant Warren was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed or authorized the signing of.  As the General Partner's highest officer and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Warren is a defendant in the Securities Class Action.   For these reasons, Defendant Warren breached his duty of good faith and faces a substantial likelihood of liability.

451.  The Company's principal sources of cash flow are derived from its direct and indirect investments in the limited partner and general partner interests in ETO[5], Sunoco LP and USAC, all of which are limited partnerships engaged in diversified energy-related services, and cash flows from the operations of Lake Charles LNG.

452.  Defendant Warren serves as directors of ETP's General Partner.

453.  "Conflicts of interest may arise because of the relationships among ETP, Sunoco LP, their general partners and [Energy Transfer].  [The Company's] general partner's directors and officers have fiduciary duties to manage [its] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] General Partner's directors are also directors and officers of ETP's general partner or Sunoco LP's general partner, and have fiduciary duties to manage the respective businesses of ETP and Sunoco LP in a manner beneficial to ETP, Sunoco

---

[5]      Energy Transfer Operating, L.P. ("ETO") is formerly known as Energy Transfer Partners, L.P. ("ETP").

LP and their respective Unitholders.  The resolution of these conflicts may not always be in [the Company's] best interest or that of [the Company's] Unitholders."  *See* Energy Transfer's Form 10-K, dated Feb. 24, 2017 at p. 39.

**B.**  **Defendant Long**

454.  Defendant Long is not independent or disinterested.  Defendant Long has served as the General Partner's CFO since February 2016 and has served as a director of the General Partner since April 2019.  Thus, as the Company admits, he is a non-independent director.  The General Partner provides Defendant Long with his principal occupation, and he receives significant compensation, including $6,609,967 in 2018 for his services.  As such, Defendant Long is beholden to the General Partner.  As the General Partner's CFO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant Long signed, and thus personally made the false and misleading statements in the 2016 Form 10-K, the 2017 Form 10-K, and the 2018 Form 10-K.  Moreover, Defendant Long is a defendant in the Securities Class Action.  For these reasons, Defendant Long breached his duty of good faith and faces a substantial likelihood of liability.

455.  Defendant Long has served as a director of Sunoco LP since May 2016, and as Chairman of the Board of USAC since April 2018.

456.  "Conflicts of interest may arise because of the relationships among ETO, Sunoco LP, USAC, their general partners and [Energy Transfer].  [The Company's] General Partner's directors and officers have fiduciary duties to manage [the Company's] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] general partner's

directors or officers are also directors and/or officers of ETO's general partner, Sunoco LP's general partner or USAC's general partner, and have fiduciary duties to manage the respective businesses of ETO, Sunoco LP and USAC in a manner beneficial to ETO, Sunoco LP, USAC and their respective unitholders.   The resolution of these conflicts may not always be in [the Company's] best interest or that of [its] Unitholders." *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 41.

457.   "Conflicts of interest may arise because of the relationships among ETO, Sunoco LP, USAC, their general partners and [Energy Transfer].  [The Company's] General Partner's directors and officers have fiduciary duties to manage [the Company's] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] general partner's directors or officers are also directors and/or officers of ETO's general partner, Sunoco LP's general partner or USAC's general partner, and have fiduciary duties to manage the respective businesses of ETO, Sunoco LP and USAC in a manner beneficial to ETO, Sunoco LP, USAC and their respective unitholders.   The resolution of these conflicts may not always be in [the Company's] best interest or that of [its] Unitholders." *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 41.

### C.   Defendant McReynolds

458.   Defendant McReynolds is not independent or disinterested.   Defendant McReynolds served as the President of the General Partner from March 2005 until October 2018 on which date he became Special Advisor to the General Partner.  He has also served as a director of the General Partner since August 2005.  As the Company admits, he is a non-independent director.  The General Partner provides Defendant McReynolds with his principal occupation, and he receives significant compensation, including $1,422,273 in 2018 for his services.  As such, Defendant McReynolds is beholden to the General Partner.  As the General Partner's President

and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant McReynolds signed, and thus personally made the false and misleading statements in the 2016 Form 10-K, the 2017 Form 10-K, and the 2018 Form 10-K.  Moreover, Defendant McReynolds is a defendant in the Securities Class Action. For these reasons, Defendant McReynolds breached his duty of good faith and faces a substantial likelihood of liability.

### D.  **Defendant McCrea**

459.   Defendant McCrea is not independent or disinterested.  Defendant McCrea has served as the President and CCO of the General Partner since October 2018 and has served as a director of the General Partner since December 2009.  As the Company admits, he is a non-independent director.   The General Partner provides Defendant McCrea with his principal occupation, and he receives significant compensation, including $10,780,120 in 2018 for his services.  As such, Defendant McCrea is beholden to the General Partner.  As the General Partner's President and CCO, and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant McCrea signed, and thus personally made the false and misleading statements in the 2016 Form 10-K, the 2017 Form 10-K, and the 2018 Form 10-K.  Moreover, Defendant McCrea is a defendant in the Securities Class Action. For these reasons, Defendant McCrea breached his duty of good faith and

faces a substantial likelihood of liability.

460.    Defendant McCrea serves as a director of ETP.

461.    Defendant McCrea served as President and Chief Operating Officer ("COO") of ETP's general partner from June 2008 to November 2015.

462.    "Conflicts of interest may arise because of the relationships among ETP, Sunoco LP, their general partners and [Energy Transfer].  [The Company's] general partner's directors and officers have fiduciary duties to manage [its] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] General Partner's directors are also directors and officers of ETP's general partner or Sunoco LP's general partner, and have fiduciary duties to manage the respective businesses of ETP and Sunoco LP in a manner beneficial to ETP, Sunoco LP and their respective Unitholders.  The resolution of these conflicts may not always be in [the Company's] best interest or that of [the Company's] Unitholders."  *See* Energy Transfer's Form 10-K, dated Feb. 24, 2017 at p. 39.

**E.**    **Defendant Ramsey**

463.    Defendant Ramsey is not independent or disinterested.  Defendant Ramsey has served as the COO of the General Partner since October 2018 and has served as a director of the General Partner since July 2012.  As the Company admits, he is a non-independent director.  The General Partner provides Defendant Ramsey with his principal occupation, and he receives significant compensation, including $4,400,195 in 2018 for his services.  As such, Defendant Ramsey is beholden to the General Partner.  As the General Partner's COO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets.  Further, Defendant Ramsey signed, and thus personally made the false and misleading statements in the 2016 Form 10-K, the 2017 Form 10-K, and the 2018 Form 10-K.  Moreover, Defendant Ramsey is a defendant in the Securities Class Action.  For these reasons, Defendant Ramsey breached his duty of good faith and faces a substantial likelihood of liability.

464.    Defendant Ramsey serves as a director of ETP's general partner.

465.    Defendant Ramsey has served as Chairman of Sunoco LP's board since April 2015 and served on the USAC board since April 2018.

466.    "Conflicts of interest may arise because of the relationships among ETP, Sunoco LP, their general partners and [Energy Transfer].  [The Company's] general partner's directors and officers have fiduciary duties to manage [its] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] General Partner's directors are also directors and officers of ETP's general partner or Sunoco LP's general partner, and have fiduciary duties to manage the respective businesses of ETP and Sunoco LP in a manner beneficial to ETP, Sunoco LP and their respective Unitholders.  The resolution of these conflicts may not always be in [the Company's] best interest or that of [the Company's] Unitholders."  *See* Energy Transfer's Form 10-K, dated Feb. 24, 2017 at p. 39.

467.    "Conflicts of interest may arise because of the relationships among ETO, Sunoco LP, USAC, their general partners and [Energy Transfer].  [The Company's] General Partner's directors and officers have fiduciary duties to manage [the Company's] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] general partner's directors or officers are also directors and/or officers of ETO's general partner, Sunoco LP's general partner or USAC's general partner, and have fiduciary duties to manage the respective businesses of ETO, Sunoco LP and USAC in a manner beneficial to ETO, Sunoco LP, USAC and

their respective unitholders.  The resolution of these conflicts may not always be in [the Company's] best interest or that of [its] Unitholders."  *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 41.

    **F.**    **Defendant Anderson**

468.    Defendant Anderson is not independent or disinterested follow.  Defendant Anderson has served as a director of the General Partner since June 2018.  Defendant Anderson has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant Anderson signed, and thus personally made the false and misleading statements in the 2018 Form 10-K.  For these reasons, Defendant Anderson breached his duty of good faith and faces a substantial likelihood of liability.

469.    Defendant Anderson served as a member of the board of directors of Sunoco Logistics Partners L.P. from October 2012 until April 2017.

470.    "Conflicts of interest may arise because of the relationships among ETO, Sunoco LP, USAC, their general partners and [Energy Transfer].  [The Company's] General Partner's directors and officers have fiduciary duties to manage [the Company's] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] general partner's directors or officers are also directors and/or officers of ETO's general partner, Sunoco LP's general partner or USAC's general partner, and have fiduciary duties to manage the respective businesses of ETO, Sunoco LP and USAC in a manner beneficial to ETO, Sunoco LP, USAC and their respective unitholders.  The resolution of these conflicts may not always be in [the

Company's] best interest or that of [its] Unitholders." *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 41.

G.  **Defendant Brannon**

471.    Defendant Brannon is not independent or disinterested.  Defendant Brannon has served as a director of the General Partner since March 2016.  Defendant Brannon has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Further, Defendant Brannon signed, and thus personally made the false and misleading statements in the 2016 Form 10-K, the 2017 Form 10-K, and the 2018 Form 10-K.  For these reasons, Defendant Brannon breached his duty of good faith and faces a substantial likelihood of liability.

472.    Defendant Brannon also served on the board of directors and as a member of the audit committee and compensation committee of Sunoco.

473.    "Conflicts of interest may arise because of the relationships among ETO, Sunoco LP, USAC, their general partners and [Energy Transfer].  [The Company's] General Partner's directors and officers have fiduciary duties to manage [the Company's] business in a manner beneficial to [the Company] and [its] Unitholders.  Some of [the Company's] general partner's directors or officers are also directors and/or officers of ETO's general partner, Sunoco LP's general partner or USAC's general partner, and have fiduciary duties to manage the respective businesses of ETO, Sunoco LP and USAC in a manner beneficial to ETO, Sunoco LP, USAC and their respective unitholders.  The resolution of these conflicts may not always be in [the

Company's] best interest or that of [its] Unitholders." *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 41.

H. **Defendant Davis**

474. Defendant Davis is not independent or disinterested. Defendant Davis is a co-founder of the Company and has served as a director of the General Partner since July 2018. Defendant Davis has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Davis signed, and thus personally made the false and misleading statements in the 2018 Form 10-K. For these reasons, Defendant Davis breached his duty of good faith and faces a substantial likelihood of liability.

I. **Defendant Grimm**

475. Defendant Grimm is not independent or disinterested. Defendant Grimm has served as a director of the General Partner since October 2018. Defendant Grimm has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Grimm signed, and thus personally made the false and misleading statements in the 2018 Form 10-K. For these reasons, Defendant Grimm breached

his duty of good faith and faces a substantial likelihood of liability.

### J.      Defendant Washburne

476.    Defendant Washburne is not independent or disinterested.  Defendant Washburne has served as a director of the General Partner since April 2019.  As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, Defendant Washburne breached his duty of good faith and faces a substantial likelihood of liability.

### K.      The General Partner

477.    Defendant LE GP faces a substantial likelihood of liability as a result of its knowing engagement in the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to cause the Company to make false and misleading statements and omissions of material fact to the investors and the general public that falsely represented the Company's performance and value.  As the direct beneficiary and the primary controller of the above-alleged scheme, the General Partner benefited at the expense of the Company.  As the General Partner breached its duty of good faith to the Company and it faces a substantial likelihood of liability.

### L.      Defendants Warren, Long, Ramsey and Sturrock
####         – PennTex Midstream Partners, LP

478.    Defendant Warren served as the Chief Executive Officer of PennTex Midstream

Partners, LP's ("PennTex")[6] general partner from November 2016 to July 2017.

479.    Defendant Long served as the Chief Financial Officer and as a director of PennTex's general partner from November 2016 to July 2017.

480.    Defendant Ramsey served as President and COO and Chairman of the board of directors of PennTex's general partner from November 2016 to July 2017.

481.    Defendant Sturrock served as a Senior Vice President of PennTex's general partner, from November 2016 until July 2017, and as its Controller and Principal Accounting Officer from January 2017 until July 2017.

482.    By virtue of these business entanglements, the Board's own admission with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board.

**M.    Defendants Warren and Davis – Crosstex Energy, Inc.**

483.    Defendant Warren served as a director of Crosstex Energy, Inc. ("Crosstex") from 1996 to 2000 and as President and COO from 1993 to 1996.

484.    Defendant Davis served as a director of Crosstex from 1996 to 2000.

485.    By virtue of these business entanglements, the Board's own admission with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board.

**N.    Defendants Warren, Brannon and Davis – Cornerstone Natural Gas, Inc.**

486.    Defendant Warren served as President, COO and a director of Cornerstone Natural Gas, Inc. ("Cornerstone") from 1993 to 1996.

---

[6]    In June 2017, the Company acquired all of the publicly held PennTex common units through a tender offer and exercise of a limited call right.

487. Defendant Brannon served on the board of directors and as a member of the audit committee and compensation committee of Cornerstone.

488. Defendant Davis served as Chairman of the board of directors and Chief Executive Officer of Cornerstone from 1993 to 1996.

489. By virtue of these business entanglements, the Board's own admission with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board.

**O.    Defendants Long and Sturrock – Regency GP LLC**

490. Defendant Long served as Executive Vice President and CFO of Regency GP LLC ("Regency") from November 2010 to April 2015.

491. Defendant Sturrock served as Vice President and Controller of Regency from February 2008 and in November 2010 was appointed as the principal accounting officer. From June 2006 to February 2008, Defendant Sturrock served as the Assistant Controller and Director of financial reporting and tax for Regency.

492. By virtue of these business entanglements, the Board's own admission with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board.

**P.    Defendants Long, Ramsey, McCrea, Anderson, and Brannon – Sunoco LP**

493. Defendant Long has served as a director of Sunoco LP ("Sunoco") since May 2016.

494. Defendant Ramsey has served as Chairman of Sunoco LP's board since April 2015.

495. Defendant McCrea served as the Chairman of the board of directors of the general partner of Sunoco Logistics L.P. from October 2012 to April 2017.

496. Defendant Anderson served as a member of the board of directors of Sunoco

Logistics Partners L.P. from October 2012 until April 2017.

497.     Defendant Brannon formerly served on the board of directors and as a member of the audit committee and compensation committee of Sunoco.

498.     By virtue of these business entanglements, the Board's own admission with respect to certain directors' independence, as well as the substantial likelihood of liability faced by a majority of the Board.

**Q.     Defendants McCrea and Ramsey – LE GP, LLC**

499.     Defendants McCrea and Ramsey serve as directors of LE GP, LLC ("LE GP").

500.     Defendant "Warren may be deemed to own Common Units held by LE GP due to his ownership of 81.2% of its member interests. The voting and disposition of these Common Units is directly controlled by the board of directors of LE GP, LLC." *See* Energy Transfer's Form 10-K, dated Feb. 21, 2020 at p. 152.

**R.     Defendants Anderson, Brannon and Grimm – The Audit Committee**

501.     The Audit Committee Defendants (Anderson, Brannon and Grimm) each face a substantial likelihood of liability for their failure to take steps to ensure the Company's internal compliance with the law.  The Audit Committee Charter specifically charges the members of the Audit Committee with ensuring the Company's compliance with legal and regulatory requirements, and the Audit Committee Defendants violated their duties of loyalty and good faith by failing to take adequate steps to ensure such compliance.

**S.     Defendants Warren, Long, McReynolds, McCrea,
          Ramsey, Anderson, Brannon, Davis and Grimm**

502.     Defendants Warren, Long, McReynolds, McCrea, Ramsey, and Brannon each signed the false and misleading 2016 Form 10-K, 2017 Form 10-K and 2018 Form 10-K, which falsely represented that (i) the construction permits issued in connection with the Mariner East

Pipeline were obtained by the Company through the use of coercion, bribery, or other improper methods; (ii) the use of such improper methods increased the risk that the Company would be subjected to government or regulatory investigations and/or litigation; and (iii) the Company failed to maintain internal controls. Defendants Anderson, Davis, and Grimm signed the 2018 Form 10-K, which contained the same false and misleading statements as in the 2016 Form 10-K and 2017 Form 10-K.

## XIV. CAUSES OF ACTION

### COUNT I

### (Against Defendants For Breach Of Good Faith)

503. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

504. Defendants owe Energy Transfer a duty of good faith.

505. Defendants violated and breached their duty of good faith by acting against Energy Transfer's best interests as set forth above.

506. Defendants violated and breached their duty of good faith because they believed they were acting against Energy Transfer's best interests in committing the misconduct set forth above.

507. Defendants violated and breached their duty of good faith because they knew they were acting against Energy Transfer's best interests in committing the misconduct set forth above.

508. Defendants violated and breached their duty of good faith because they should have known that their reckless behavior in committing the misconduct set forth above was acting against Energy Transfer's best interests.

509. Defendants violated and breached their duty of good faith because they consciously

disregarded their duty to form a proper subjective belief that their behavior in committing the misconduct set forth above was acting against Energy Transfer's best interests.

510.    In breach of their duty of good faith, Defendants willfully or recklessly caused Energy Transfer to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and make false and misleading statements and omissions of material fact that failed to disclose that: (i) the construction permits issued in connection with the Mariner East Pipeline were obtained by Energy Transfer through the use of coercion, bribery, or other improper methods; (ii) the use of such improper methods increased the risk that Energy Transfer would be subjected to government or regulatory investigations and/or litigation; and (iii) Energy Transfer failed to maintain internal controls.

511.    As a direct and proximate result of Defendants' failure to abide by their duty of good faith, Energy Transfer has sustained significant damages.  As a result of the breach of the duty of good faith alleged herein, Defendants are liable to Energy Transfer.

512.    As a direct and proximate result of Defendants' breach of their duty of good faith, Energy Transfer has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending a securities lawsuit, severe damage to the unit price of Energy Transfer, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against Defendants For Unjust Enrichment)

513.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

514.    By their breach of their duty of good faith through their wrongful acts, violations

of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Energy Transfer.

515.   Defendants either benefitted financially from their breach through the receipt of bonuses, unit options, or similar compensation from the General Partner that was tied to the performance or artificially inflated valuation of Energy Transfer, or received compensation that was unjust in light of Defendants' lack of good faith conduct.

516.   Plaintiff, as a unitholder and a representative of Energy Transfer, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their duty of good faith.

## COUNT III

### (Against Defendants For Abuse Of Control)

517.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

518.   Defendants' lack of good faith allowed them to abuse their ability to control and influence Energy Transfer.

519.   As a direct and proximate result of Defendants' actions, Energy Transfer sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to Energy Transfer.

## COUNT IV

### (Against Defendants For Waste Of Corporate Assets)

520.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

521.     As a result of the foregoing, and by failing to properly consider the interests of Energy Transfer and its public Unit holders, Defendants have caused Energy Transfer to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust Energy Transfer.

522.     As a result of the waste of corporate assets, Defendants are each liable to Energy Transfer.

**COUNT V**

**(Against Defendants For Indemnification And Contribution)**

523.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

524.     The misconduct of Defendants described above has exposed Energy Transfer to significant liability under various federal and state laws.

525.     Energy Transfer is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

526.     Defendants have caused Energy Transfer to suffer substantial harm through their misconduct.

527.     Energy Transfer is entitled to contribution and indemnification from Defendants in connection with all such claims that have been, are, or may be asserted against Energy Transfer by virtue of Defendants' misconduct.

**XV.     REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law in all respects;

B.      Awarding, against Defendants and in favor of Energy Transfer, the damages sustained by Energy Transfer as a result of Defendants' breaches of their duty of good faith;

C.      Directing Energy Transfer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Energy Transfer and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

1.      a proposal to strengthen Energy Transfer's internal controls;

2.      a proposal to strengthen Energy Transfer's communications and disclosures;

3.      a proposal to strengthen Energy Transfer's oversight of its disclosure procedures; and

4.      a proposal to strengthen Energy Transfer's controls over financial reporting;

D.      Awarding Plaintiff judgment on each and every Count;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## XVI.   <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

DATED: July 15, 2020

**LAW OFFICES BERNARD M. GROSS, P.C.**


By:  */s/ Susan R. Gross*
      Susan R. Gross, Esq.
Two Penn Center, Suite 1820
1500 John F. Kennedy Blvd
Philadelphia, PA 19102
Telephone: (215) 561-3600
Facsimile: (215) 561-3000
Email: susang@bernardmgross.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, DONNA HARRIS, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ____ day of January 2020.

DONNA HARRIS